- - -

        IN THE UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF OHIO

                  EASTERN DIVISION

                        - - -

Queen Tiera R. Miller,        )
                Plaintiff,    )
     vs.                      ) Case No. 1:19-cv-01080-DCN
City of Shaker Heights, Ohio, )
et al.,
                              )
                Defendants.   )
                              )
                        - - -

        DEPOSITION OF OFFICER TYLER SMITH

             FRIDAY, NOVEMBER 1, 2019

                        - - -

The deposition of OFFICER TYLER SMITH, a Defendant herein, called by the Plaintiff for examination under the Federal Rules of Civil Procedure, taken before me, Ivy J. Gantverg, Registered Professional Reporter and Notary Public in and for the State of Ohio, by agreement of counsel and without further notice or other legal formalities, at the offices of Mazanec, Raskin & Ryder, 100 Franklin's Row, 34305 Solon Road, Cleveland, Ohio, commencing at 9:13 a.m., on the day and date above set forth.

1  Q      So talk me through, in as much detail as you can
2  remember, the stop involving Queen Miller on the 21st of
3  September, 2018.
4  A      I observed a vehicle with a violation, window tint,
5  it was black, I couldn't see in at all.  That's what first
6  alerted me.  And I ran the plate on my computer.  The
7  driver -- or the owner, I should say, came back with a
8  warrant.  And then I initiated a traffic stop on the
9  vehicle because of both of those violations.
10 Q      Okay.  Keep going.  So when you initiated the
11 traffic stop, you activated your lights, right?
12 A      Lights, siren, yes.
13 Q      And the car pulled over?
14 A      Yes.
15 Q      What happened next?
16 A      Pulled over on Shelburne, just east of Warrensville
17 Center.  And I got out of the vehicle, introduced myself
18 as a police officer, and the reason for the stop.  It was
19 not the owner operator, it was another female driver
20 operator.
21 Q      Okay.  What happened next?
22 A      Let's see.  I went -- another unit arrived, Officer
23 Meredith, Number 59.  At night, we always have another
24 officer come.  So she came, and she was my assist officer.
25 Q      So she wasn't riding in the vehicle with you?

1  A      No, she was not.
2          And I found out that the owner and the passenger, I
3  think, both had warrants, if I remember right.  I think we
4  detained the driver, and we tried to send what's called a
5  warrant confirmation request to, I think it was East
6  Cleveland, or maybe it was Berea, one of the cities, I
7  don't remember which one.
8          Whatever city it was, they couldn't pick her up due
9  to manpower, I think it was, they didn't have enough
10 people working.  So she was advised on that.
11         The driver's license -- the operator's license was
12 suspended.  And so I asked Officer Meredith to write the
13 passenger, who was the owner, Queen, to write her a
14 citation for wrongful entrustment, for letting one drive
15 without a license.
16 Q       So let me ask you, Officer Smith, you arrived on
17 scene, and I viewed the video.
18 A       Okay.
19 Q       I think it's a dash cam, and there was some body
20 cam, too, right?
21 A       Yes.
22 Q       And you pulled over the vehicle, as you stated, and
23 then you walked up.
24         And when you're pulling somebody over, you address
25 the person driving the vehicle, and if there's somebody

```
 1  else, right, when you approach them?
 2  A     Right.
 3  Q     When you approached the car, did you recognize
 4  Queen?
 5  A     No.
 6  Q     So --
 7  A     I didn't even see her.
 8  Q     Okay.  So you walked up and you saw the driver, and
 9  you weren't able to see --
10  A     Yeah, I just saw -- as long as I can see the
11  passenger's hands, I'm cool.  I don't believe I even
12  acknowledged her until later on, when I asked her why she
13  was letting someone drive without a license, when she had
14  a valid license.
15            MR. McLANDRICH:  Can we take a couple minute
16        break?
17            MR. KLEBANOW:  Can I ask this line of
18        questioning, first, or do you want to take the
19        break immediately?  I'd like to finish the line of
20        questioning.  But if it's an emergency room, or if
21        there's a real reason, I guess we can, but I'd like
22        to finish my line of questioning.
23            MR. McLANDRICH:  Go ahead, finish.
24            MR. KLEBANOW:  I'll be brief, if you need to
25        take a break.
```

BY MR. KLEBANOW:

Q   Officer Smith, so you had stated right off the bat, you walked up and you were addressing the driver, who was not Queen Miller.

A   Right.

Q   And then at some point during the stop, you did begin to interact and speak with Queen Miller, who was in passenger seat, right?

A   Right.

Q   When you started speaking with Queen, did you immediately recognize her?

A   No.

Q   Did you recognize her at all?

A   No.

Q   So this is somebody that you had sex with just a few years prior, but you didn't remember her; is that correct?

A   A few years, yes.

Q   Okay, so if you can continue on with what happened. Keep going.

    You said you think you had detained the driver, you had called for a warrant check, and they didn't want them because of a manpower issue.

A   The driver was hysterically crying, talking about how she didn't want to go to jail, and could I just let

```
 1  her go.
 2          I told her it was going to be okay, tried to
 3  reassure her of that, because she was crying like crazy in
 4  the seat, and I was trying to help her to realize, you
 5  know, they may not even want you, which they ended up not
 6  wanting her.
 7  Q      And then, at some point, you began addressing
 8  Queen's issue, right?
 9  A      Yes.
10  Q      Because there was a citation issued by Shaker for a
11  wrongful entrustment, you said?
12  A      Yes, Officer Meredith wrote the citation.
13  Q      But you interacted and spoke with Queen numerous
14  times during the stop, right?
15  A      Right.
16  Q      At any point during the stop, did you recognize
17  her?
18  A      I recognized that -- I remembered her from
19  somewhere, but I did not know where at the time.
20  Q      Do you remember at what point you remembered that
21  she was someone that you had slept with?
22  A      I remembered that after the stop, when we got --
23  after the restaurant, when we got to the restaurant.
24  Q      So at no point during the stop did you remember
25  her?
```

89

**MORSE, GANTVERG & HODGE**

1  BY MR. KLEBANOW:
2  Q     Officer Smith, what I was asking you right before
3  the break is about your phones, and you had indicated that
4  you have gotten a new phone since your encounter at the
5  East Cleveland gas station with Queen Miller, and you had
6  indicated that some of the numbers transferred, but you
7  weren't sure if all of them transferred; is that accurate?
8  A     Yeah, that's accurate.
9  Q     The stop with Queen Miller and one other individual
10 was around 3:00 in the morning on the 21st of September,
11 2018.  Does that sound right?
12 A     It sounds right.
13            (Thereupon, Plaintiff's Exhibit 6 (Smith) was
14            marked for identification.)
15 BY MR. KLEBANOW:
16 Q     Officer Smith, you've been handed what's been
17 marked are Plaintiff's Exhibit 6.  Do you recognize this
18 document?
19 A     Yes.
20 Q     What is that document?
21 A     It's a City of Shaker Heights traffic citation.
22 Q     And this was the ticket that you had referenced
23 earlier that Queen Miller received regarding the wrongful
24 entrustment?
25 A     Yes.

```
 1  Q      Okay, around what time do you remember it being?
 2  A      Maybe like 4:00.
 3  Q      So around 4:00 a.m., everyone had left the scene?
 4  A      Yeah.  Somewhere around there, yes.
 5  Q      Were you working -- presumably you were working the
 6  night shift?
 7  A      Yes.
 8  Q      And what time does that shift end?
 9  A      That shift ends at 6:00 a.m.  For me, it ended at
10  5:00 a.m.
11  Q      For you, it ended at 5:00 that day, or it always
12  ends for you at 5:00?
13  A      That day.
14  Q      Why did it end at 5:00 that day?
15  A      Because I was the early car that day.
16  Q      What does it mean to be the early car?
17  A      It means you arrive an hour earlier, before the
18  rest of the shift does, to overlap the previous shift by
19  an hour.
20  Q      And then you get to leave an hour earlier?
21  A      Yes.  But you take all the calls, so that the
22  previous shift doesn't have to be held over for overtime.
23  There's two early cars.
24  Q      Did you have any calls come in that you responded
25  to in between Queen's and when you got off work that day?
```

A     I don't believe so.

Q     You don't --

A     Say that again.

Q     No problem.

A     Calls for service?

Q     Yeah. So what I mean is -- when I say that, and my terminology might not be correct, that you'd get a phone call -- not a phone call -- you'd get a call over the radio if there was an issue in Shaker and you have to respond to it, right?

A     Right.

Q     Or if you're driving on the roads and you see someone driving erratically, or they're speeding, or they run a stop sign, you would pull them over, right?

A     Right.

Q     In between around 4:00 a.m., when you told me that Queen left the scene and the stop ended, and you said you got off around 5:00, did you respond to any calls or initiate any stops between 4:00 and 5:00?

A     I don't recall, but I don't believe so.

Q     What did you do right when you got off work that day?

A     Turned in my tickets that I wrote that day. I went into the roll call room -- I'm sorry -- the report writing room, turned in all my paperwork from that day. Cleaned

1  my car out.  What I mean by that is, gathered all my
2  stuff, my bags, work bags, jacket, and made the car ready
3  for the next officer to come on shift.
4  Q     And you left around 5:00 a.m. from the Shaker
5  Heights police station?
6  A     Yes.
7  Q     And you got into your personal vehicle which was
8  parked there?
9  A     Yes.
10 Q     What did you do right after that?  So you got in
11 your car.  Where did you go?
12 A     I was heading home.
13 Q     Where do you live?  Or where did you live, I should
14 say, at the time?
15 A     I lived on the west side, in Strongsville.
16 Q     Did you make it home?
17 A     Eventually, yes.
18 Q     Did you make it home directly from the police
19 station?
20 A     No.
21 Q     So where did you go -- strike that.
22       Did you call anybody when you got off work?
23 A     No.
24 Q     You didn't call anybody?
25 A     No.

```
                          CERTIFICATE
State of Ohio,        )
                      ) SS:
County of Cuyahoga.   )
```

1. CERTIFICATE
2. State of Ohio, )
3. ) SS: County of Cuyahoga. )

        I, Ivy J. Gantverg, Registered Professional Reporter and Notary Public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the above-named OFFICER TYLER SMITH, was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the deposition as above set forth was reduced to writing by me by means of stenotype, and was later transcribed into typewriting under my direction by computer-aided transcription; that I am not a relative or attorney of either party or otherwise interested in the event of this action.

        IN WITNESS WHEREOF, I have hereunto set my hand and seal of office at Cleveland, Ohio, this 6th day of December, 2019.

_____
Ivy J. Gantverg, Notary Public
in and for the State of Ohio,
Registered Professional Reporter.
My Commission Expires November 5, 2023.

**MORSE, GANTVERG & HODGE**