1                              - - -

2               IN THE UNITED STATES DISTRICT COURT

3                    NORTHERN DISTRICT OF OHIO

4                        EASTERN DIVISION

5                              - - -

6    Queen Tiera R. Miller,         )

7                      Plaintiff,   )

8         vs.                       ) Case No. 1:19-cv-01080-DCN

9    City of Shaker Heights, Ohio,  )
     et al.,
10                                  )

                      Defendants.   )
11                                  )

12                             - - -

13            DEPOSITION OF OFFICER TYLER SMITH

14               FRIDAY, NOVEMBER 1, 2019

15                             - - -

16   The deposition of OFFICER TYLER SMITH, a Defendant herein,

17   called by the Plaintiff for examination under the Federal

18   Rules of Civil Procedure, taken before me, Ivy J.

19   Gantverg, Registered Professional Reporter and Notary

20   Public in and for the State of Ohio, by agreement of

21   counsel and without further notice or other legal

22   formalities, at the offices of Mazanec, Raskin & Ryder,

23   100 Franklin's Row, 34305 Solon Road, Cleveland, Ohio,

24   commencing at 9:13 a.m., on the day and date above set

25   forth.

```
 1    APPEARANCES:

 2    On Behalf of the Plaintiff:

 3          Jared S. Klebanow, Esq.
            Klebanow Law
 4          850 Euclid Avenue - Suite 701
            Cleveland, Ohio  44114
 5          jklebanow@klebanowlaw.com

 6    On Behalf of Defendant City of Shaker Heights, Ohio:

 7          Steven D. Strang, Esq.
            Gallagher, Sharp
 8          Bulkley Building - Sixth Floor
            1501 Euclid Avenue
 9          Cleveland, Ohio  44115
            sstrang@gallaghersharp.com
10
      On Behalf of Tyler Smith:
11
            John T. McLandrich, Esq.
12          Mazanec, Raskin & Ryder
            100 Franklin's Row
13          34305 Solon Road
            Cleveland, Ohio  44139
14          jmclandrich@mrrlaw.com

15    Also Present:

16          Commander John Cole

17

18

19

20

21

22

23

24

25
```

MORSE, GANTVERG & HODGE

1                              WITNESS INDEX

2                                                          PAGE

3    OFFICER TYLER SMITH
     Cross Examination
4    By Mr. Klebanow                                          4

5    Cross Examination
     By Mr. Strang                                          166
6

7                              EXHIBIT INDEX

8    EXHIBIT                                              PAGE

9    Plaintiff's (Smith) Exhibit 1                          34
     Plaintiff's (Smith) Exhibit 2                          35
10   Plaintiff's (Smith) Exhibit 3                          38
     Plaintiff's (Smith) Exhibit 4                          44
11   Plaintiff's (Smith) Exhibit 5                          55
     Plaintiff's (Smith) Exhibit 6                          93
12   Plaintiff's (Smith) Exhibit 7                         133
     Plaintiff's (Smith) Exhibit 8                         139
13   Plaintiff's (Smith) Exhibit 9                         143

14

15

16

17

18

19

20

21

22

23

24

25

                    **MORSE,  GANTVERG  &  HODGE**

1                          OFFICER TYLER SMITH

2 the deponent herein, called for examination under the

3 Rules, having been first duly sworn, as hereinafter

4 certified, was deposed and said as follows:

5                         CROSS EXAMINATION

6 BY MR. KLEBANOW:

7 Q     Good morning, Officer Smith.  My name is Attorney

8 Jared Klebanow.  I represent the plaintiff in this lawsuit

9 that's been filed against yourself and the City of Shaker

10 Heights.

11 A     Good morning.

12 Q     Can you state your full name and spell it for the

13 court reporter, please.

14 A     Tyler, T-Y-L-E-R, last name Smith, S-M-I-T-H.

15 Q     Officer Smith, have you ever had your deposition

16 taken before?

17 A     No, I have not.

18 Q     So I want to go over some ground rules of a

19 deposition before we start.  First and foremost, what a

20 deposition is, it's an opportunity for me to ask you some

21 questions under oath, and get your responses to those

22 questions.

23       During the process, I'll ask you questions, and I

24 ask that you do your best to wait for me to finish my

25 question before you start your answer.  I'm going to do

```
 1   the same for you, I'll do my best to wait for you to

 2   finish your response before I ask a question, okay?

 3   A      Okay.

 4   Q      The reason for that is, the court reporter, who is

 5   sitting next to us, is taking everything that we're saying

 6   down, and if we talk over each other, even if it's

 7   inadvertent, it's tough for her to catch everything we're

 8   saying.

 9   A      I understand.

10   Q      If I ask you a yes or no question, I ask that you

11   respond with a yes or a no.  It's easy to say uh-huh, or

12   uh-uh, or shake your head, but again, it's tough for the

13   court reporter to decipher what that is, okay?

14   A      Okay.

15   Q      If at any point you need to take a break today,

16   it's completely fine, you can ask me, you can ask your

17   counsel to take a break.  The only rule being that if I

18   ask you a question, I ask that you answer it before we

19   take the break.

20   A      Okay.

21   Q      Are you on any medications today that would affect

22   your ability to testify honestly?

23   A      No.

24   Q      Are you on any medications today that would affect

25   your ability to remember things?
```

```
 1   A       No.
 2   Q       What did you do to prepare for your deposition
 3   today, other than speak with your counsel?
 4   A       I spoke with my wife, I spoke to my pastor.  That
 5   was it.
 6   Q       What did you speak to your pastor about?
 7               MR. McLANDRICH:  That's privileged.
 8               MR. KLEBANOW:  Are you instructing him not to
 9           answer the question?
10               MR. McLANDRICH:  Yeah.
11   BY MR. KLEBANOW:
12   Q       Did you review any documents?
13   A       No.
14   Q       You didn't look at anything to prepare for today?
15   A       No.
16   Q       Officer Smith, where are you originally from?
17   A       Cleveland.
18   Q       You were born in Cleveland?
19   A       Yes.
20   Q       Where did you go to school, high school?
21   A       St. Peter Chanel.
22   Q       You graduated?
23   A       Yes.
24   Q       And college?
25   A       I went to the University of Akron.
```

1    Q      Did you graduate?

2    A      Yes.

3    Q      With what degree?

4    A      I double majored in criminal justice and political

5    science.

6    Q      What year did you graduate?

7    A      2012.

8    Q      Have you ever been arrested before?

9    A      No.

10   Q      Have you ever been sued before?

11   A      No.

12   Q      Have you ever sued anyone before?

13   A      No.

14   Q      How old are you?

15   A      Twenty-nine.

16   Q      I want to talk a little bit about your relationship

17   history.  How many girlfriends have you had in the past?

18          MR. McLANDRICH:  Objection.  What's the

19          relevance of this?

20          MR. KLEBANOW:  You can state your speaking

21          objection for the record, if you --

22          MR. McLANDRICH:  I just want to know whether

23          we're going to get into a harassing line of

24          questioning that indicates to me to contact the

25          court, before we waste too much time, or whether we

1          can have a discussion about it.

2                  MR. KLEBANOW:  Go off the record for a minute.

3                  (Thereupon, a discussion was had off the

4          record.)

5                  MR. KLEBANOW:  Go back on.

6                  MR. McLANDRICH:  Go ahead, Tyler, answer his

7          question.

8     A     Can you repeat the question?

9     Q     Oh, no problem at all.

10         I asked you to talk a little bit about your

11    relationship history, and how many girlfriends you've had

12    in the past.

13                 MR. McLANDRICH:  Define what a girlfriend is.

14    Q     Somebody that you deemed to be your girlfriend.

15    And you can tell me what that means, if you'd like to.

16    A     I'd say between three and five.

17    Q     Do you consider Queen Miller to be one of those

18    former girlfriends?

19    A     No.

20    Q     No?

21    A     No.

22    Q     How many women do you think you've had sex with in

23    the past?

24    A     I don't remember.

25    Q     More than five?

```
 1   A      Probably more than five.

 2   Q      More than ten?

 3   A      I don't remember.

 4   Q      So more than five, and you're not sure the number

 5   after that?

 6   A      I don't remember.

 7   Q      More than 25?

 8   A      I don't remember.

 9   Q      More than a hundred?

10   A      I don't remember.

11   Q      Okay, more than a thousand?

12          I understand you're saying you don't remember.  At

13   some point right now, you would acknowledge that you

14   haven't slept with a thousand women?  Maybe you have.  I'm

15   just trying to narrow it down.

16          I'm not trying to trick you, or ask you anything

17   that you don't understand.  I'm just trying to bracket the

18   number.

19          So I understand you're saying more than five, and

20   I'm trying to get to a number that you don't think it was

21   on the top end, that's all I'm trying to do.

22   A      No, I don't think it was that many.  That's a

23   little excessive.

24   Q      So somewhere between five and a thousand?  Or is

25   there a lower number that you think you could give me?
```

```
1    A      It's lower, but I don't remember the number.

2    Q      Have you ever cheated on a girlfriend before?

3    A      No.

4    Q      Have you ever cheated on your wife before?

5    A      Yes.

6    Q      Was that with Queen Miller?

7    A      Yes.

8    Q      After you graduated from the University of Akron,

9    what was your first job?

10   A      I worked at a funeral home.

11   Q      And when did you start doing that?

12   A      When I was about 14.

13   Q      How long did you have that job?

14   A      Until about a few years ago.

15   Q      Why did you leave that job?  Or were you terminated

16   from your employment?

17   A      I left by choice.

18   Q      Why did you leave?

19   A      I became a police officer.

20   Q      So you went directly from working at the funeral

21   home to your first job as a police officer?

22   A      No, it overlapped a little bit.

23   Q      So you were working both at the funeral home and as

24   a police officer?

25   A      That's correct.
```

1   Q      Where was your first job as a police officer?

2   A      East Cleveland, Ohio.

3   Q      When did you start there?

4   A      In 2013, I believe it was.  Yeah, 2013.

5   Q      I want to talk about some of the training that you

6   received at East Cleveland, okay?

7   A      Okay.

8   Q      Talk to me generally about what type of training

9   you received.

10  A      Prior to East Cleveland?  Because I went to the

11  Police Academy.

12  Q      Sure, let's talk about that.  So when did you go to

13  the Police Academy?

14  A      In the beginning of 2013.

15  Q      Okay.  What kind of training was provided at the

16  Police Academy?

17  A      Physical training, mental training, you go over

18  laws, mostly traffic laws, those kind of things.

19  Q      Do they train you in any way at the Police Academy

20  about whether or not it's right to have a relationship

21  with somebody that you've been involved in either stopping

22  or arresting, is there any training of that sort?

23  A      No.

24  Q      Are you trained in the Fourth Amendment in any way?

25  A      Yes.

```
1    Q      Do you know what the Fourth Amendment --

2    A      Well, are you talking, at the Police Academy?

3    Q      At the Academy.

4    A      No.

5    Q      What about the Fourteenth Amendment?

6    A      No.

7    Q      Do you know what the Fourth Amendment is?

8    A      That's search and seizure.

9    Q      I'm sorry?

10   A      The right to search and seizure.

11   Q      What does that mean to you?

12          MR. McLANDRICH:  Objection.  You can answer.

13   A      To me, it means -- I guess, in my opinion, when you

14   can search and seize someone, just what it says.

15   Q      Do you think the Fourth Amendment has anything else

16   to do with anything other than searching somebody?

17   A      I'm sure it does.

18   Q      Do you know what that is?

19   A      I'd have to reread it.

20   Q      You said that there was mental training, is the

21   word you used, at the Police Academy.  What type of mental

22   training?

23   A      When I said mental, I meant that there's training

24   as far as -- so there's scenario-based trainings, as far

25   as like traffic stops, as far as shootings, as far as
```

1    people with mental health.  It's not so much mental, it's

2    more of being able to go over those things, so it's not

3    the first time -- when you inherit those things in the

4    field, it's not the first time you discover those things.

5         I don't mean mental, like they study your brain or

6    something.

7    Q    Any other training you received at the Police

8    Academy?

9    A    Sure.  We're trained in firearms, trained in

10   driving.  We're trained in -- mostly laws, about Ohio

11   laws.

12   Q    What about using citizens' data or information for

13   personal use, any training on that at the Police Academy?

14   A    Not at the Police Academy.

15   Q    LEADS training, not at the Police Academy?

16   A    No.

17   Q    What about training at East Cleveland, so let's

18   talk about that.

19   A    Uh-huh.

20   Q    Was there any different type of training that you

21   received at East Cleveland that you had not already

22   received at the Academy?

23   A    Different type?  What do you mean by different

24   type?

25   Q    Sure.  For example, the question I just asked you

1    about keeping citizens' data private.  Was there any

2    training on that at East Cleveland?

3    A      There was no ten or eight hour block of training,

4    like it would be for other types of training.  But there

5    was mention of it.

6            And when I was in training, in the training

7    program, FTO program, it was mentioned by my training

8    officer, both my training officers.

9    Q      What about LEADS?  Any LEADS training at East

10   Cleveland?

11   A      The same thing, yes.

12   Q      Was there any training on professionalism, in

13   general, at East Cleveland?

14               MR. McLANDRICH:  Objection.  You can answer.

15   A      Yes.

16   Q      Was that formal training, or as you had called it,

17   kind of informal training?

18   A       It was formal to the extent that we had, again,

19   like scenarios.  My training officer went over different

20   scenarios to try to reenact situations, I guess as a

21   preventive measure type of thing, for training.

22   Q      Going back to your relationship history really

23   quick, have you ever been in a relationship with anybody

24   that you've ever cited, while you were a cop?

25   A      No.

```
 1   Q      How about, have you been in a relationship with
 2   anyone you've ever arrested, as a cop?
 3   A      No.
 4   Q      Are you friends with anybody that you've ever
 5   cited, as a police officer?
 6   A      No.
 7   Q      Are you friends with anyone that you've ever
 8   arrested, as a police officer?
 9   A      Yes.  Not that I arrested, but that my partner has
10   arrested.
11   Q      Were you involved in any way in the stop, or
12   bringing them to the station, or anything like that?
13   A      Yes.
14   Q      Who is that person?
15   A      I don't remember his name.  We're not friends
16   anymore.  It's somebody I went to high school with.  It
17   was a mutual friend.
18   Q      You don't remember their first name?
19   A      I don't.
20   Q      You don't remember their last name?
21   A      I don't.
22   Q      So it's somebody that you used to be friends with,
23   that you were involved in their arrest in one way or
24   another, but you don't remember anything about their name?
25   A      Correct.
```

```
 1   Q      Who is the mutual friend's name?

 2   A      His name was Marcelus.

 3   Q      What's his last name?

 4   A      I don't know his last name.

 5   Q      So that's your current friend named Marcelus, and

 6   you don't remember his last name?

 7   A      He's not my current friend.

 8   Q      So it's an old mutual friend?

 9   A      Correct.

10   Q      And you remember his first name, but not his last

11   name?

12   A      That's correct.

13   Q      Do you remember any part of his last name?

14   A      No.

15   Q      What year was that in?

16   A      When I was in East Cleveland, when I first -- near

17   when I first started.

18   Q      Around 2013?

19   A      Yeah, in 2013.

20   Q      Did you ever receive any discipline while you were

21   working at East Cleveland?

22   A      No.

23   Q      Formal or informal discipline, you never received

24   any?

25   A      What do you mean by informal?  Like not on paper,
```

1   or just talked?  What do you mean?

2   Q       Sure.  And if there is none, you can tell me.

3           Of course, you know what formal discipline would

4   be, right, where you would go through the process of being

5   disciplined or investigated by a department or a city.

6           Informally, what I mean is, if there is some sort

7   of verbal warning that you could get, or something that

8   wouldn't be documented.

9   A       When you say, investigated, does that mean

10  discipline by itself, or are you talking about --

11  Q       I can clear that up.

12          So you can receive discipline, right?  So if

13  somebody would accuse you of wrongdoing, there may be an

14  investigation, and if the department or the investigator

15  would find you, I'll use the term, guilty, or liable,

16  whatever you're being accused of, then you could be

17  subject to discipline, which could include suspension, or

18  being terminated, and so on, and so forth, right?

19  A       Yes.

20  Q       What I'm asking you is -- you understand that --

21  A       I understand that.

22  Q       -- and you're saying you have not received that at

23  East Cleveland?

24  A       I have not received that.

25  Q       Did you receive any sort of informal discipline,

1    where maybe somebody came and sat you down, and spoke to

2    you, and gave you a verbal warning that would not appear

3    in any document?

4    A      No.

5    Q      Were you ever accused of any wrongdoing while you

6    were working for the City of East Cleveland?

7    A      No.

8    Q      Not by a citizen?

9    A      No.

10    Q      And not by any other police officer or

11    administrator at East Cleveland?

12    A      No.

13    Q      Was there ever an investigation into any conduct

14    that you had done while at East Cleveland, that you're

15    aware of?

16    A      No.

17    Q      At some point, you left the East Cleveland Police

18    Department; is that right?

19    A      That's correct.

20    Q      What year was that?

21    A      2015.

22    Q      Why did you leave?

23    A      I didn't make enough money to make ends meet.

24    Q      Your decision completely?  You weren't terminated

25    or asked to leave?

1    A      Correct, my total decision.

2    Q      And it was solely financial, was the reason for

3    leaving?

4    A      It was financial, and there wasn't a lot of help.

5    What I mean by that is, I got a lot of shifts where it was

6    just me and maybe one other person on the road, and I

7    didn't feel safe anymore.  It was kind of dangerous.

8    Q      Did you ever have any incident that made you feel

9    unsafe?  So other than generally, you're saying, where you

10   don't feel there was enough assistance, did something ever

11   happen to you when you were working at East Cleveland that

12   made you feel unsafe?

13   A      Besides getting shot at?  No.

14   Q      Did you actually get shot, or just shot at?

15   A      Shot at.  And then all the fights that I've had to

16   do.

17   Q      You mean fights that you've broken up?

18   A      No, fights that I was involved in -- well, yeah,

19   trying to break up a fight, of other people fighting, and

20   we were outnumbered.

21   Q      You weren't fighting somebody, you were trying to

22   break up a fight?

23   A      Yeah.  Responding to a call of a fight, and got

24   involved, and outnumbered.

25   Q      Did you file or submit an application to Shaker

1   Heights?

2   A       Yes.

3   Q       Were you referred to Shaker by anybody, or did you

4   just find an opening and decide to apply?

5   A       I found an opening.  I found out they were doing a

6   lateral transfer, a Civil Service lateral transfer, and I

7   applied for that.

8   Q       Where did you see that?

9   A       I saw that online, and by word of mouth.  I do know

10  people there.

11  Q       Briefly talking about the hiring process at Shaker,

12  so you submit an application.  What happened next?

13  A       I'm trying to think.  I got a phone call from HR, I

14  believe it was HR, and they scheduled -- someone from the

15  department or the City scheduled an interview, and asked

16  me if I was still interested, and I told them yes.  And

17  they gave me a date and time, asked me if I could make it,

18  and I said yeah.

19  Q       How many interviews did you have?

20  A       With the City themselves?

21  Q       The police department.  I'm not sure if you

22  interviewed with the Mayor, if you interviewed with the

23  Police Chief, if you interviewed with an internal

24  investigator.  How many interviews did you have, and who

25  were they with, if you remember?

1  A     I would say between -- I'd say between four and

2  six.

3  Q     Do you remember who they were with?

4  A     Yes.  I remember most of them.

5  Q     Can you tell me who, the ones you remember?

6  A     One was with a Sergeant Allison, from Shaker.  One

7  was a panel interview, where there were several officers

8  and supervisors.  I don't remember everybody who was in

9  the interview.

10 Q     Okay.

11 A     One was with a company that they use.  I don't

12 remember the name of the company, but it's a company they

13 use for -- I'm not sure what they use it for.  They're out

14 in Bainbridge.

15 Q     Okay.

16 A     There's another company -- eventually, I did

17 interview with the Mayor -- or not the Mayor -- the Chief.

18 Q     And at some point, you were hired on as a patrol

19 officer?

20 A     Yes.

21 Q     When you came on to Shaker, what training did

22 Shaker provide you?

23 A     Initially, we started off with firearms training.

24 Q     Okay.

25 A     That was the very first training, as well as

1    classroom training that was parallel to that firearms.

2    Q       What's in the classroom training?

3    A       So in the classroom, you go over traffic stop

4    scenarios, you go over types of calls that they get

5    usually in general.  We'd go over traffic accidents.

6    Diversity --

7    Q       Was there any -- I'm sorry.

8    A       Diversity training.

9    Q       Okay.

10   A       I said firearms.

11           There was also a training on a type of officer they

12   expect you to be, in general, while working at Shaker.

13   Q       Like professionalism?

14   A       Sure.

15   Q       Was there any training about keeping citizens' data

16   private, specifically?

17   A       There was -- again, it wasn't like a block training

18   on it, but it was discussed with both my training

19   officers.

20   Q       Would you consider it informal training?

21   A       Yes.

22   Q       What about LEADS?  Did you have any LEADS training

23   at Shaker?

24   A       Yes.

25   Q       Is that formal or informal?

1    A      It's both.

2    Q      So you had a block class about it, and then you

3    also were counseled about it?

4    A      Yes, you had to take a LEADS test before you could

5    get LEADS certified.

6    Q      Did you pass that LEADS test?

7    A      Yes.

8           I already had -- LEADS carries over from the prior

9    city, and then I retook the test and passed.

10   Q      Was there any training that you were permitted by

11   the City of Shaker to not attend or not do because you had

12   already done it at East Cleveland?

13          Do you understand my question?

14               MR. STRANG:  Objection.

15   A      No.

16   Q      Let me explain.  So for example, was there any

17   required training at Shaker -- and I'll just make up an

18   example.  Let's say there was LEADS training -- and I'm

19   not using this as a specific example -- and they said, you

20   don't have to do it at Shaker because you've already done

21   it at East Cleveland.  Was there any kind of training like

22   that, that you were permitted to not do at Shaker, that

23   they offered, because you had already done it at East

24   Cleveland?

25               MR. STRANG:  Objection.

**MORSE, GANTVERG & HODGE**

```
 1    A       No.

 2    Q       No?

 3    A       Shaker does their own training.  They don't rely on

 4    other agencies training their officers.  They do their own

 5    training.

 6    Q       So you had to redo all the training they did?

 7    A       Plus more.

 8    Q       Plus more.

 9            What was the plus more that you're speaking of,

10    that you didn't do at East Cleveland?

11    A       The proper way to do accident -- I was never

12    actually taught that in East Cleveland.

13    Q       The proper way to do what?

14    A       Accident investigations.

15    Q       Accident investigations, okay.

16    A       Safety, especially firearms safety.  Shaker harps

17    on firearms safety.

18            In general, how to be courteous to people.

19    Q       How do they teach that, how to be courteous to

20    people?  What kind of training did you receive on that?

21    A       It was mostly scenario-based.

22    Q       So an instructor reads off a scenario and asks you

23    how you would handle it, is that how they train?

24    A       He reads it off and you act it out.

25    Q       Okay, so it's a role playing exercise?
```

1    A       Sure.

2    Q       Is that with a group of trainees and an instructor?

3    A       Yes.

4    Q       Do you know who the instructor was for your

5    training?

6    A       No.

7    Q       Was it a different instructor for different

8    courses, or was it one instructor doing all of it for the

9    trainees?

10   A       There were different instructors for different --

11   so the firearms instructor would do the firearms part of

12   the training, the accident investigation would do -- there

13   was a different person for each training.

14   Q       Did you ever receive sexual harassment training?

15   A       Yes.  It wasn't just sexual harassment, it was

16   harassment in general.

17   Q       Was that part of the diversity training, or was it

18   separate?

19   A       I believe it was separate.  But it is covered in

20   your training.  There's like 30 days of class before you

21   can actually even go on the road.

22   Q       It was 30 days of harassment training, or 30 days

23   of in general training?

24   A       In general training.  And that was covered in those

25   30 days.

1    Q     When you say, harassment, and then sexual

2  harassment was covered in that, is that related to fellow

3  employees and officers and administrators, or is that

4  directed to citizens?

5  A     All.

6  Q     So you're saying that the training specifically

7  talked about both?

8  A     Yes.

9        We have a bias based police training, also, which

10  talks about -- that's included in that.  It covers

11  harassment, sexual harassment, not being discriminatory

12  against people because of their race, you know, sex,

13  gender, sexual preference, those kind of things.

14  Q     And the biased based police training, was there

15  anything about being biased because you know the person

16  you're dealing with?

17  A     They didn't specifically say that.

18  Q     Do you think that would be a problem, if you were

19  arresting somebody or citing somebody, and you knew them

20  personally?

21  A     Would it be a problem?  No.

22  Q     That would not be a problem, in your mind?

23  A     To arrest somebody?

24  Q     Or cite somebody.

25  A     No, if they broke the law.

```
 1   Q      Do you feel you have ever done anything, in your
 2   scope as a police officer, which violates the rules of
 3   conduct at Shaker Heights?
 4             MR. STRANG:  Objection.
 5             MR. KLEBANOW:  You can answer the question.
 6   A      Say that again.
 7   Q      Sure.  Do you feel you have ever done anything, in
 8   your scope as a police officer, which violates the rules
 9   of conduct at Shaker Heights?
10             MR. McLANDRICH:  Objection.
11             MR. STRANG:  Objection.  Just for
12         clarification, Jared, is that a term of art, the
13         rules of conduct?  Is that a specific --
14             MR. KLEBANOW:  I can make it broader.
15   BY MR. KLEBANOW:
16   Q      I'll give you the actual definition.
17         The Rules and Regulations, are you familiar with
18   those, for the City of Shaker Heights?
19   A      Yes.
20   Q      Do you feel, in your scope as a police officer, you
21   have ever done anything which violates the Rules and
22   Regulations for the police department of the City of
23   Shaker Heights?
24   A      No.
25   Q      Do you feel, in your scope as a police officer,
```

1    you've done anything which violates the Code of Ethics at

2    the City of Shaker Heights Department of Police?

3    A     No.

4    Q     Do you feel, in your scope as a police officer,

5    you've done anything which violates the law?

6    A     No.

7    Q     What about, violates the Constitution?

8    A     No.

9    Q     Do you know what the Fourteenth Amendment is?

10          MR. McLANDRICH:  Objection.  You can answer.

11    A     Could you refresh my memory?  Do you have it in

12    front of you?

13    Q     I'm just asking you if you know.  If you don't

14    know, that's okay.  I'm just trying to understand what you

15    know about the Constitution.

16    A     I know it.  I just forgot off the top of my head at

17    this moment.

18    Q     How can you know you've never done anything while

19    an officer at Shaker Heights that violates the

20    Constitution, if you don't know what the Amendments are?

21          MR. McLANDRICH:  Objection.

22    A     I didn't say I don't know what the Amendments are.

23    Q     Well, if you can't remember them right now, how can

24    you remember whether you violated any of them?

25          MR. McLANDRICH:  Objection.

1   A      Which Amendment are you referring to?

2   Q      I asked you about the Fourteenth Amendment, in

3   particular.

4   A      Do you have the Fourteenth Amendment?

5   Q      I'm not asking if I have it.  I'm asking if you

6   know what it is.

7   A      I do know what it is.

8   Q      What is it?

9   A      I don't know right off the top of my head.

10  Q      So you don't know it right now.  You would need to

11  read it, you're saying, and then you could learn what it

12  is.

13              MR. McLANDRICH:  Objection.

14  A      Not learn what it is.  I could be refreshed.  My

15  memory could be refreshed.

16  Q      So I'm asking you right now if you've ever done

17  anything as a cop that violated the Constitution, and

18  you're saying no.  But if you would need to read the

19  Amendments to understand or know what they are, how can

20  you know you haven't violated them?  Wouldn't you need to

21  know them, to know if you violated them or not?

22              MR. McLANDRICH:  Objection.

23              MR. KLEBANOW:  You can answer.

24  A      Before I became a police officer, I was -- we had

25  to know the Fourteenth Amendment, or the Amendments.  And

1    so I had read them at some point before I became a police

2    officer.  At this very moment, I don't remember all of

3    them, and specifically the one you're referring to.

4    Q      Sure.  And I understand that.

5           But what I'm trying to figure out is, how can you

6    definitively, under oath, state you've never violated

7    them, if right now you don't remember what they all are?

8                 MR. McLANDRICH:  Objection.

9    A      Because before this moment, before you asked me

10   that question, before I became a police officer, I knew,

11   and I still know.  I just forgot, at this very moment.

12   Q      Have you ever been accused by a citizen of Shaker

13   Heights of any wrongdoing, other than Queen Miller?

14   A      What do you mean by wrongdoing?

15   Q      Somebody made a complaint against you.

16   A      Yes.

17   Q      How many times has that happened?

18   A      I'm not sure.

19   Q      More than once?

20   A      I believe so.  People complain every time they get

21   a ticket, every time they're arrested, so I would imagine

22   so.

23   Q      Well, first and foremost, let me ask, are you sure

24   that every single time someone gets cited or arrested,

25   they complain?

```
1   A      They complain directly to me.  So yes.

2   Q      What about formal complaints against you?

3   A      I don't know how many.  I don't know.  I'm sure

4   there have been, but I don't know.

5   Q      More than one?

6          MR. McLANDRICH:  Jared, we can do it off the

7          record or we can do it on the record, but they

8          don't know when a complaint comes in about them.

9          So to ask him that question isn't fair to him.

10         MR. KLEBANOW:  But can I ask him, John?  Isn't

11         it my right at the deposition, and if he can --

12         wouldn't he be able to tell me if he knows or

13         doesn't know?

14         So if I ask him, more than one, he can respond

15         however he wants.  I'm not telling him to respond a

16         certain way.

17         So if a question is fair or unfair, I don't

18         think you have a right to object, or tell him how

19         to answer the question, right?

20         MR. McLANDRICH:  Well, if I think you're

21         trying to trick the witness, yes, I think I do.

22         MR. KLEBANOW:  But I'm not trying -- if you

23         want to make an objection on the record that you

24         think I'm trying to trick the witness, you can go

25         ahead.
```

1          MR. McLANDRICH:  All right.

2          MR. KLEBANOW:  If he doesn't understand, and

3      wants me to clarify the question, of course, he can

4      ask me to do so, right?

5  A      I can't give you an honest answer if there's more

6  than one, because I don't know -- like my attorney said, I

7  don't know the number of -- we don't know the complaints

8  that come in, all of them.  So I have no way of knowing

9  that.

10 Q      And I understand and appreciate that you may not

11 know every complaint that was made, right?

12 A      Right.

13 Q      I'm asking you, of the ones you're aware of, are

14 you aware that there has been more than one complaint, or

15 not, made against you by a citizen of Shaker Heights,

16 other than Queen Miller?

17 A      I am aware.

18 Q      That there's been more than one.

19 A      Yeah.

20 Q      How many do you remember?

21 A      One.

22 Q      So as far as you know, there's only been one made

23 against you; is that correct?

24          MR. McLANDRICH:  One other.

25 Q      Other than Queen Miller.

```
1    A       Yes.

2    Q       Fair enough, other than Queen Miller.

3            Do you remember who that was?

4    A       No.

5    Q       Was it a man or a woman?

6    A       It was a lady, a woman.

7    Q       How many times have you been interviewed regarding

8    complaints made against you by citizens of Shaker Heights?

9            When I say, interviewed, I mean internally, you had

10   an investigator from the City of Shaker Heights interview

11   you.

12   A       I believe it was one or two.

13           You mean, other than this one?

14   Q       Other than Queen Miller.

15   A       Yeah, I believe it was one or two.

16   Q       Well, it was one, the woman that you just spoke

17   about, you said it was a lady that had made the complaint

18   that you're aware of.  Is that one of the times you've

19   been interviewed?

20   A       Yes.

21   Q       Who is the other time?

22   A       I don't remember who.  I just know -- I think there

23   was another time.  I don't remember who, though.

24   Q       Do you remember who conducted that interview?

25   A       Internal Affairs.
```

1    Q      Do you remember who at Internal Affairs?

2    A      I believe it was either -- well, it was probably

3    Commander Cole, because he's the Internal Affairs officer.

4    Q      You believe he did both of those interviews?

5    A      I believe so.

6              (Thereupon, Plaintiff's Exhibit 1 (Smith) was

7              marked for identification.)

8    BY MR. KLEBANOW:

9    Q      Officer Smith, you've been handed what's been

10   marked Plaintiff's Exhibit 1.  Do you recognize that

11   document?

12   A      Yes.

13   Q      What is that?

14   A      The Law Enforcement Automatic Data System, LEADS.

15   Q      What is LEADS?

16   A      It's the Law Enforcement Automatic Data System.

17   Q      What does that mean?

18   A      It's what we use to like run people's -- like run

19   license plates.  It's the system that law enforcement in

20   Ohio uses.

21   Q      Is that information confidential?

22   A      Yes.

23   Q      Would it be inappropriate for an officer to use

24   information they receive off of LEADS for personal gain?

25   A      Yes, that would be inappropriate.

1   Q      What about information that an officer gets off of

2   like a speeding ticket, is that confidential?

3   A      Yes.

4   Q      Would it be inappropriate for an officer to use

5   information they received or got off of a speeding ticket

6   for personal gain?

7   A      Yes, that would be inappropriate.

8   Q      Do you believe you've ever done that?

9   A      No.

10  Q      Do you think it would be illegal for someone to do

11  that, to take information they received off of a speeding

12  ticket and use it for personal gain?

13          MR. McLANDRICH:  Objection.  You can answer.

14  A      Yes, that would be illegal.

15          (Thereupon, Plaintiff's Exhibit 2 (Smith) was

16          marked for identification.)

17  BY MR. KLEBANOW:

18  Q      Officer Smith, you've been handed what's been

19  marked Plaintiff's Exhibit 2.  Do you recognize this

20  document?

21  A      Yes.

22  Q      What is this?

23  A      It's given out by the Attorney General's Office on

24  our EOPOTA -- on the EOPOTA website.  It's a certificate

25  that all officers have to complete, it's online training

1   for ethics and professionalism.

2   Q      What's involved in that training?  What type of

3   stuff is taught?

4   A      Things that are taught are how to be -- well,

5   again, there's scenarios online, they give you a lot of

6   stories or actors, and you have to answer questions.

7   Q      In the categories of ethics and professionalism?

8   A      Yes.

9   Q      Do you think it's ethical for a police officer to

10  enter into a sexual relationship hours after they've been

11  involved in citing somebody, whether it be a traffic

12  citation or other?

13             MR. McLANDRICH:  Objection.

14  A      Should I answer?

15  Q      Yes, you can answer.

16  A      Repeat the question again.

17  Q      Sure.  Do you think it's ethical for a police

18  officer to enter into a sexual relationship with somebody

19  that they had been involved in citing or arresting hours

20  prior?

21  A      I think it depends who the person is.

22  Q      What does it depend on?

23  A      Well, if I cite my wife, and we have sex later, I

24  don't think that's a problem.

25  Q      What about somebody you had never met before?  Not

1    you.  I'm asking in general.

2           So generally, if a police officer cites somebody

3    that they have never met before, and a few hours later

4    they're having sex with that person, is that unethical?

5                MR. McLANDRICH:  Objection.

6    A      I think that depends.

7    Q      Depends on what?

8    A      On who the people are, how many hours later, why

9    they're having sex.

10   Q      What if it was just a few hours later?

11   A      The same thing.

12   Q      Do you think it would be unethical if a police

13   officer, who had just been involved in issuing a ticket,

14   offered to pay for that ticket in exchange for a sexual

15   relationship with somebody?  Is that unethical?

16               MR. McLANDRICH:  Objection.  You can answer.

17   A      Say that again, please.

18   Q      Sure.  Would you find it unethical if a police

19   officer who had been involved in issuing a citation then

20   offered to pay for that citation, that ticket, in exchange

21   for sex?

22   A      Well, that would be unethical, yes.

23   Q      That would be unethical.

24          Would that be illegal?

25   A      I'd have to check.  It might be.

```
 1                  (Thereupon, Plaintiff's Exhibit 3 (Smith) was

 2          marked for identification.)

 3   BY MR. KLEBANOW:

 4   Q      Officer Smith, you've been handed what's been

 5   marked Plaintiff's Exhibit 3.  Do you recognize this

 6   document?

 7   A      Yes.  This is our off duty weapon sheet.

 8   Q      Why did you want to carry your Smith & Wesson off

 9   duty?

10                  MR. McLANDRICH:  Objection.

11   A      Why did I want to carry my Smith & Wesson off duty?

12   Q      Yes.  My understanding is that a form and procedure

13   has to be filled out by an officer in order to carry their

14   weapon off duty, they just have to have approval to do so;

15   is that right?

16   A      That's correct.

17   Q      And my understanding is, this form was at least

18   part of the process of you requesting that?

19   A      Part of the process, correct.

20   Q      So you willfully asked to be able to do it, right?

21   You don't have to file this form.  You chose to, right?

22                  MR. McLANDRICH:  Objection.  You can answer.

23   A      Yes.

24   Q      So my question is, why did you want to carry it off

25   duty?
```

```
 1              MR. McLANDRICH:  Objection.  You can answer.
 2   A     Well, it's smaller than my service weapon.
 3   Q     I'm not asking about the size of the weapon --
 4   A     Oh.
 5   Q     -- or the specifics of the weapon.  I'm just asking
 6   why you wanted to carry it off duty.
 7   A     Well, I've had a lot of threats against my life,
 8   and I arrest a lot of bad people, and I have a right to
 9   carry a gun, like anyone does in this country.  So I
10   exercised my right to carry the gun.
11   Q     Sure.  And I'm not challenging your Second
12   Amendment right, or your right to carry a gun.  I'm just
13   asking why you wanted to do it.  So are you saying --
14   A     To protect my life.
15   Q     Out of fear?
16              MR. McLANDRICH:  Objection.  You can answer.
17   A     Fear, preventive measures, sure.
18   Q     You said you've had your life threatened before.
19   Who has threatened your life?
20   A     A lot of people.
21   Q     Anyone other than someone you've been arresting at
22   the time?  So what I mean by that is, I assume that in
23   your line of duty, you have been arresting people, you're
24   breaking up fights, and somebody may say, I'm going to
25   kill you, or I'm going to hurt you, something like that.
```

```
 1           Have you ever received a threat when you weren't
 2   actively involved in a situation, such as somebody sent
 3   something to your house, or emailed you, or called you?
 4   A       Yes.
 5   Q       When was that?
 6   A       Which time?
 7   Q       How many times has it happened?
 8   A       Quite a bit.
 9   Q       Have you ever had anybody act on a threat that you
10   heard, that you've had to actively defend yourself?
11   A       No.
12   Q       Was it ever a female?
13   A       No.
14   Q       Do you know who is Celeste Rushin is?
15   A       No.
16   Q       You don't know anything about that name?
17   A       It sounds familiar.
18   Q       You don't know who it is, though?
19   A       No.
20   Q       You told me that you've been interviewed one, maybe
21   two times in your career, about someone who made a
22   complaint against you; is that right?
23   A       That's right.
24   Q       One of those people was Celeste Rushin, wasn't it?
25   A       It might have been, yes.
```

1  Q     So I asked you a moment ago if you knew who Celeste

2  Rushin was, and you said no.

3        You've been investigated one or two times over the

4  course of your career.

5             MR. McLANDRICH:  Could you turn the volume of

6        your voice down?  It's hurting my ears.

7             MR. KLEBANOW:  Sure.

8             MR. McLANDRICH:  I appreciate it.  Thank you.

9             MR. KLEBANOW:  Yeah.

10  BY MR. KLEBANOW:

11  Q     You've been investigated by -- I'm sorry.  You've

12  been investigated one or two times over the course of your

13  career.

14  A     Yeah.

15  Q     Isn't that a big deal, when you're investigated and

16  interviewed for a citizen complaint?

17  A     Is it a big deal?

18  Q     Yeah.

19  A     It depends on what the complaint is and who the

20  person is.

21  Q     If it's only happened one or two times, isn't it

22  something you'd probably remember?

23  A     It depends on the importance of it.  I mean, just

24  because you've been interviewed doesn't mean it becomes a

25  big deal automatically.

**MORSE, GANTVERG & HODGE**

1  Q      Do you remember your interview with Commander Cole

2  about Celeste Rushin's complaint?

3  A      Do I remember the interview?  Barely.

4  Q      In that interview, Commander Cole was asking you

5  about the two times that you had interacted with Celeste

6  Rushin; do you remember that?

7  A      Something like that, yes.

8  Q      And during that interview, he asked you to describe

9  the encounters, right?

10  A      (Witness nods).  Yes.

11  Q      And you told Commander Cole that you had interacted

12  with Celeste Rushin twice, and it was about a year apart.

13  Does that sound right?

14  A      That sounds right.

15  Q      And during the second interaction, Commander Cole

16  noted that you stated, "'Hey, I think I remember you.'

17  Then the driver said, 'I don't think we ever met.'  I

18  said, 'Yes, I believe so, I believe about a year and a

19  half, maybe 2 years ago at the BP on Fairmount Circle.'

20  The driver said, 'I don't think so.'"

21         Then Commander Cole had you, Officer Smith,

22  stating, "I then asked the driver, 'Did you used to drive

23  a gold Lexus.'  She replied, 'Yes.'  I then said, Did you

24  use to babysit and/or be a babysitter?'  She said 'Yes.'"

25         Do you remember that?

**MORSE, GANTVERG & HODGE**

```
 1    A      Yeah, that was the discussion we had the first
 2    time.
 3    Q      So on August 10th, 2017 when you were interviewed
 4    by Cole, and during the second stop with Celeste Rushin,
 5    you were able to remember from a year prior that this
 6    woman that you had stopped drove a Lexus, and was a
 7    baby-sitter, but then today, you couldn't even remember
 8    the woman's name.  Is that right?
 9    A      I remember the encounter.  I just couldn't remember
10    her name, no.
11           I remember the Lexus, yes.  I remember that that
12    person was a baby-sitter.  I didn't know what her name
13    was.  I don't have her name memorized in my head.
14    Q      So one year between stops -- and you stop a lot of
15    people, don't you, in your line of work?
16    A      I do stop a lot of people.  But I've never stopped
17    her.
18    Q      I just mean, in general, you stop a lot of people.
19    You interact with a lot of people.
20    A      Interact, yeah.  That's two different things.
21    Q      One year between stops or interactions with Celeste
22    Rushin, you can remember all this information about her,
23    but then a few years later, today, you couldn't even
24    remember her name.  Isn't that strange?
25           MR. McLANDRICH:  Objection.  You can answer.
```

```
1   A      When you say, remember all these things, I
2   remembered two things, the baby-sitting, and the Lexus,
3   that's what I remembered.  I don't think it's strange.
4          I don't remember everybody's name, no.  I don't
5   remember people.  I remember a lot of faces.  I don't
6   remember a lot of names.
7                  (Thereupon, Plaintiff's Exhibit 4 (Smith) was
8          marked for identification.)
9   BY MR. KLEBANOW:
10  Q      Officer Smith, you've been handed what's been
11  marked Plaintiff's Exhibit 4.  It's a packet of
12  information, it's a Table of Contents of the investigative
13  file created by Commander Cole related to the Celeste
14  Rushin investigation.  Have you ever seen this document
15  before?
16  A      No.
17  Q      If you'd like, I can give you a moment to look
18  through it, and you can tell me when you're comfortable,
19  and I'll ask you some questions.
20  A      Okay.
21                 (Pause)
22                 MR. McLANDRICH:  I'll be right back while he
23          reads that.
24                 (Thereupon, Mr. McLandrich left the room and
25          reentered the room.)
```

```
 1              MR. KLEBANOW:  Officer, Smith, if you'd like
 2         to read the entire thing, you're more than welcome
 3         to.
 4              MR. McLANDRICH:  He's going to.  He's going to
 5         read the entire thing.
 6              MR. KLEBANOW:  That's fine.
 7              (Thereupon, a discussion was had off the
 8         record.)
 9              (Short recess had.)
10              THE WITNESS:  Okay, I'm finished.
11    BY MR. KLEBANOW:
12    Q    What do you remember, Officer Smith, if anything,
13    from your interactions with Ms. Rushin?
14    A    I remember pulling up next to her, telling her that
15    her rear plate illumination was not lit.
16    Q    On the first time you interacted with her; is that
17    right?
18    A    That's right.
19    Q    And if you go to Page -798 -- at the bottom, do you
20    see where it's marked SH-000798; do you see that?
21    A    -798?
22    Q    -798.
23    A    Okay.
24    Q    And do you see where it says at the top, "I then
25    interviewed Ms. Rushin, the substance of which is, in
```

**MORSE, GANTVERG & HODGE**

 1   furtherance of and in addition to, the information she

 2   provided in her complaint form."  Do you see that?

 3   A     I see that.

 4   Q     And then there's a bunch of bullet points; do you

 5   see those?

 6   A     Yes.

 7   Q     Do you disagree with any of the factual statements

 8   in those bullet points?

 9   A     Yes.

10   Q     So let's go down the list, and anytime you see one

11   you disagree with, I want you to tell me, okay?

12   A     Okay.

13   Q     So start at the top, and when you see one that you

14   disagree with, let me know.

15   A     The third bullet point from the top.

16   Q     So that one reads, "Ms. Rushin reported that

17   Patrolman Smith ordered her to pull over into the BP gas

18   station after notifying her that her license plate light

19   was out."  Is that the one you're talking about?

20   A     That's the one I'm talking about.

21   Q     What about that do you disagree with?

22   A     Where Ms. Rushin states that I ordered her to pull

23   over to the BP gas station.

24   Q     What do you think happened?

25   A     When I told her that her light was out, she asked

1   me, what's that?  When I told her it was a rear plate
2   illumination, she said, what is that?
3          I told her it's the light above her license plate.
4          And she said, I don't have one of those.
5          And I said, yes, you do, everybody has one on their
6   car.
7   Q      So did you ask her to pull somewhere so you could
8   show her?
9   A      No.  I said, do you want me to show you where it
10  is?
11         And she said, yeah.
12  Q      And then did you ask her to pull off somewhere so
13  you could show her?
14  A      Well, she said, I'm going to pull over right here.
15         I said, no, let's pull to the BP down the street,
16  out of the way of traffic.  And --
17  Q      So you're saying your issue is that --
18             MR. McLANDRICH:  You're clipping him off,
19         you're talking over him.  So let him finish, then
20         you can talk.  And you're getting loud again.
21             You've got a very loud speaking voice, and
22         you're only a foot across the table.
23             MR. KLEBANOW:  Okay, John.
24             MR. McLANDRICH:  Thank you.
25

```
1   BY MR. KLEBANOW:

2   Q      Go ahead and finish.

3   A      That was it.

4   Q      That was it?  Okay.

5          So your issue with that bullet point was the word,

6   order?

7   A      That's correct.

8   Q      So you're not contesting you went to the BP.  It's

9   just that you're saying you didn't order her to go to the

10  BP, you mutually decided to go to the BP?

11  A      Right, a safe place to -- you know, we don't want

12  to get crammed by a drunk driver behind us.

13  Q      Keep going, and let me know the next bullet point

14  that you have an issue with.

15  A      Okay.

16         I never told her my age.  I just told her my name.

17  Q      So we're at one, two, three, four --

18  A      The sixth.

19  Q      The sixth bullet point down.  And that reads,

20  "Ms. Rushin reported that Patrolman Smith notified her

21  that his name was, 'Tyler,' and that he was '26 years

22  old.'"

23         You're stating that you don't believe it's correct

24  that you gave her your age?

25  A      Right.  There's no reason to give my age.
```

```
 1   Q       Do you ever give your age out when you stop
 2   somebody while you're working as a police officer?
 3   A       No, but people do ask me.
 4   Q       Do you respond when they ask you?
 5   A       Yes.
 6   Q       In this case, did she ask you?
 7   A       No.
 8   Q       So you're saying you never gave your age.
 9   A       Correct.
10   Q       Keep on going, let me know if there's anything else
11   you see.
12   A       The next bullet point, number seven.
13   Q       Okay.
14   A       She states that I inquired as to whether she had a
15   boyfriend.
16   Q       Did you inquire --
17   A       No.
18   Q       -- at all into her relationship status?
19   A       No.
20   Q       Would it have been appropriate for you to do so?
21   A       No.
22   Q       Do you have any reason to believe why she would
23   make all of this stuff up, if you don't think it's true?
24           MR. McLANDRICH:  Objection.
25   A       I don't.
```

1    Q      So you have no idea why she would say this stuff?

2    A      Well, when she -- she asked me, when I was showing

3    her where the license plate light was, she said that, I

4    don't know how to change that, I wouldn't know how to do

5    that, how to get the bulb.

6           And what I said was, you can have your -- I said,

7    you can have your dad, or maybe your boyfriend, somebody,

8    show you, I'm sure most guys are good with cars.

9           And she said, okay, I'll do that.

10   Q      How did you know that she had a boyfriend?

11   A      I didn't.  That's why I said dad, or boyfriend, or

12   whoever, a male figure.  I mean, most guys know about

13   cars, when it comes to lights.

14   Q      Okay.  Anything else that you see?  Keep going

15   down, let me know if you see anything else that you

16   disagree with.

17   A      The second one from the very bottom.

18   Q      I'm just going to read it and make sure we're

19   accurately identifying it.  It reads, "Ms. Rushin reported

20   that Patrolman Smith told her to call him and notified her

21   that they could, 'hang out.'"

22          Is that the one you're referring to?

23   A      That's the one I'm referring to.

24   Q      What do you disagree with about that statement?

25   A      I never told her to call me.  She asked me if I had

 1   a card on me, and I said no.  And I think I said, no, you

 2   could take my number.

 3   Q      Is there anything else?

 4   A      I said, call me if there's any issues.

 5   Q      Is there anything else within that statement you

 6   disagree with?

 7   A      No, that was it.

 8   Q      Do you remember all of this information that you've

 9   just given me independently of just reading this, or did

10   you need to read this to remember those things?

11   A      I remembered some of it.  It's coming back now that

12   I'm reading it.

13   Q      Then you had a second interaction with Ms. Rushin;

14   is that correct?

15   A      That's correct.

16   Q      And it was about a year later?

17   A      Yeah.  Give or take, yeah.

18   Q      Sure.  And there's additional bullet points

19   starting at the bottom of the page, do you see those, of

20   000798, and then it rolls into 000799?

21   A      Yes, I see those.

22   Q      Do you see those bullet points?

23   A      Yes.

24   Q      I'd ask you to do the same thing you did at the

25   top, and identify any bullet points that you read that you

1    disagree with the facts as stated.

2    A       The second one from the top.

3    Q       Okay.  That reads, "Patrolman Smith had briefly

4    activated his overhead lights and air horn, but did not

5    leave either on."

6            Is that the one you're speaking about?

7    A       That's the one I'm speaking about.

8    Q       What do you disagree with?

9    A       I didn't activate my lights or air horn.

10   Q       So you didn't -- did you do anything to get her

11   attention?  You're saying you didn't activate your lights?

12   A       I may have tooted my horn, but it wasn't the

13   lights, or siren, or anything.

14   Q       So you may have hit the horn, but you're saying you

15   didn't do the lights, and you didn't prolong leave on the

16   air horn; is that right?

17   A       Right.

18   Q       Anything else?  Keep going down.  Anything else you

19   see?  And again, it rolls on to the next page at -799.

20   A       So on -799, the third one from the top.

21   Q       "Patrolman Smith inquired as to why she had not

22   called him."

23           Is that what you're identifying?

24   A       Right.

25   Q       What do you disagree with in that statement?

```
1    A      I never asked her why she didn't call me.
2    Q      Do you have any idea why she would say you did?
3           MR. STRANG:  Objection.
4           MR. McLANDRICH:  Objection.
5    A      No.
6    Q      Did you know Ms. Rushin before you met her the
7    first time?
8    A      No.
9    Q      Keep going down.  So we're at the third from the
10   bottom there.  Keep going and let me know if there's
11   anything else you see.
12   A      It says, "Patrolman Smith --" which is the one,
13   two, three -- fourth one from the top, "-- stated, 'Do you
14   still have a boyfriend?' to which she answered in the
15   affirmative."
16   Q      Are you saying that never happened?
17   A      I never asked her if she had a boyfriend.
18   Q      So you're saying she's making this up?
19   A      I'm saying I never said that.
20   Q      Anything else you see that's not accurate, as you
21   continue to go down?
22   A      Let's see.
23          No, that's all.
24   Q      Had you inquired -- if it were true, the third one
25   from the top, "Patrolman Smith inquired as to why she had
```

1  not called him," if you had, in fact, stated that, do you

2  agree that would be inappropriate?

3  A      If I asked her why she never called?

4  Q      That's correct.  If you asked.

5        And I'm not asking you to admit that you did.  I'm

6  saying, if you had, in fact, asked her why she hadn't

7  called you, would you agree that that would have been

8  inappropriate?

9             MR. STRANG:  Objection.

10            MR. McLANDRICH:  Objection.

11  A      No.  It depends how you look at it, but no.

12  Q      You think that would have been appropriate?

13  A      I don't think it would have been appropriate or

14  inappropriate.

15  Q      Do you find that you often remember small details,

16  such as someone's occupation that you stopped a year ago?

17  Are you able to remember small things like that pretty

18  easily?

19  A      Yes.

20  Q      So one year between stops, you were able to

21  remember that she was a baby-sitter; is that right?

22  A      Yes.

23  Q      Do you remember being -- strike that.

24        You stated earlier in the deposition that you

25  remember being interviewed by Commander Cole about

1   Ms. Rushin's complaint; is that correct?

2   A       Well, once you said the person, yeah.  I didn't

3   remember her name, but I remembered --

4   Q       I'm saying, the interview with Commander Cole.

5   A       Yes.

6   Q       You remember being interviewed by Commander Cole?

7   A       Yes.

8   Q       Were you honest in that interview?

9   A       Yes.

10          MR. McLANDRICH:  Are we done with this

11          document for now (indicating).

12          MR. KLEBANOW:  Yes.

13          (Thereupon, Plaintiff's Exhibit 5 (Smith) was

14          marked for identification.)

15          (Thereupon, a discussion was had off the

16          record.)

17  BY MR. KLEBANOW:

18  Q       Officer Smith, would you agree with me that Celeste

19  Rushin's complaint against you was a sexual harassment

20  complaint?

21          MR. McLANDRICH:  Objection.  You can answer.

22          MR. STRANG:  Same objection.

23  A       No.

24  Q       Why not?

25          MR. McLANDRICH:  Objection.  You can answer.

1    A       There was nothing sexual about it.

2    Q       Didn't she accuse you of flirting with her?

3    A       She did.

4    Q       Isn't there something sexual about flirting with

5    somebody?

6    A       If that happened, yes.

7    Q       Right.  So I'm not asking you whether you feel you

8    were guilty of sexual harassment or sexually harassed

9    anybody.  What I'm asking you is, would you agree with me

10   that her complaint accused you of sexual harassment?

11           MR. McLANDRICH:  Objection.  You can answer.

12   A       No, I wouldn't say sexual harassment.

13   Q       So if somebody accuses you, as a cop, of being

14   flirtatious and flirting with them when it's unwanted, you

15   don't think that's a sexual harassment complaint?

16           MR. McLANDRICH:  Objection.  You can answer.

17   A       That's not -- not just as a cop, but as a person,

18   if somebody doesn't want to be -- I wouldn't automatically

19   say that that's sexual harassment, no, either.

20   Q       I want to make sure I understand your response.

21   A       Okay.

22   Q       And I understand that you're saying that you didn't

23   sexually harass her.  I understand that.

24           You're stating, so I understand, that you don't

25   even think her complaint would fall into the realm of

1   sexual harassment?

2   A      That's what I'm stating.

3   Q      Even though she is accusing you of flirting with

4   her when she didn't want you to?

5   A      Flirting is an opinion, and I don't believe I was

6   flirting.

7   Q      I understand that you don't believe you were

8   flirting.  But do you understand that she thought you were

9   flirting with her?

10  A      I understand what she said, yes.

11  Q      So if she thought you were flirting with her, even

12  if you believed you weren't, wouldn't you agree with me

13  that her complaint is that you sexually harassed her, even

14  if you disagree with the facts of her complaint?

15  A      No, because I think that would be saying that

16  flirting is automatically sexual harassment, and I don't

17  think they're the same thing.

18  Q      Okay.  So you're saying that if somebody accuses

19  you of flirting with them when it's unwanted, that is not

20  a sexual harassment complaint?

21  A      Correct.

22  Q      And you previously stated you've been trained in

23  sexual harassment, correct?

24  A      It was general, it was harassment in general.

25  Q      And sexual harassment was a component of that?

1   A      Yes.

2              MR. KLEBANOW:  John, can we let him read

3          during the break?

4              MR. McLANDRICH:  Absolutely.

5              MR. KLEBANOW:  Why don't you read that during

6          the break, and we'll take five.

7              MR. McLANDRICH:  Okay.

8              (Short recess had.)

9              THE WITNESS:  Okay, I've read it.

10  BY MR. KLEBANOW:

11  Q      Officer Smith, do you recognize this as a copy of

12  the transcript of your interview with Commander Cole?

13  A      Yes.

14  Q      If you'd flip with me over to SH-000883.  Do you

15  see those markings on the bottom?

16  A      Yes.

17  Q      And I guess it begins on 000882, Commander Cole

18  asks you a question about your first interaction with

19  Ms. Rushin.  Do you see that?

20  A      Yes.

21  Q      At the bottom of that top paragraph, do you see

22  where it says, "She then asked me if I had a card with me

23  or on me.  I replied, 'No.'  I had run out.  I then

24  offered to give her my cell phone number if she had any

25  questions because at the time I could not remember my work

1  phone number extension or password."  Do you see that?

2  A      I read it.  Hold on, let me find it.

3         You're on the very last paragraph?

4  Q      The top, there's a big paragraph -- on 000883.

5  A      Oh.

6  Q      It starts on 000882 and rolls to the next page.

7  I'm talking about the bottom of the top paragraph of

8  000883.

9  A      Yes, I see that.

10  Q      And you had previously told me that you have a

11  skill of remembering small details; do you remember

12  telling me that?

13  A      Yes.

14  Q      So in this instance, you told Commander Cole that

15  you gave her your cell phone number because you couldn't

16  remember your own work phone number extension or password.

17  Is that accurate?

18  A      Right, which are on my card, which I did not have,

19  yes.

20  Q      You couldn't remember any of those three things?

21  A      Correct.  I usually don't have to remember, because

22  it's usually on the card.  But I didn't have the card.

23  Q      If you'd flip to 000885, at the top of the page,

24  there's a big paragraph, and it's you speaking about your

25  second interaction with Ms. Rushin; do you see that?

1    A       Yes.

2    Q       And that's where you talk about remembering that

3    she used to drive a Lexus, that she used to be a baby-

4    sitter; do you see that?

5    A       I see that.

6    Q       When you were interacting with Ms. Rushin and you

7    recited these things, did she seem concerned?

8    A       No.

9    Q       Did she think it was weird?

10   A       I don't know what she was thinking.

11   Q       Did she give you any indication that she thought it

12   was strange that you remembered these things?

13   A       No.  Her eyes were kind of big.  I think she was

14   maybe shocked that I remembered.  But no, no indication

15   other than that.

16   Q       And you indicated earlier that you believe or are

17   stating that you never said, why didn't you call me,

18   during the second interaction; is that right?

19   A       That's correct, I never stated that.

20   Q       Then why were you reminding her that you gave her

21   your phone number during the first interaction?

22   A       To remind her how we had met, and that we did

23   actually meet, because she stated that she had never seen

24   me before.  I was trying to refresh her memory that, in

25   fact, we had seen each other before, the last time we met.

1    Q      And then you say that Ms. Rushin said, "'Well, I

2    might have remembered that happening, but I was talking to

3    someone at the time who ended up becoming my boyfriend and

4    that is why I never called.'"  Do you see that?

5    A      That's what she said, yeah.

6    Q      Is it your testimony that she just started talking

7    about her boyfriend and her relationship status out of the

8    blue?

9    A      Yes.

10   Q      Did you think she was hitting on you?

11   A      Which time?

12   Q      Let's go through both.

13          So the first time, did you think she was hitting on

14   you?

15   A      I couldn't tell.  Possibly.

16   Q      And when I say, hitting on you, I mean flirting

17   with you.

18   A      Yes, possibly.

19   Q      What about the second time?

20   A      No, the second time, she seemed to be in defense.

21   She wanted me to know that she had a boyfriend, which it

22   states here, I didn't mean it like that, and I told her

23   that.  That wasn't my point of asking if she remembered

24   me.

25   Q      Flip to 000887.

```
 1   A      Okay.

 2   Q      At the top, see where the question reads, "On

 3   either of your encounters with Ms. Rushin, did you provide

 4   her with your age," and you said, "No."

 5   A      I said, "No."

 6   Q      And Commander Cole followed up and asked, "How

 7   would Ms. Rushin have known your age?"  Do you see that?

 8   A      I see that.

 9   Q      And you responded, "She may have asked, and I may

10   have told her, but I don't recall."  Do you see that?

11   A      Right, yes.

12   Q      Isn't that the opposite of the answer you gave to

13   the question prior?

14   A      Yes, it is.

15   Q      So that first response was not truthful; is that

16   correct?

17              MR. McLANDRICH:  Objection.

18   A      Well, I wouldn't say it wasn't truthful.  I didn't

19   remember.

20   Q      Well, even if you didn't remember, it wasn't a

21   correct response; is that right?

22   A      That's safe to say, yeah.

23   Q      Did you think your actions in regard to both

24   instances with Ms. Rushin were appropriate?

25   A      Yes.
```

1  Q      Do you believe you were honest throughout the

2  investigation process?

3  A      Yes.

4  Q      Prior to reviewing the interview with Commander

5  Cole in that substantive investigation packet that we've

6  already talked about, did you remember any of the details

7  of Ms. Rushin's complaint?

8  A      No, not until I reviewed it.

9  Q      You didn't remember, not a single detail?

10 A      Other than the baby-sitting and the Lexus.

11 Q      But you remembered those things?

12 A      Yes.

13 Q      Out of all of this, as you came in here today,

14 those are the only things that you remembered independent

15 of reading those things?

16 A      Yes.

17 Q      You didn't even remember her name.

18 A      I didn't remember her name.

19 Q      When is the first time that you met Queen Miller?

20 A      The first time was when I was in college.

21 Q      And you had said that that was at the University of

22 Akron?

23 A      Yes.

24 Q      What year do you allege you met Queen?

25 A      I don't remember what year it was.  I know it was

1    in college, but I don't remember what year.

2    Q     What were the circumstances regarding how you met?

3    A     We met after a party.  I think it might have been

4    an ice breaker.

5    Q     When you say, an ice breaker, do you mean for a

6    fraternity or --

7    A     No, an ice breaker is a party that's given during

8    college.  It could either be at the beginning of the first

9    semester or second semester.  It's just a party given by

10    the college.

11    Q     Was it thrown by the University of Akron?

12    A     I believe it was.  There were several.  So I'm not

13    sure if that specific one was thrown by the university, or

14    thrown by people -- because you can borrow the

15    university's union center to have parties.  I don't know

16    who actually threw the party, though.

17    Q     Was it for students?

18    A     Yeah.  It was for anyone who wants come, as long as

19    you're 18 or over with a college ID, or state ID.

20    Q     Or state ID.  So you don't have to be a student to

21    go?

22    A     Correct.

23    Q     Did you know if Queen was a student?

24    A     I did not know.

25    Q     And you said you met her after one of these events?

```
 1   A      Yes.

 2   Q      Who were you at the event with?

 3   A      I came by myself.

 4   Q      Do you know who Queen was with at the event?

 5   A      No.

 6   Q      And you said you met her after the event.  Was she

 7   at the event, or you met her after the event was over?

 8   A      She was outside the event.

 9   Q      So she wasn't in the event?

10   A      I assume she was.  I mean, I couldn't see her -- I

11   don't know if she was in there.  I saw her afterwards

12   outside.  I don't know if she had attended, I don't know.

13   Q      Had you ever seen her or met her before that

14   instance?

15   A      Before that?  No.

16   Q      How did you come to speak with her?  So you said

17   you saw her outside the event.  Did you talk to her?

18   A      Yes.

19   Q      How did you come to interact?  What were the

20   circumstances that led up to that?

21   A      I think I might have introduced myself, or she

22   introduced herself.  I don't know who spoke first.  But we

23   talked outside the event.  I don't remember who said what

24   first.

25   Q      Did you go somewhere with her immediately after
```

1  that?

2  A      Shortly after.

3  Q      Where did you go?

4  A      We went to my dorm.

5  Q      You went to your dorm?

6  A      Yes.

7  Q      And what did you guys do in your dorm?

8  A      We ended up having sex.  I don't know if it was --

9  I can't recall if it was in the dorm or in the car.  But

10  it was -- I remember seeing my dorm.  I just don't

11  remember if we had sex inside or outside.

12  Q      And it would have been your vehicle?

13  A      I don't remember.  It was a vehicle, but I don't

14  remember which vehicle.

15  Q      So you can't remember if you had sex with her in

16  your dorm, or in your car, or in her car?

17  A      Right.  It was either a car or my dorm, my dorm.

18  Q      Were you in a relationship with anyone at the time?

19  A      No.

20  Q      Officer Smith, do you remember responding to

21  interrogatories or questions that were sent by me?

22  A      Yes.

23  Q      And you responded to those in writing with your

24  counsel; do you remember that?

25  A      Yes.

1  Q     Or you responded to them with the assistance of

2  your counsel?

3  A     Yes.

4  Q     Did you answer those questions honestly?

5  A     Yes.

6  Q     Interrogatory Number 7, the question that was asked

7  was, "If you knew Queen Tiera M. Miller prior to

8  September 21, 2018, please state how you knew her."

9       Your response was, "I did not remember Ms. Miller

10  at the time of the traffic stop, but later remembered that

11  I had met her in college and also at a gas station in East

12  Cleveland.  While attending college at the University of

13  Akron, I had sex with Ms. Miller in her dorm or a

14  vehicle."  Do you remember that response?

15  A     I never said, her dorm.

16  Q     Are you stating at this time that that response is

17  not accurate?

18  A     That word, her, is inaccurate.  But the rest of it

19  is accurate.

20  Q     What did you do, with as much detail as you can

21  tell me, in between the time you met Queen outside of this

22  ice breaker and when you went back to your dorm or a

23  vehicle and had sex with her?

24  A     I didn't do anything.

25  Q     Well, you had to have gotten there, right?

1   A      Right.

2   Q      So I want as much detail as you can remember.  So

3   let me give you an example.

4   A      Okay.

5   Q      You were at -- I think you said it was at the

6   Union, the ice breaker?

7   A      Yeah, I believe so.

8   Q      And you met her just outside the Union?

9   A      Yes.

10  Q      You had to have gotten back from the Union to your

11  dorm or your vehicle.  So when I said I'm asking for all

12  detail, I would want to know how you got back.  Did you

13  take a cab?  Did you drive?  Did you walk?  Did somebody

14  pick you up?  Did you stop for food on the way?  Did you

15  go to another bar?  So I'll let you go ahead and put as

16  much detail as you can give me, okay?

17  A      I know that I parked outside my dorm.  I just don't

18  remember if I drove there, or if I walked over there.  My

19  parking space was outside my dorm.  I don't remember how I

20  got back.  I don't remember if I walked or if I drove.  I

21  don't think I drove.  I'm not certain.

22  Q      Were you drinking that night?

23  A      No.  I never drank in my life.

24  Q      You've never had any alcohol?

25  A      Correct.

1   Q      Any drugs?

2   A      No, never.

3   Q      So you remember being there, but you don't remember

4   how you got home; is that right?

5   A      That's correct.

6   Q      Did you stop anywhere along the way?  So did you

7   stop for food?  Did you meet anyone else?  Did you go to a

8   bar?  Anything in between the time that you left the ice

9   breaker event until you got back to either what you had

10  said was your dorm or one of your two vehicles?

11  A      I don't believe so, no.

12  Q      So you're saying that you met Queen for the very

13  first time -- about what time was it, after this ice

14  breaker?  Was it a 7:00 o'clock ice breaker, or like a

15  10:00 or 11:00 p.m. ice breaker?

16  A      It's usually in the evening.  They usually go until

17  1:30 or 2:00-ish, somewhere, a.m.

18  Q      Ending at 1:30 or 2:00 a.m.?

19  A      Yes.

20  Q      Was there alcohol at the event?

21  A      No, you're not allowed to have alcohol at a college

22  event.

23  Q      Was Queen intoxicated?

24  A      No.

25  Q      Was she acting intoxicated?

1    A       No, not to me.

2    Q       Have you been around intoxicated people in your

3    life?

4    A       Yes.

5    Q       So you generally can recognize when somebody is

6    under the influence of alcohol or drugs?

7    A       Now, I can.  Back then, I couldn't.  But yes, I've

8    been trained now.  So yes, now.

9    Q       So from what you remember, you're saying she was

10   not under the influence --

11   A       Correct.

12   Q       -- of either alcohol or drugs?

13   A       That's correct.

14   Q       You're saying this particular ice breaker ended

15   around 1:30 or 2:00 a.m.?

16   A       They all ended around there, so I would say yes.

17   Q       You met her outside after, and told me you didn't

18   speak with her at all inside, correct?

19   A       Correct.

20   Q       So you met her around 1:30 or 2:00 a.m. outside?

21   A       Correct.

22   Q       How long did you speak with her outside before you

23   left?

24   A       I don't remember.  There were a lot of people

25   outside talking.  It wasn't three hours, but it wasn't

1    like two minutes, either.  I don't remember the exact
2    time.
3    Q    Can you give me anything in between those two, in
4    between two minutes and three hours?  And I understand you
5    might not remember if it was five minutes and 32 seconds,
6    that's not what I'm asking you.  I'm just asking you to
7    give me a general idea, was it a five minute conversation
8    or was it a half an hour conversation?
9    A    I understand what you're saying.  I don't remember.
10   Q    Were there other people in the conversation?
11        So for example, were you speaking with Queen, with
12   one of Queen's friends or one of your friends, also, in
13   the conversation?
14   A    I think it was just she and I talking.  There was
15   no one else -- there were other people around, but not
16   engaged in our conversation.
17   Q    And your testimony is that you left this ice
18   breaker with Queen, you don't remember how you got back,
19   but you either got back to your dorm room or one of your
20   two cars and immediately had sex?
21   A    Shortly after we got back.  I think we talked a
22   little bit, and then we had sex.  It wasn't like, close
23   the door, we just had sex.
24   Q    Is this something that you did often in college,
25   you would meet somebody, and then immediately have sex

1    with them?

2    A        No, not often.

3    Q        About how many times would you say that that

4    happened?

5    A        I'd say more than once and less than five.

6    Q        Do you remember the circumstances of those other

7    times?

8              MR. McLANDRICH:  Just note my objection to

9        this line of questioning, but you can answer.

10   A        No.

11   Q        Do you remember the names of any of the women?

12   A        No.

13   Q        Not one?

14   A        No.

15   Q        How long do you claim that you had sex with Queen

16   that night in either your dorm or one of your two

17   vehicles?

18   A        Maybe ten minutes.

19   Q        Did she leave immediately after you had sex?

20   A        No.

21   Q        Did she stay the night?

22   A        No.

23   Q        How long did she stay after you were done having

24   sex?

25   A        About maybe a half hour, 45 minutes.

```
1    Q       What did you talk about?

2    A       I don't remember.

3    Q       You don't remember anything you talked about?

4    A       No.

5    Q       Do you remember anything you talked about with her

6    before you had sex, so from the time you met her until you

7    got back to either your dorm or one of the two vehicles?

8    A       The only thing I remember is she asked if I was a

9    student there.

10   Q       Did you ask her if she was a student?

11   A       No.

12   Q       Did you care if she was a student?

13   A       Did I care?

14   Q       Yes.

15   A       No.

16   Q       Do you allege that you exchanged phone numbers that

17   evening?

18   A       I think we did.  I believe so.

19   Q       So you believe so.

20   A       I believe that we did, yeah.

21   Q       So you're unsure?

22   A       I'm uncertain, but I believe we did.

23   Q       Do you believe that you gave her your number and

24   she gave you hers?

25   A       I think it was an exchange, yes.
```

```
1   Q      Did you contact her after that time?

2   A      Nope.  She didn't contact me, and I didn't contact

3   her.

4   Q      Do you know where she went when she left?

5   A      No.

6   Q      Did she drive to the ice breaker event?

7   A      I don't know.

8   Q      So after she left your dorm, she walked somewhere?

9   What I mean by that is, or you can tell me -- you were in

10  your dorm room.  Did you walk her out, or did you just

11  open your dorm room door and then she had to get out of

12  the building herself?

13  A      I don't even know if we were in the dorm.

14  Remember, I said it was the car or the dorm.

15  Q      Okay.

16  A      When she left, she called someone.  And I don't

17  know where she went, though, with that person.

18  Q      At some point -- strike that.

19         Did you see or interact with Ms. Miller anytime in

20  between this occurrence that you've spoken about at the

21  University of Akron, and the date in which you gave her a

22  citation around 3:00 in the morning?

23  A      Did I see her again?

24  Q      Did you see or interact with her at any time in

25  between those two points?
```

1   A       Yes, I mentioned about the gas station in East
2   Cleveland.  That was the other time.
3   Q       Talk to me about that.  Tell me the circumstances
4   in which you interacted with her at this gas station.  So
5   for example, when it was, did you speak.  As much detail
6   as you can remember.
7   A       We spoke.  It was the Ohio -- it's called Ohio Gas,
8   gas station, on Noble, in East Cleveland.
9   Q       Do you remember when it was?
10  A       I don't.  It was after that incident when we first
11  met, and it was before this incident, but I don't remember
12  the exact.  I think I was still working at the funeral
13  home.
14  Q       That was my next question.  Were you a police
15  officer at either Shaker, East Cleveland, or were you not
16  a police officer and just working at the funeral home?
17  A       I don't believe I was a police officer.  Yeah, I
18  believe I was working at the funeral home.
19  Q       Did you randomly run into her at the gas station or
20  was it planned?
21  A       It was random.
22  Q       Did you say anything to each other?
23  A       Yeah, we talked.  I don't remember exactly what was
24  said.
25  Q       Did she approach you or did you approach her?

```
1    A       She approached me.

2    Q       And you don't remember anything that was said?

3    A       Nope.  I know we exchanged numbers again.  And I

4    remember I saved her name and her number, what she had on,

5    and she told me she was a hairdresser.  I do remember that

6    conversation, she told me she did hair.

7    Q       This is at the gas station?

8    A       Yes.

9    Q       You just said you saved her name, her phone number,

10   and what she was wearing in your phone?

11   A       Yes.

12   Q       What she was wearing at the gas station, or what

13   she was wearing at the University of Akron?

14   A       At the gas station.

15   Q       Why did you put in your phone what she was wearing?

16   A       So I'd remember who she was.

17   Q       Do you remember people often by what they're

18   wearing?

19   A       Yes.  What they drive, or what they're wearing.

20   Stuff like that helps me remember people.

21   Q       Does that help you remember their names?

22   A       Sometimes.  Especially if you put the name with

23   what they're wearing.

24   Q       So if I looked through your phone, or if somebody

25   looked through your phone today, would all of or a
```

1    majority of your contacts have an identifier about that

2    person, in addition to their phone number?

3    A      No.

4    Q      What percent of people -- well, strike that.

5           Is the reason that you have a new phone, or is that

6    because you only do that for a small number of people?  Do

7    you understand my question?

8    A      No.

9    Q      So you indicated to me that one of the ways that

10   you remember people is that you'll put what I'm calling an

11   identifier.  In your words, it was the type of car they

12   drive, what they were wearing, and that's in addition to

13   their phone number and their name.

14   A      Right.

15   Q      Since -- let me ask you this to start:

16          Since that time at the gas station, have you gotten

17   a new phone?

18   A      Yes.

19   Q      And do you transfer your contacts from one phone to

20   another?

21   A      Sometimes.  I've had several phones since then.  So

22   some have transferred, some haven't.

23   Q      So at the time when you interacted with Ms. Miller

24   at the gas station, would a majority of your contacts have

25   had an identifier, or would most not have an identifier?

```
1    A      Some have, some have had identifiers.  There are
2    other people don't need identifies, like family, or close
3    friends, I guess.
4    Q      What about today, for example, what percent, if you
5    had to guess, of your phone would the contacts have an
6    identifier?
7    A      Well, my circle has gotten a lot smaller, so not
8    that many.
9    Q      What made you decide whether or not to put an
10   identifier for somebody when you met them?
11   A      Maybe if it was somebody I didn't think I'd
12   remember, or if there's maybe the same person in my phone.
13          So say, for example, there's two Kevins.  I would
14   put -- for Kevin that goes to my church, I would put
15   Kevin, and then my church name next to it, and what he
16   does at the church, as opposed to Kevin who works at the
17   police department with me.  Because I don't know a lot of
18   last names.  That doesn't help me identify people.  It's
19   where I know them from that helps me identify people.
20   Q      And it helps you identify them, by their first
21   name; is that correct?
22   A      For the most part, yeah.
23   Q      At any point after you met Queen at the University
24   of Akron, did you begin following her on social media?
25   A      No.
```

1    Q      So the same question for after the gas station at

2    East Cleveland, did you begin following her on social

3    media?

4    A      No.

5    Q      When I say, social media, I mean any form.  So that

6    could be Facebook, Twitter, Snapchat, Tinder, any social

7    media app.

8    A      No.

9    Q      To date, to today, as you sit here, have you ever

10   followed Queen Miller on any social media platform?

11          MR. McLANDRICH:  What does followed mean?

12   Q      So if you don't understand it, when you follow

13   somebody on a social media app, you have the option, for

14   example, on Twitter, that you can follow a page; do you

15   understand that?

16   A      I understand that.

17   Q      Do you have Twitter?

18   A      No.

19   Q      Do you have Facebook?

20   A      No.

21   Q      Do you have an Instagram?

22   A      No.

23   Q      So you don't have any social media at all?

24   A      No.

25   Q      Have you ever created one under a name that isn't

1    yours?

2    A       No.

3    Q       Have you ever used it?  So have you ever even used

4    it on someone else's phone or someone else's computer?

5    A       I'm familiar with how it works, yes.

6    Q       So you've never utilized one under your name, or

7    any other name, personally?  So what I mean by that is,

8    there are people out there, right, that could create a

9    fake name.

10           So Twitter, and Facebook, and Instagram, they don't

11   fact check who creates accounts, right?

12   A       Right.

13   Q       So I could go create an account and call myself

14   John Smith, even though that's not my name, right?

15   A       Right.

16           You're asking me, have I ever followed her, like

17   have I ever befriended her, like asked her to be a friend

18   or something on one of those?

19   Q       Yes.  On any form of social media.

20   A       No.

21   Q       Whether it be your name, or any other name.

22   A       No, I've never.  No.

23   Q       Have you ever viewed her page on social media?

24   A       Yes.

25   Q       And how have you done that?

```
 1   A      It's public.  It's open.

 2   Q      Okay.  Just so I follow, and I understand, you have

 3   never requested --

 4   A      Correct.

 5   Q      -- or actively clicked the button to follow one of

 6   her pages, but you have pulled up her pages and just

 7   viewed them?

 8   A      Since these allegations, yes.

 9   Q      At what point or multiple points have you done

10   that?  Did you view her page after your interaction at the

11   University of Akron?

12   A      No.  It was after I found out I was being sued by

13   her.

14   Q      Okay.  So you had never even viewed any of her

15   social media until this lawsuit was filed?

16   A      As far as I remember, right.  Correct.

17   Q      As far as you remember.  So you're unsure, or are

18   you certain?

19   A      I'm certain.

20   Q      Can you describe your dorm room for me, the one

21   that you were living in at the time of this alleged

22   incident at the University of Akron?

23   A      Yeah.  I mean, it's a room, four walls, a door, a

24   refrigerator, bathroom.

25   Q      Was there a bathroom in the dorm room, or was it in
```

1    the hallway?

2    A       In the room.  In the dorm room.

3    Q       Anything else you remember about the room?

4    A       No.  Nothing that would stand out.  It's just a

5    room.

6    Q       Did you have a roommate?

7    A       Yes.

8    Q       What was your roommate's name?

9    A       Christian.

10   Q       Do you remember his last name?

11   A       Bailey.

12   Q       Was Christian there that night when you had sex

13   with Queen either in your dorm or in one of your cars?

14   A       I don't know.  I think he went home for the

15   weekend.

16   Q       Where was he from?

17   A       Cleveland.  And our rooms weren't -- we didn't

18   share an actual room.  We shared a common area.

19   Q       So were there two people assigned to one room,

20   where there would be two individual bedrooms and one

21   common area?

22   A       It would be four individual -- that one is two,

23   yes.  Two, for that one, yes.

24   Q       So you had one other roommate --

25   A       I had two different dorms.  This instance, when I

```
 1   met her, I had one other, Christian, was the only other
 2   roommate.
 3   Q     And you had a suite, where you had two separate
 4   bedrooms and you shared a common area?
 5   A     And a bathroom, correct.
 6   Q     And a bathroom.
 7         Did you talk to Christian at all about Queen?
 8   A     No.
 9   Q     Were you friends with Christian?
10   A     Yeah.
11   Q     Are you still friends with Christian?
12   A     He was in my wedding, but we don't keep in touch.
13   Q     When was your wedding?
14   A     September 2nd, 2017.
15   Q     So Christian has no idea about this interaction
16   with Queen?
17   A     None whatsoever.
18   Q     Did you guys share information about your sex lives
19   with each other?
20   A     No.
21   Q     So even as buddies, you wouldn't talk about, hey, I
22   had sex with this person, or I was trying to hook up with
23   this person, or this girl was really hot, or good looking,
24   you wouldn't say anything like that to each other?
25   A     Christian had the same girlfriend since eighth
```

1    grade.  They were madly in love.  So we never talked that

2    kind of -- we didn't have that kind of -- it wasn't like

3    your average guy, I guess you would say.

4    Q       Did you talk to any of your other friends about

5    that night?

6    A       No.

7    Q       So you didn't tell any of your buddies that you

8    even hooked up with a girl that evening or that night?

9    A       No.  It's nobody's business.

10   Q       Did you follow up with Queen -- after the gas

11   station, you told me you exchanged numbers, for what you

12   said was a second time, right?

13   A       Right.

14   Q       Did either of you follow up with each other?

15   A       No, we never kept in touch.  I never called her,

16   she never tried calling me.

17   Q       No text messages?

18   A       No.

19   Q       No contacting via social media, I assume,

20   considering you --

21   A       No.

22   Q       Did you ever see Queen again between the stop --

23   I'm sorry -- the random occurrence you claim at the East

24   Cleveland gas station and September 21, 2018?

25   A       No.  Not between, no.  Not until this time.

1  Q      So talk me through, in as much detail as you can

2  remember, the stop involving Queen Miller on the 21st of

3  September, 2018.

4  A      I observed a vehicle with a violation, window tint,

5  it was black, I couldn't see in at all.  That's what first

6  alerted me.  And I ran the plate on my computer.  The

7  driver -- or the owner, I should say, came back with a

8  warrant.  And then I initiated a traffic stop on the

9  vehicle because of both of those violations.

10  Q      Okay.  Keep going.  So when you initiated the

11  traffic stop, you activated your lights, right?

12  A      Lights, siren, yes.

13  Q      And the car pulled over?

14  A      Yes.

15  Q      What happened next?

16  A      Pulled over on Shelburne, just east of Warrensville

17  Center.  And I got out of the vehicle, introduced myself

18  as a police officer, and the reason for the stop.  It was

19  not the owner operator, it was another female driver

20  operator.

21  Q      Okay.  What happened next?

22  A      Let's see.  I went -- another unit arrived, Officer

23  Meredith, Number 59.  At night, we always have another

24  officer come.  So she came, and she was my assist officer.

25  Q      So she wasn't riding in the vehicle with you?

```
 1    A       No, she was not.

 2            And I found out that the owner and the passenger, I

 3    think, both had warrants, if I remember right.  I think we

 4    detained the driver, and we tried to send what's called a

 5    warrant confirmation request to, I think it was East

 6    Cleveland, or maybe it was Berea, one of the cities, I

 7    don't remember which one.

 8            Whatever city it was, they couldn't pick her up due

 9    to manpower, I think it was, they didn't have enough

10    people working.  So she was advised on that.

11            The driver's license -- the operator's license was

12    suspended.  And so I asked Officer Meredith to write the

13    passenger, who was the owner, Queen, to write her a

14    citation for wrongful entrustment, for letting one drive

15    without a license.

16    Q       So let me ask you, Officer Smith, you arrived on

17    scene, and I viewed the video.

18    A       Okay.

19    Q       I think it's a dash cam, and there was some body

20    cam, too, right?

21    A       Yes.

22    Q       And you pulled over the vehicle, as you stated, and

23    then you walked up.

24            And when you're pulling somebody over, you address

25    the person driving the vehicle, and if there's somebody
```

1    else, right, when you approach them?

2    A       Right.

3    Q       When you approached the car, did you recognize

4    Queen?

5    A       No.

6    Q       So --

7    A       I didn't even see her.

8    Q       Okay.  So you walked up and you saw the driver, and

9    you weren't able to see --

10   A       Yeah, I just saw -- as long as I can see the

11   passenger's hands, I'm cool.  I don't believe I even

12   acknowledged her until later on, when I asked her why she

13   was letting someone drive without a license, when she had

14   a valid license.

15            MR. McLANDRICH:  Can we take a couple minute

16        break?

17            MR. KLEBANOW:  Can I ask this line of

18        questioning, first, or do you want to take the

19        break immediately?  I'd like to finish the line of

20        questioning.  But if it's an emergency room, or if

21        there's a real reason, I guess we can, but I'd like

22        to finish my line of questioning.

23            MR. McLANDRICH:  Go ahead, finish.

24            MR. KLEBANOW:  I'll be brief, if you need to

25        take a break.

1    BY MR. KLEBANOW:

2    Q     Officer Smith, so you had stated right off the bat,

3    you walked up and you were addressing the driver, who was

4    not Queen Miller.

5    A     Right.

6    Q     And then at some point during the stop, you did

7    begin to interact and speak with Queen Miller, who was in

8    passenger seat, right?

9    A     Right.

10   Q     When you started speaking with Queen, did you

11   immediately recognize her?

12   A     No.

13   Q     Did you recognize her at all?

14   A     No.

15   Q     So this is somebody that you had sex with just a

16   few years prior, but you didn't remember her; is that

17   correct?

18   A     A few years, yes.

19   Q     Okay, so if you can continue on with what happened.

20   Keep going.

21         You said you think you had detained the driver, you

22   had called for a warrant check, and they didn't want them

23   because of a manpower issue.

24   A     The driver was hysterically crying, talking about

25   how she didn't want to go to jail, and could I just let

1   her go.

2          I told her it was going to be okay, tried to

3   reassure her of that, because she was crying like crazy in

4   the seat, and I was trying to help her to realize, you

5   know, they may not even want you, which they ended up not

6   wanting her.

7   Q      And then, at some point, you began addressing

8   Queen's issue, right?

9   A      Yes.

10  Q      Because there was a citation issued by Shaker for a

11  wrongful entrustment, you said?

12  A      Yes, Officer Meredith wrote the citation.

13  Q      But you interacted and spoke with Queen numerous

14  times during the stop, right?

15  A      Right.

16  Q      At any point during the stop, did you recognize

17  her?

18  A      I recognized that -- I remembered her from

19  somewhere, but I did not know where at the time.

20  Q      Do you remember at what point you remembered that

21  she was someone that you had slept with?

22  A      I remembered that after the stop, when we got --

23  after the restaurant, when we got to the restaurant.

24  Q      So at no point during the stop did you remember

25  her?

1   A       None whatsoever.

2   Q       Looking back on it now, do you find it strange that

3   she didn't say anything to you about it?

4   A       If she remembered, yeah.

5   Q       Was there anything of note that you remember that

6   was said at the traffic stop, other than routine business?

7   A       From me to her?

8   Q       Either one.

9   A       Well, her car did break down.  It wouldn't start.

10  Q       Sure.  Okay.  So you found that unusual?

11  A       Yeah.  I mean -- yeah, it's not normal for the car

12  to stop working on a stop.

13  Q       Was there anything said during a conversation about

14  the breakdown that struck you as unusual?

15  A       No, we were just going to -- she asked if we could

16  jump the car.  And my partner, I think it was Briana,

17  informed her that we couldn't do that because of our

18  computers, it would mess the system up.  So she's got to

19  have a licensed driver come and jump her car, or -- yeah,

20  give her a jump.

21  Q       So was there anything -- and I understand it might

22  not be usual for the car to break down, but it sounds like

23  still it's fairly routine police business.

24          Was there anything said by either her or you, that

25  you remember, that was very out of the ordinary at the

1    stop?

2    A      She complimented me.

3    Q      What did she compliment you on?

4    A      She said, you have very nice eyes.

5    Q      Okay.  Did you respond to that?

6    A      No.

7    Q      What did you take that to mean?  Just a little

8    compliment, or did you think of it as something more?

9    A      I didn't really know.  I didn't -- I don't know.  I

10   didn't take it as anything in the beginning, until all

11   this happened afterwards.  So no.

12   Q      You said you've had a number of phones since the

13   University of Akron.  How many phones have you had?

14   A      At least five, maybe, give or take.  Probably five,

15   six.

16   Q      Did you have a new phone in between Akron and the

17   East Cleveland gas station?

18   A      I don't remember.

19   Q      Have you gotten a new phone since the East

20   Cleveland gas station incident?

21   A      Yeah.  Yes.  I don't remember between the time

22   frame of Akron and East Cleveland, whether I had the same

23   phone.

24   Q      After the East Cleveland gas station incident, you

25   said you've gotten a new phone?

```
 1    A      Yes.
 2    Q      Did you transfer all your numbers to that new
 3    phone?
 4    A      Not all of them.
 5    Q      Some of them?
 6    A      Most of them.  And I didn't transfer it.  The
 7    company transferred -- the phone provider transferred
 8    them.
 9    Q      So is there a reason -- for example, you said some.
10    Did you pick and choose which ones you wanted?
11    A      No.  They said all of them don't always get
12    transferred.
13    Q      And you don't know which ones came through and
14    which ones didn't?
15    A      Correct.
16            MR. KLEBANOW:  John, if you need to take a
17        break, we can.  Otherwise, I can keep going.  Do
18        you need a break?
19            MR. McLANDRICH:  Yeah, let's take a quick
20        break.
21            MR. KLEBANOW:  That's fine.
22            (Short recess had.)
23            MR. KLEBANOW:  Back on record after a short
24        break.
25
```

1    BY MR. KLEBANOW:

2    Q       Officer Smith, what I was asking you right before

3    the break is about your phones, and you had indicated that

4    you have gotten a new phone since your encounter at the

5    East Cleveland gas station with Queen Miller, and you had

6    indicated that some of the numbers transferred, but you

7    weren't sure if all of them transferred; is that accurate?

8    A       Yeah, that's accurate.

9    Q       The stop with Queen Miller and one other individual

10   was around 3:00 in the morning on the 21st of September,

11   2018.  Does that sound right?

12   A       It sounds right.

13                  (Thereupon, Plaintiff's Exhibit 6 (Smith) was

14           marked for identification.)

15   BY MR. KLEBANOW:

16   Q       Officer Smith, you've been handed what's been

17   marked are Plaintiff's Exhibit 6.  Do you recognize this

18   document?

19   A       Yes.

20   Q       What is that document?

21   A       It's a City of Shaker Heights traffic citation.

22   Q       And this was the ticket that you had referenced

23   earlier that Queen Miller received regarding the wrongful

24   entrustment?

25   A       Yes.

1  Q      It looks like the time was 2:29; do you see that?

2  A      Yes.

3  Q      And it's not circled, but that was a.m., correct?

4  A      Yes.

5  Q      And do you see, if you look at the -- I'll describe

6  it, I guess it's the side of the ticket.  But if you turn

7  it sideways, you can see where there's Present Address,

8  there's a spot for a signature and a phone number; do you

9  see that?

10 A      Yes.

11 Q      And it looks like Ms. Miller filled in her phone

12 number; do you see that?

13 A      Yes.

14 Q      At the time that this ticket was issued, are you

15 certain one way or another if you already had Ms. Miller's

16 phone number?

17 A      At the time of the --

18 Q      That the ticket was issued.

19 A      No, I wasn't certain, because I didn't even

20 remember her.

21 Q      At around 3:00 a.m., after the car issue --

22 A      Uh-huh.

23 Q      -- both the driver and Ms. Miller left the scene;

24 is that correct?

25 A      It was later than that, but yes.

```
1    Q      Okay, around what time do you remember it being?

2    A      Maybe like 4:00.

3    Q      So around 4:00 a.m., everyone had left the scene?

4    A      Yeah.  Somewhere around there, yes.

5    Q      Were you working -- presumably you were working the

6    night shift?

7    A      Yes.

8    Q      And what time does that shift end?

9    A      That shift ends at 6:00 a.m.  For me, it ended at

10   5:00 a.m.

11   Q      For you, it ended at 5:00 that day, or it always

12   ends for you at 5:00?

13   A      That day.

14   Q      Why did it end at 5:00 that day?

15   A      Because I was the early car that day.

16   Q      What does it mean to be the early car?

17   A      It means you arrive an hour earlier, before the

18   rest of the shift does, to overlap the previous shift by

19   an hour.

20   Q      And then you get to leave an hour earlier?

21   A      Yes.  But you take all the calls, so that the

22   previous shift doesn't have to be held over for overtime.

23   There's two early cars.

24   Q      Did you have any calls come in that you responded

25   to in between Queen's and when you got off work that day?
```

MORSE, GANTVERG & HODGE

```
 1   A      I don't believe so.

 2   Q      You don't --

 3   A      Say that again.

 4   Q      No problem.

 5   A      Calls for service?

 6   Q      Yeah.  So what I mean is -- when I say that, and my

 7   terminology might not be correct, that you'd get a phone

 8   call -- not a phone call -- you'd get a call over the

 9   radio if there was an issue in Shaker and you have to

10   respond to it, right?

11   A      Right.

12   Q      Or if you're driving on the roads and you see

13   someone driving erratically, or they're speeding, or they

14   run a stop sign, you would pull them over, right?

15   A      Right.

16   Q      In between around 4:00 a.m., when you told me that

17   Queen left the scene and the stop ended, and you said you

18   got off around 5:00, did you respond to any calls or

19   initiate any stops between 4:00 and 5:00?

20   A      I don't recall, but I don't believe so.

21   Q      What did you do right when you got off work that

22   day?

23   A      Turned in my tickets that I wrote that day.  I went

24   into the roll call room -- I'm sorry -- the report writing

25   room, turned in all my paperwork from that day.  Cleaned
```

1   my car out.  What I mean by that is, gathered all my

2   stuff, my bags, work bags, jacket, and made the car ready

3   for the next officer to come on shift.

4   Q      And you left around 5:00 a.m. from the Shaker

5   Heights police station?

6   A      Yes.

7   Q      And you got into your personal vehicle which was

8   parked there?

9   A      Yes.

10  Q      What did you do right after that?  So you got in

11  your car.  Where did you go?

12  A      I was heading home.

13  Q      Where do you live?  Or where did you live, I should

14  say, at the time?

15  A      I lived on the west side, in Strongsville.

16  Q      Did you make it home?

17  A      Eventually, yes.

18  Q      Did you make it home directly from the police

19  station?

20  A      No.

21  Q      So where did you go -- strike that.

22         Did you call anybody when you got off work?

23  A      No.

24  Q      You didn't call anybody?

25  A      No.

1  Q      Did anyone call you?

2  A      Yes.

3  Q      Who called you?

4  A      Your client.

5  Q      When you say, my client, you're referring to Queen

6  Miller?

7  A      Yes.

8  Q      You're saying that she called you at around 5:00

9  a.m.?

10  A      Yes.

11  Q      What did she tell you?

12  A      She asked me -- she told me that she -- it was

13  going to be hard for her to pay for this ticket, and could

14  I meet her.

15  Q      So you're saying she asked you to meet?

16  A      Yes.

17  Q      And where did she want to meet you?

18  A      She told me she wanted to meet at someplace that

19  had pancakes.

20  Q      Okay.  Did you tell Ms. Miller that you were near

21  her home?

22  A      No.

23  Q      Were you near her home?

24  A      No.  I didn't know where her home was.

25  Q      Didn't you have a copy -- didn't you have access to

1  this ticket?

2  A       I had access to it, yes.

3  Q       Did you ever look at her address?

4  A       No.

5  Q       But you could have?

6  A       I could have.

7  Q       And you could have looked at her phone number,

8  right?

9  A       I could have.

10  Q       When she called you -- you claim she called you.

11  A       Correct.

12  Q       And it was right around 5:00 a.m.

13  A       Correct.

14  Q       Right when you were getting off work.

15  A       That's correct.

16  Q       Did her phone number come up as one that was

17  already in your phone, or did --

18  A       No.

19  Q       If you would just let me finish the question.

20  A       I'm sorry.

21  Q       That's okay.

22          -- or did it come up as one, where it just comes up

23  as the number because it's not saved?

24  A       Her name and number didn't come up.  It was just a

25  number that came up.

1   Q     So it came up as if it's a call from a number

2 that's not saved in the phone?

3   A     That's correct.

4   Q     Do you usually answer phone calls from numbers that

5 aren't saved?

6   A     Sometimes.

7   Q     Is there a reason you would answer one versus not

8 answer one?

9   A     Yes, there are some times.

10   Q     What are those reasons?

11   A     More so if I feel like it.  This particular

12 situation was because of the time of day, I thought it was

13 kind of unusual for a telemarketer to be calling, so I

14 thought it might have been an emergency or something.

15   Q     So you received this phone call.  Were you

16 surprised that she was calling you?

17   A     Yes.

18   Q     And what was said on the phone call?  You already

19 indicated she said she wanted pancakes, but give me as

20 much detail as you can give me about what was said between

21 both you and her on the call.

22   A     I asked where she wanted -- I agreed to meet and

23 asked her where.

24   Q     Did you feel it was appropriate to be meeting her?

25   A     I didn't feel it was not appropriate.

```
 1    Q      Did you even know what she wanted to meet about,
 2   other than her saying she wanted pancakes?
 3    A      Well, yeah, she wanted to discuss the ticket.  And
 4   she also told me she had a sick child who was, her words,
 5   terminally ill.
 6    Q      How many tickets -- and I know you don't know the
 7   exact number -- do you think you write in a given calendar
 8   year?
 9    A      So like you're saying the year 2016, 2017?
10    Q      Yeah, just a given year.  And I'm not asking for an
11   exact number.  Give me an estimate of how many tickets you
12   think you would write in a given calendar year?
13    A      Between 800 and 1,100.
14    Q      So in your career, is it safe to say you may have
15   written around 5,000 tickets?
16    A      At least.
17    Q      Maybe between 5,000 and 10,000 tickets?
18    A      Yes.
19    Q      How many times have you met with somebody outside
20   of work that you issued a ticket to, to discuss the
21   ticket?
22    A      You mean planned or unplanned?
23    Q      Planned.  And not in court.  I don't mean, you're
24   called to testify in a court proceeding.  I mean where you
25   would go with them to a restaurant, or Starbucks, or a
```

```
1   bar.
2   A       A few times.  So I would not go with them.  There's
3   been times when I've seen people that I've cited, and
4   they'll come up to me and say, hey, do you remember me?
5           I say, yeah.
6           Or I'll say, no, and they'll tell me, hey, I think
7   you cited me, gave me a ticket.
8           Sometimes I'll say I did, or I'll say -- if I
9   remember, I'll say yes.
10  Q       And I understand that that could happen, right,
11  where you could be at a restaurant, somebody could come up
12  to you.
13          What about planned, where you planned to meet
14  somebody that you had issued a citation to, to discuss the
15  ticket?
16  A       Never.
17  Q       This was the only time?
18  A       Yes.
19  Q       Did you ask her what she specifically wants to meet
20  about, or was it just generally, I want to talk about the
21  ticket, and you agreed to go and meet her for pancakes to
22  talk about the ticket?
23  A       It was the ticket.  She mentioned that, like I
24  said, her son was -- or child was terminally ill.  She
25  didn't want to go into details over the phone.
```

**MORSE, GANTVERG & HODGE**

```
 1        And she also mentioned about her car being -- she
 2   was having car issues.  Well, she said, this is going to
 3   be a setback for her and the child, because she has
 4   medical bills.
 5        And then she mentioned her car being -- I think it
 6   was a new battery, and something else she mentioned, I
 7   don't know what it was, something else was wrong with her
 8   car.
 9   Q    Okay.
10   A    It was going to set her back.
11   Q    So you settle up on meeting -- was it at the
12   landmark?
13   A    Yeah, we agreed to meet there.
14   Q    Who came up with the idea to go to the Landmark?
15   A    Her.  Because I said, well, what's open?
16   Q    Okay.  And so she said, let's meet at the Landmark?
17   A    Yes.
18   Q    And did she give you a time?
19   A    Well, I said, did you want to meet -- I said, do
20   you want to meet later on?
21        She said, we can meet now, if you can.
22   Q    So you drive right from the station to the
23   Landmark?
24   A    Yes.  I didn't know how to get there, though.  She
25   told me how to get there.
```

1   Q      And you made your way to the Landmark?

2   A      Yeah.

3   Q      Did you enter it into your phone to get directions?

4   A      No.  She told me how to get there, because I didn't

5   know how to get there.

6   Q      So you didn't enter it into your phone?

7   A      Correct.

8   Q      And you were going straight from work, so you were

9   wearing your uniform?

10  A      No.  We change.

11  Q      Okay.  So you're saying -- what were you wearing

12  when you went to meet her?

13  A      I had on black sweatpants and a jacket.

14  Q      Do you normally wear your uniform home on a normal

15  day and change at home, or do you change and only leave

16  your uniform at Shaker Heights Police Department?

17  A      I'll change and take it with me to wash.

18  Q      Oh, okay.  So there's no requirement from the City

19  of Shaker that you leave the uniforms at the station?

20  A      They don't like you to wear a uniform out.  So you

21  can't show it or display it.  So if you have a coat on,

22  it's fine.  But they don't want anybody to know where you

23  work.

24  Q      So would it be a violation of Shaker Heights

25  policy -- for example, let's say you were leaving that

1    day, and you were just wearing your uniform.

2    A       With nothing over it?

3    Q       Nothing over it, and you just drove home.

4    A       Yeah, that's in our policy.  That's a violation.

5    Q       A violation of the policy.

6    A       Yes, correct.

7    Q       So if -- I'm not saying that you're saying you

8    did --

9    A       Okay.

10   Q       -- if you had worn your uniform to the Landmark,

11   and had breakfast with Ms. Miller in the Landmark in your

12   uniform, that would have been a violation of policy?

13   A       Yes.

14   Q       So you make it to the Landmark, and she makes it to

15   the Landmark?

16   A       Uh-huh.

17   Q       And what do you talk about at breakfast?

18   A       She goes on and talks about her child -- first of

19   all, to go back, when she's calling me, she's crying, or

20   it sounded like she was crying hysterically, and then she

21   asked me to meet her.

22           And then fast forward, she -- I thought she was

23   crying.  It looked like tears come out of her face.  And

24   we were talking about the ticket I had written her, and

25   how it was going to set her back.  She told me again her

```
 1   child was sick, and she wasn't going to be able to afford
 2   this, it was going to throw her finances off even further,
 3   or dig a hole deeper in her finances.
 4   Q      Did she say what illness her child had?
 5   A      She never said the illness.
 6   Q      Did you ask her?
 7   A      I did ask.
 8   Q      What did she respond?
 9   A      She just said, he's sick.  She never went into
10   details about what the sickness was.
11   Q      Do you know, today, if she has a terminally ill
12   child?
13   A      I do not.
14   Q      Do you know, today, if she has a child at all?
15   A      I do not.  I believe she does.
16   Q      What makes you believe that?
17   A      On Facebook, her public place, she has pictures of
18   a child.  I'm assuming it's hers.  I don't know that to be
19   a fact, that's all.
20   Q      What else did you talk about at breakfast?
21   A      Talked about -- she asked me if I could help her
22   with the ticket, or with her car, if I knew any mechanics.
23   Q      Why did you agree to meet her in the first place?
24   I mean, it's 5:00 a.m.
25          What time did you start that night?  What time does
```

1   your shift start at night?

2   A      5:00.

3   Q      5:00 p.m.

4   A      Twelve hours shifts.

5   Q      Twelve hours shifts.

6          So you just worked a 12 hour shift.  Presumably,

7   you're tired; is that correct?

8   A      Yeah.

9   Q      You get a call from somebody who you claim at this

10  point you still haven't recognized from your past; is that

11  correct?

12  A      Correct.

13  Q      And this woman is upset, and crying, and not happy

14  that she got a ticket; is that right?

15  A      That's right.

16  Q      Why would you go meet this person for breakfast?

17  Why wouldn't you just tell them no?

18  A      Well, I asked her if we could meet later, and she

19  said, can we meet now?

20  Q      But just because she asked, doesn't mean you have

21  to.

22  A      That's right.

23  Q      So why would you go?

24  A      I guess because she was crying so hysterically, I

25  just felt bad.  She was crying.  I don't know.  Other than

**MORSE, GANTVERG & HODGE**

1    that, she was crying so hysterically.

2    Q       Didn't you think this was weird?

3    A       A little bit, yeah.

4    Q       I mean, you've had a fairly long law enforcement

5    career.  Not crazy long, but lengthy enough.  Has it ever

6    happened to you before?

7    A       No.

8    Q       So it's weird, right?

9    A       Well, people have cried, yes.

10   Q       Well, cried.

11           But a situation where somebody calls after a 12

12   hour shift at 5:00 in the morning, and they want to meet

13   you for breakfast to talk about a citation that you just

14   issued, that hasn't happened, has it?

15   A       No, it hasn't.

16   Q       Did you think it was really weird?

17   A       I thought it was weird.

18   Q       And at this point, you still hadn't recognized her

19   until you got there; is that right?

20   A       Correct.

21   Q       Did you recognize her as soon as you got into the

22   Landmark?

23   A       No.

24   Q       At what point did you remember?

25   A       When I was sitting in her car.

```
1   Q      So we haven't gotten there yet in our --
2   A      Correct.
3   Q      So all through breakfast, you don't remember at all
4   that this is a person that you allege you've had sex with
5   before?
6   A      That's correct.
7   Q      And seen again at an East Cleveland gas station.
8   A      That's correct.
9   Q      Anything else of note that you talked about at
10  breakfast?  So you said you talked about her financial
11  situation, it sounds like, a terminally ill child.
12  A      Her car, broke down car.
13  Q      Getting her car fixed, or asking for a mechanic.
14  Anything else?
15  A      Not at breakfast, no.
16  Q      So as breakfast is coming to an end --
17  A      Uh-huh.
18  Q      -- did the server bring the bill?
19  A      Yeah.  Yes.
20  Q      Did you grab it and say, I'm going to pay for this
21  for you?  Did she ask you to split it?
22  A      The server put the bill in front of me, and I
23  just -- I just paid for it.  I just said, I've got it.
24  Q      And did you do that just to be nice?
25  A      Yes.
```

1  Q     Do you remember how much the bill was?

2  A     It wasn't that much.  It was -- it was less than

3  $20.  I don't remember the exact dollar amount, though.

4  Q     I think you had indicated in your responses to

5  interrogatories that you let Ms. Miller keep the change?

6  A     Yeah.

7  Q     Was that just a few dollars?

8  A     Yes.

9  Q     Is there a reason that you would just let her have

10  a few bucks, like a couple of dollars?  Was it, again,

11  just to be nice?

12  A     She asked.

13  Q     So I understand, the bill comes, you said it was

14  under 20.  So let's say it's $17 or $18, something like

15  that.

16  A     Right.

17  Q     And she brings you back three dollars change, and

18  Ms. Miller says, hey, can I have that three dollars or two

19  dollars?  Is that how it happened?

20  A     I had other money with me, and she asked -- when I

21  said I would help her, she said, well, you can start by

22  helping me with that right there.

23        And I said, no, I can't give you that.

24        She said, what about the change?  And I gave her

25  the change.

1    Q      Were you insulted that she asked you for money?

2    A      Insulted?  No.  It was three dollars --

3    Q      Well --

4    A      -- four dollars.

5    Q      I thought you indicated that she asked you for more

6    money, and you said, I can't do that, but then she said,

7    can I have the change.

8    A      I wasn't insulted, no.

9    Q      That did happen, though, right?

10   A      Yes.

11   Q      So she asked for additional money, you said no, but

12   then she said, can I have the couple bucks, and you said

13   sure?

14   A      Right.

15   Q      Did you find it strange that she was asking the

16   police officer who had been involved in writing her a

17   ticket to pay for her ticket?

18   A      Yes.

19   Q      And you indicated that you told her something to

20   the effect of, I can't do that; is that right?

21   A      Right.  Then and there, yeah.

22   Q      What did you say exactly; do you remember?

23   A      I don't remember exactly what I said, no.

24   Q      Was it directly related to the ticket?  So what I

25   want to differentiate between is, did she just say, hey,

**MORSE, GANTVERG & HODGE**

1   can you help me out with some money, and you said no, or

2   did she say, can you help me pay for the ticket, and you

3   said, I can't do that?

4   A     She never said about the ticket.  She said, can I

5   have that right there, referring to the money I had in my

6   hand.

7   Q     I see.  So you had more than just the $20 in your

8   hand, and she wanted all of it?

9   A     She wanted what was in my wallet, yeah.

10  Q     I understand.  And you said, no, but she could have

11  the four dollars change, or three dollars change.

12  A     Yes.

13  Q     What happened immediately after you paid the bill?

14  A     We walked outside.  We each had a to-go box.  We

15  didn't finish the meal.

16  Q     Okay.

17  A     We walked outside.  I said, I'll -- I think she

18  said -- no, I said, I'll call -- she said, call me if

19  you're going to help me, if you're truly going to help me.

20        I said, okay, or something along those lines.

21        And then I was going to walk to my car, and she

22  asked -- she said, do you have a minute just to talk a

23  little further, could you sit in my car for a second.

24  Q     So when she said, call me if you're really going to

25  help me, in your mind, were you thinking you were going to

1    do more?

2    A       What do you mean by more?

3    Q       So what I mean by that is, she says, call me if

4    you're really going to help me.  At that moment, are you

5    thinking, yes, I'm going to call her and I'm going to find

6    a way to help her more, or --

7    A       Yes, that's it.

8    Q       That is what you were thinking?

9    A       Yes.

10   Q       Why are you going out of your way to help this

11   particular person so much?

12   A       She's not the first person I've ever helped.  What

13   I mean by that is, she's not the first person I've ever

14   given money to, to help somebody out.  And I don't mean

15   for a ticket, but I mean, in general, I've helped a lot of

16   people with money who needed help.

17   Q       So I'll go back to that, but let me follow up.

18           Have you ever paid for someone's ticket --

19   A       No, I have not.

20   Q       -- before, that wasn't your own?

21   A       No, I have not.

22   Q       Whether it be one that you wrote, somebody else in

23   the Shaker Heights Police Department wrote, or any ticket

24   ever, you have never assisted somebody else in paying for

25   a ticket?

1   A       Oh, yes, I have.

2   Q       Okay.

3   A       But not as a police officer, yes.

4   Q       So as a police officer, since you've been a police

5   officer, you're saying you have helped other friends, or

6   family, or somebody, pay for a ticket?

7   A       But not one that I wrote, or one of my colleagues

8   wrote.  And I was a police officer during that time, but

9   it wasn't one I actually wrote.

10  Q       Okay.  So to narrow it down a little further, you

11  are saying -- strike that.

12          Have you ever paid for a ticket that was written by

13  the Shaker Heights Police Department?

14  A       No.

15  Q       And at any point in your law enforcement career,

16  you have never paid for a ticket that you either issued or

17  were involved in any way in issuing?

18  A       That's correct.

19  Q       So then she says that she wants to talk to you a

20  minute or two further, and she asked you to come into her

21  vehicle, or go into yours?

22  A       Her vehicle.  Because we went in her vehicle and

23  sat in her vehicle.

24  Q       What kind of car was it?

25  A       Hers?

1    Q       Yes.

2    A       It was a Jeep, a small Jeep.  A Compass.

3    Q       And you're getting that off the ticket?

4    A       Yes.

5    Q       Do you have an independent recollection of the car,

6    the color of the car, other than looking at the ticket, or

7    are you just getting that by looking at the ticket?

8    A       It was dark colored, it had illegal window tint,

9    and that's pretty much it.  And it was small, a smaller

10   Jeep. I remember it was a smaller Jeep.

11   Q       So you get in her car, and what happens next?

12   A       She starts bursting out crying.

13   Q       Okay.  And what do you do?

14   A       I'm just sitting there, looking at her, saying,

15   it's going to be okay.

16           And she said, you don't understand what this is

17   going to do to me.

18   Q       So she's crying hard?

19   A       Yeah.

20   Q       She's very upset?

21   A       Yes.

22   Q       Okay.  And how do you respond when she says, you

23   don't know what this is going to do to me?

24   A       I said, that's why I said I'm going to help you.

25   Q       I'm sorry?

**MORSE,  GANTVERG & HODGE**

```
 1   A      I said, that's why I said, I'm going to help you,
 2   I'm going to help you out.
 3   Q      Then what happened next?  Did she say, how are you
 4   going to help me, are you going to give me money?  What
 5   response did she have?
 6   A      She said, I really hope you can, I would be
 7   grateful, or that would really help me out, or something
 8   like that.
 9   Q      And she's still crying?
10   A      Yeah.  But then she starts kissing my neck.
11   Q      So you're saying that while she's crying really
12   hard, and telling you this, she then begins to kiss your
13   neck while she's crying?
14   A      Yeah, on the left side, right here (indicating),
15   yep.
16   Q      And what do you do?
17   A      Well, she starts touching my private area, and I --
18   I said something along the lines that, what are you doing?
19   Q      Were you married at the time?
20   A      Yes.
21   Q      Did you have your wedding ring on?
22   A      Yes, I did.
23   Q      When you said she started grabbing your private
24   area, is that over your pants or under your pants?
25   A      It was briefly over my pants, and then she
```

1    unfastened them and went inside my pants.

2    Q       And at any point, did you tell her to stop?

3    A       I said, what are you doing?

4    Q       And what did she say?

5    A       Nothing.

6            And then she got out of her seat -- because she's

7    sitting in the driver's seat, I'm in the passenger seat.

8    And she reaches down my left side, and she starts -- she

9    doesn't slide over.  She like turns, and then turns again,

10   and sits in my lap.

11   Q       So she goes from --

12   A       She -- go ahead.

13   Q       She's crying really hard, she starts kissing your

14   neck.  She starts touching you over your pants, and then

15   unfastens your pants.  You say, what are you doing, and

16   then she maneuvers herself to be straddling you?  Do I

17   understand that right?

18   A       What do you mean by straddling?

19   Q       So straddling, where she would be facing you, and

20   her legs would be on top of you?

21   A       No.

22   Q       Okay, so can you explain?  I'm just trying to

23   figure out where you both are.

24   A       So we're both -- I'm in the passenger seat, facing

25   forward.

1    Q      Okay.

2    A      She's in the driver's seat, facing forward.  She

3    turns to her right, and then she's facing the back --

4    turns to the right again, so she's facing me.  The first

5    time, she's facing the back seat.

6           And then she turns a third time.  By the third

7    time, she's moving from her seat, back into my seat.

8    Q      With you there.

9    A      Yes.

10   Q      So she's on top of you.

11   A      Yes.

12   Q      Is she facing you?

13   A      She's facing the front.

14   Q      Okay.  So she's facing the front windshield, and so

15   are you.

16   A      Correct.  She's basically sitting in my lap.

17   Q      Okay.

18   A      After she pulled my private parts out.

19   Q      Are you wearing pants at this point?

20   A      Yeah.

21   Q      Are they pulled down?

22   A      They're up.

23   Q      They're up, but unfastened.

24   A      Yes.

25   Q      Is she wearing all her clothes at this point?

1   A       Yes.  But I forgot to say, she had on shorts

2   initially.  And when she came there, she had on a skirt, a

3   really short skirt.

4   Q       Okay.  And was she wearing underwear?

5   A       No, I don't believe so.

6   Q       Okay.  So what happened now that she's sitting

7   there facing forward, and you're facing forward?  And you

8   had stated to her, what are you doing, and there was no

9   response; is that correct?

10  A       Correct.

11  Q       What happened next?

12  A       She -- well, if I can remember, she was leaning

13  down to the left.  She was turned, and she was grabbing

14  something.  I didn't know what it was.  And it was the

15  condom.  So when she turned, she sat on me, and she put

16  the condom on me.

17  Q       When you say that -- are you saying she had it with

18  her, or she got it -- where did she get the condom from?

19  A       I think it was in her purse, or it was down here on

20  the floor (indicating).  I don't know where.

21  Q       So at that point, your pants -- and were you

22  wearing underwear, boxers?

23  A       I was wearing boxers.

24  Q       And those were pulled down, as well?

25  A       No, they are up.  Both my pants and my boxers have

**MORSE, GANTVERG & HODGE**

```
 1    flies.  I don't know the proper name, but an opening.

 2    Q      So she went through that and put the condom on?

 3    A      Yes.

 4    Q      Are you saying anything else at this point?

 5    A      No.

 6    Q      Did you think it was appropriate at the time, what

 7    you were doing?

 8    A      What I was doing, or what she was doing to me?

 9    Q      Both of you.  You were about to have sex, right?

10    A      It appears so, yes.

11    Q      So did you feel it was appropriate?

12    A      No.  It was probably why I couldn't say anything.

13    It was like I couldn't talk.

14    Q      You didn't tell her, stop, right?

15    A      I did, eventually.

16    Q      After you had sex?

17    A      After she put the condom on me, she put me inside

18    her, and I told her, we can't do this, this isn't like

19    before.

20    Q      So at what point did you recognize that it was

21    somebody you had sex with before?

22    A      I believe when she started kissing my neck.

23    Because she did the same exact thing when I was in

24    college.  I almost had like a deja vu moment.  It was the

25    same motive, she kissed my neck, and then we had sex in
```

1   college.  And then she did the same thing, and that's

2   where I was like, oh, I remember you now.

3   Q     Did you say anything to her when you remembered

4   her, about that?

5   A     The only thing I said was, we can't do this, not

6   like before.  And then I said, I'm married now, I told her

7   that.

8         And then she turned and looked at me, and said,

9   what, you're married?

10        I said, yes.  And I said, see, and I showed her my

11  ring (indicating).  Then she --

12  Q     And how -- go ahead.

13  A     And then she said, you don't have to -- she said,

14  you don't have to -- something along the lines, you don't

15  have to worry because your wife's not here, or she'll

16  never find out, or nobody would ever know, something like

17  that.

18  Q     And what were you feeling when she said that?  What

19  were your thoughts?

20  A     What kind of person would try to sleep with

21  somebody when they know they're married, those were my

22  thoughts.

23  Q     Did you feel guilty for what you had just done?

24  A     Yes.

25  Q     Did you regret what you had just done?

1    A    Yes.  I regretted it, letting her make that move on

2    me, and moving that far in on me, yes.

3    Q    What was the time between when she first kissed

4    your neck and when you actually had intercourse?  Ten

5    seconds?

6    A    What time was it?

7    Q    No, no, I'm sorry.  Ten seconds, 30 seconds, 60

8    seconds?

9    A    Very short.  I mean, it was almost simultaneously.

10   It was probably three or four seconds.

11   Q    And how long did you actually have intercourse?

12   A    It wasn't even full intercourse.  She sat on me,

13   I'd say a total of three seconds, three or four seconds.

14   Q    That, to be frank, your penis was inside of her?

15   A    Yes, correct.

16   Q    Was there any oral sex?

17   A    No.

18   Q    Did you ever put your fingers inside of her?

19   A    No.

20   Q    So after she says to you something to the effect

21   of, your wife won't find out, or she won't know, what

22   happens next?

23   A    Well, after I said, we can't do this, it's not like

24   before, she gets up and goes back -- sits back in her

25   seat.  And I said, I have to go.

1   Q      And you get out of the car?

2   A      No.  She drives me back to my car.  Initially, we

3   had -- and I didn't say this -- she had pulled across the

4   street, away from the restaurant.  I forgot to say that.

5   Q      So you get into her car after you're done with

6   breakfast, she drives away.

7   A      First she pulls in the parking lot.  It was pitch

8   black.  And I said, I don't want to talk here, it's not a

9   good spot.  It didn't feel right.

10         So she pulled back in the street, makes a left,

11  pulls down St. Clair and parks on the right-hand side

12  across from the restaurant.

13  Q      So I'm understanding you, she's initially parked

14  right outside the Landmark?

15  A      Further back, yeah.  In front, yeah.

16  Q      In front of the building.

17         So I know the Landmark, it's a small restaurant

18  that's right off the street.

19  A      Yes.

20  Q      Was she parked on the street?

21  A      Yes.

22  Q      And it's right in front of the restaurant, where

23  she was parked?

24  A      A little further back, yeah.

25  Q      Okay.  Pretty close?

1    A       Yeah.

2    Q       And she asks you to get in the car to talk a little

3    further.

4    A       She wanted to talk more, yeah.  And I told her,

5    just for a second.

6    Q       And you tell her, when you get in the car, that you

7    don't feel comfortable with the spot that she's sitting

8    in?

9    A       I didn't feel comfortable with -- well, she said,

10   look at those guys.  And there were two guys in the front

11   of the store -- I forgot to say this -- there were two

12   guys in front of the store.  That was the whole reason we

13   moved from the front of the store to the parking lot.  The

14   guys looked, I don't want to say shady, but they looked

15   like they were up to no good.  So she said, I'm going to

16   pull over here.  That's why she pulled into the parking

17   lot.

18           So she pulled in the parking lot.  And that spot

19   was darker than being in front of the spot -- in front of

20   the restaurant.  So I said, well, this isn't any better, I

21   don't feel comfortable here.

22   Q       Why didn't you feel comfortable?  You were worried

23   about the two guys in the doorway?

24   A       Yeah.

25   Q       I'm just trying to understand.  You said you were

1    uncomfortable.  You were afraid of these two random

2    individuals in the doorway, or you wanted to -- you just

3    didn't want to be in a dark space with Queen?  Which of

4    the two?

5    A      Well, initially afraid -- she and I agreed it

6    wasn't good for us to sit there, because either they were

7    probably going to rob somebody, because of the time of

8    morning, and they were wearing dark clothing.  So we

9    agreed to pull away from there.

10           But she went to the parking lot, and I said, well,

11   this isn't any better, this is darker than -- nobody would

12   ever see us over here.  I said, why don't we go out there.

13           And she said, okay.  So she pulls out, turns left,

14   and goes down the street to St. Clair and parks.

15   Q      Why were you worried about people seeing you?

16   A      Well, if we were going to get robbed, you want

17   people to be able to see you.

18   Q      If you were genuinely afraid you were going to get

19   robbed, you're a police officer.  Did you call the police?

20   A      No.

21   Q      Were you carrying your firearm?

22   A      I don't remember if I had it on me or not.  But --

23   Q      Also, if you -- sorry to interrupt you.

24   A      It's okay.

25   Q      If you were worried about them robbing somebody, as

1    a cop, wouldn't you want to make sure they didn't do that?

2    A      Well, yeah.  But I didn't want to be the victim by

3    sitting there, and making it so easy for them.  Why would

4    you sit there and wait for somebody to rob you, if you can

5    move somewhere else.

6    Q      So you're saying you drove down the street and

7    around the corner --

8    A      No, I never said that.

9    Q      So you said you drove away to the spot from the

10   front of the building to where?

11   A      The very next driveway, which was the Landmark

12   parking lot.

13   Q      Okay.

14   A      She pulled in there, towards the back.  And I said,

15   well, this isn't any better, nobody can see us over here

16   if something were to happen.

17   Q      So you're still --

18   A      So basically, somebody could be hiding over there.

19   That's not a good spot.  Most robberies happen -- I want

20   to still be in the front, or somewhere well lit.  But

21   pulling into a dark parking lot wasn't a better choice, in

22   my opinion.

23   Q      So now you're not worried about the two guys,

24   you're worried about some random person hiding in the

25   dark; is that right?

**MORSE, GANTVERG & HODGE**

1    A      Both.  If those two guys start moving, nobody would

2    see us or anything, or if somebody else was hiding over

3    there.

4    Q      But you didn't notify anyone of these suspicious

5    individuals that you thought might be ready to rob

6    someone; is that right?

7    A      That's correct.

8    Q      And that's why you wanted to move?

9    A      That's why.

10   Q      No other reason?

11   A      No other reason.

12   Q      It wasn't to get more privacy with Queen?

13   A      No.  That's why I told her we should move on the

14   street, where it's well lit.

15   Q      And where did you move to?

16   A      At the end, we went out, made a left, and she

17   parked down and across the street, the opposite side of

18   the restaurant, Landmark.

19   Q      And were there people around when you parked for

20   the final time?

21   A      There were cars driving past down, but there were

22   no pedestrians walking, that I saw.

23   Q      Were you worried that somebody was going to see you

24   having sex with Queen, once she started to get on top of

25   you?

1    A      I was worried, yeah.  Not only that, but I didn't

2    want to have sex with her.

3    Q      Well --

4    A      I mean, it wasn't so much people seeing me.  I

5    wasn't trying to have sex with her.

6    Q      Well, you didn't stop her from having sex with you

7    until after, from your story, she had already gotten on

8    top of you and you started having intercourse, correct?

9    A      Right.  But they wouldn't have seen me anyway,

10   because her windows were illegally tinted.

11   Q      So that made you feel better about it?

12          MR. McLANDRICH:  Objection.

13   A      No.

14   Q      What did you do with the condom?

15   A      Took it off, and I put it in her passenger door.  I

16   forgot it was in her passenger door.

17   Q      Did you ejaculate into the condom?

18   A      I pre-came, or pre-ejaculated.

19   Q      After you had finished having intercourse, what

20   happened next?

21   A      She did a U-turn, drove me back to my car, and I

22   got out.  And I told her -- I said, I'll still help you,

23   it just can't be on these terms, it can't be like this,

24   because I'm married now.  And I left, she left.

25   Q      Did you give her any money?

```
1   A       No.

2   Q       So you gave her no money at that point?

3   A       No.

4   Q       Other than the few dollars for the --

5   A       The change, yes.

6   Q       Other than that, did you give her --

7   A       I didn't --

8   Q       -- any money?

9   A       No.

10          MR. McLANDRICH:  You can't both talk at the

11          same time.

12          THE WITNESS:  Sorry.

13  BY MR. KLEBANOW:

14  Q       So you didn't -- and I know it's clear from the

15  first question, but you're stating you did not give her

16  $150 at that first interaction at the Landmark?

17  A       Correct.

18  Q       Did she ever ask you to take care of the ticket?

19  And what I mean by, take care of it, did she ever ask you

20  if there was any way you could just get rid of it or make

21  it go away?

22  A       No.  I told her that you can't get rid of tickets.

23  You can't get rid of a ticket.

24  Q       And I understand.  And my question isn't, did you

25  get rid of a ticket.  I'm --
```

1    A      I understood the question.

2    Q      Did she inquire -- so you're saying, you told her,

3    once a ticket is written, it's written, essentially,

4    right, and I can't undue a ticket that's written?

5    A      (Witness nods).

6    Q      Was that a response to a question from Queen, can

7    you get rid of my ticket?

8    A      Well, she said, how can you help me?

9    Q      And your response was, I can't get rid of the

10   ticket?

11   A      She said, how can you help me with this ticket?

12          And I said, well, the ticket can't just go away.  I

13   can't make the ticket go away.

14   Q      And then did she follow up with, can you pay for

15   the ticket?

16   A      No, I said, it's not like the old days, where --

17   like my old job, you could probably just rip it up.  But

18   nowadays, you actually have to go by the book.  And

19   Shaker, we get audited a lot, everything is by the book.

20   Q      And you're saying, at your old job, being East

21   Cleveland?

22   A      Yeah.

23   Q      So at East Cleveland, it's a little less formal

24   than Shaker?

25   A      Honestly, yes.

1    Q       And at East Cleveland, it would have been possible

2    for you to just rip up the ticket and forget about it, but

3    in Shaker, you're saying that wouldn't be possible?

4    A       I won't say, for me to do it.  But you can give it

5    to a supervisor, and they can decide if it gets turned in

6    to the court.  They have the power there to get rid of it.

7    Q       And you could ask your supervisor, hey, do me a

8    favor and get rid of this one?

9    A       Not at Shaker.

10   Q       I'm talking about at East Cleveland.

11   A       Oh, yeah.

12   Q       Did you ever do that at East Cleveland?

13   A       Yes.

14   Q       What were the circumstances -- how many times do

15   you think you did that?

16   A       I did it for a parking ticket, that I remember.

17   Q       For a friend?

18   A       No, for an older lady.

19   Q       Okay.  Why did you do that?

20   A       Because I gave her a handicapped parking pass --

21   handicapped parking ticket, and she actually had a

22   placard, and I didn't realize it.  She brought it to the

23   station.  So I asked the supervisor, could he take care of

24   it.

25   Q       Did you do that on any other circumstances?

```
1    A       No.  Not that I remember, no.

2    Q       But you're saying, you know other people who have

3    done that?

4    A       Yeah.  Yes.

5    Q       For a number of reasons?

6    A       Yes.

7    Q       It could have been for friends, or family, or

8    something like that?

9    A       It could have been.

10   Q       But at Shaker, you're saying you've never seen that

11   happen?

12   A       Correct.  At Shaker, there is a form you can fill

13   out if you fill out a ticket incorrectly, and it still has

14   to go up the chain of command.  But it's not getting rid

15   of it or anything.

16   Q       And that's different.

17   A       The court can decide.  So yeah.

18   Q       That's different.  You're saying -- for Shaker,

19   you're saying it's procedurally done to get rid of or

20   correct a mistake --

21   A       Correct.

22   Q       -- whereas in East Cleveland, it could be, can you

23   help my friend or my family member out and just forget

24   about this one?

25   A       Yeah.
```

```
 1   Q      Do you think that's okay, that that happened in
 2   East Cleveland?
 3   A      Is it okay?
 4   Q      Yeah.  Do you think it's okay?
 5   A      I don't know.
 6   Q      So she drops you off at your car, this is the 21st.
 7   What are we talking, around 6:00 or 7:00 in the morning,
 8   8:00 in the morning?
 9   A      Yeah, I mean -- it was after 5:00, before 8:00.
10   Somewhere in there, yeah.
11   Q      Any other communications that day?
12   A      Not that day, no.  I don't believe any more that
13   day.
14          (Thereupon, Plaintiff's Exhibit 7 (Smith) was
15          marked for identification.)
16   BY MR. KLEBANOW:
17   Q      Officer Smith, you've been handed what's been
18   marked Plaintiff's Exhibit 7.
19   A      Okay.
20   Q      This is a copy of the interrogatory responses that
21   you provided to myself and my co-counsel.  Do you
22   recognize this document?
23   A      Yes.
24   Q      If you would flip to Page 4 --
25   A      Okay.
```

1  Q      -- and look at interrogatory Number 10; do you see

2  that?  It's at the very top of the page.

3  A      Yes.

4  Q      "Please list the times and dates in which you

5  contacted or attempted to contact Queen Tiera M. Miller

6  since September 20, 2018."  Do you see that?

7  A      Yes.

8  Q      And the response was, "I contacted Ms. Miller on

9  September 21, 2018 to advise her that she would need to

10  appear in court for her citation."

11  A      Yes.

12  Q      So you previously told me that Ms. Miller initiated

13  the contact based on your story to meet for breakfast; is

14  that correct?

15  A      Once I got off, yes.

16  Q      And after that time, you had sex in her vehicle; is

17  that correct?

18  A      Before this time, I contacted her.  I did contact

19  her before -- before I got off.

20  Q      Okay.  So you're saying that between the hours of

21  4:00 a.m. and 5:00 a.m., you contacted her?

22  A      Yes.

23  Q      And you got her number from the ticket --

24  A      Yes.

25  Q      -- to contact her?

1    A       Yes.

2    Q       And why did you contact her?

3    A       Because originally, I told her she did not have to

4    go to court.

5    Q       While you were at the stop?

6    A       Yes.

7    Q       Why did you tell her that?

8    A       Actually, I don't think I was the one.  I think my

9    partner, that wrote the ticket -- whatever the ticket

10   said, it was the opposite.

11           So Officer Meredith is the one who actually wrote

12   the ticket, and she put no, that she didn't have to go to

13   court.  But in fact, she did have to go to court.

14   Q       So looking at the ticket, which is Exhibit 6 -- do

15   you have it in front of you?

16   A       Yes.

17   Q       It looks like the Yes is X'd, and then the No is

18   circled and checked.  So they were both marked?

19   A       Yeah, they were both initially marked.

20   Q       And after she left, did you relook at the ticket

21   and realize that?  What made you call her?

22   A       I asked another officer, because I was changing

23   shifts, when you write a wrongful entrustment ticket, do

24   you have to go to court.  And he said, yes, I believe so.

25           So I -- it says No on the ticket.  So I called her

1  to tell her that you do have to go to court, so she

2  wouldn't miss a court date.

3  Q     And you're claiming you called her between 4:00 and

4  5:00 in the morning?

5  A     Before I got off.

6  Q     Did she answer the phone?

7  A     Yes.

8  Q     Do you normally call people who get citations, who

9  have mandatory court appearances, to let them know they

10  need to appear?

11  A     If I made a mistake on the ticket, yes.  Otherwise,

12  they'll miss their court date and get a warrant out for

13  their arrest.

14  Q     Has that happened before?

15  A     Had I ever called people?  Yes.

16  Q     No, no.  Has there ever been a mistake on a ticket

17  where you have had to follow up and call and tell them?

18  A     Yes.  More than a few times, yes.

19  Q     Because of your mistake?

20  A     Whether it's my mistake, or someone else's mistake,

21  the ticket was written, that part was in error.

22  Q     Don't you check before you issue the ticket as to

23  whether or not it's a mandatory appearance?

24  A     Yes.

25  Q     Don't you usually do that?

1    A       Do I usually --

2    Q       Don't you usually check before you write the

3    ticket?

4    A       Sometimes.

5    Q       Isn't that an important thing to look at before you

6    write a ticket, as to whether you're going to check a box

7    that there's a mandatory court appearance?

8    A       Well, I know, on most tickets, if you have to go to

9    court or not.  So I don't always have to check.  Like for

10   a red light violation, you don't have to go to court.  But

11   if it's like a suspended license, you have to go to court.

12           Wrongful entrustment, I wasn't sure about, so I

13   asked, and I found out the answer.  Once I found out I

14   made a mistake on the ticket, I called her.

15   Q       Did you make the mistake on the ticket, or did

16   Meredith make the mistake on the ticket?

17   A       Oh, Officer Meredith made it, and I called to

18   follow up.

19   Q       Why didn't Officer Meredith follow up?  Why were

20   you following up?

21   A       Well, it was my stop.  I was reviewing the ticket,

22   and I called after I asked.  It was my stop.

23   Q       What did you talk about on the call?

24   A       The ticket.

25   Q       That's it?

1    A      Yes.

2    Q      So what was said, as much as you can remember?

3    A      I told her she didn't [sic] have to go to court.

4    Q      And what did she say?

5    A      She said, I thought you told me -- she told me -- I

6    told her she did have to go to court.

7           She said, I thought you told me I didn't have to go

8    to court.

9           I said, I made a mistake.

10          And then that's when she said, this is really going

11   to set me back.  It sounded like she was crying again on

12   the phone.

13   Q      And when I asked you, and we went through the stop

14   earlier, did you just forget that you had made this call?

15   A      I did forget.

16   Q      But now you remember?

17   A      Well, you asked me -- you never asked me about the

18   phone call.  You only asked me about once I got off, what

19   I did.

20   Q      Is your telephone number 216-930-1408?

21   A      No.

22   Q      Was that ever your phone number?

23   A      No.

24   Q      What is your phone number?

25   A      216-374-5141.

1   Q       Do you know whose number it is, 216-930-1408?

2   A       No.

3               (Thereupon, Plaintiff's Exhibit 8 (Smith) was

4           marked for identification.)

5   BY MR. KLEBANOW:

6   Q       Officer Smith, you've been handed what's been

7   marked Plaintiff's Exhibit 8.  What this is, it's a copy

8   of an AT&T call log for Queen Miller.  Do you see on the

9   right side there's some highlighting?  Do you see that?

10  A       Yes.

11  Q       Do you see that that's under Friday, 9-21?  Do you

12  see that?  If you look up a little bit, there's Thursday,

13  9-20 at the top, and if you go down a few lines, you get

14  to Friday, 9-21; do you see that?

15  A       Yes.

16  Q       And do you see -- at 3:25 a.m., do you see where it

17  says, Cleveland, Ohio, 216-543-8120?  Do you see that?

18  A       Yes.

19  Q       And then the next indication is 5:00 a.m., and it

20  says, I-N-C-O-M-I, which indicates incoming; do you see

21  that?

22  A       Yes.

23  Q       And the number 216-930-1408.  Do you see that?

24  A       Yes.

25  Q       And there's a 27 minute phone call.  Do you see

1    that?

2    A      Yes.

3    Q      You're saying that this is not your phone number,

4    and you were not the person she spoke to for 27 minutes

5    while you were driving to the Landmark and she was giving

6    you directions; is that your testimony?

7    A      That's not my phone number.

8    Q      Okay.

9    A      I did speak to her.

10   Q      Do you believe that this was your phone call, and

11   it indicated it was the wrong number?

12   A      I don't know.  No.

13   Q      You told me that you got off work, and it was about

14   5:00, and you claim you received a phone call.

15   A      Correct.

16   Q      And then you claim that you drove to the Landmark.

17   A      Correct.

18   Q      And you told me that she was the one giving you the

19   directions, and stayed on with you while you went.

20   A      Correct.

21   Q      Would it take about 27 minutes to get from Shaker

22   to the Landmark?

23   A      No, probably not.

24   Q      How long do you think it would take?

25   A      Probably 15 minutes.

1    Q     So you don't believe this was you, that phone call

2    for 27 minutes, 5:00 a.m. incoming, 216-930-1408?

3    A     No.

4    Q     This log also indicates that there were no other

5    incoming calls between 3:25 and 5:00 a.m.; do you see

6    that?

7    A     I see that.

8    Q     Do you think this log is incorrect?

9    A     I don't know.

10   Q     Well, you told me that you believe you called her

11   between 4:00 and 5:00 in the morning; is that right?

12   A     That's right.

13   Q     So if she received a call between 4:00 and 5:00,

14   and it's not on this log, you would be stating that this

15   AT&T phone call log is incorrect; is that right?

16            MR. McLANDRICH:  Objection.

17   A     I don't know.  I don't see -- I don't see it on

18   there.

19   Q     Well, that's what I'm asking you.  If your story or

20   what you're saying was true, you're saying that there

21   should be a phone call that was incoming --

22   A     There should be.

23   Q     -- from your phone number between 4:00 and 5:00?

24            MR. McLANDRICH:  Objection.

25   Q     Is that correct?

1    A      That's correct.

2    Q      And you're saying that this AT&T phone log is then

3    not correct.

4    A      It doesn't show where she called me.

5    Q      So you're saying --

6    A      Or where I called her.

7    Q      So you're saying it's incorrect.

8    A      Yes.

9    Q      Do you believe that there were any other phone

10   calls between you and Queen that morning, other than this

11   call that you claim between 4:00 and 5:00 a.m., and the

12   phone at 5:00 a.m., do you believe there were any other

13   phone calls between you and her that day?

14   A      No.

15   Q      So you're claiming that this call at 5:36, do you

16   see that, 5:39, and 5:47, which have incoming from that

17   same number, 216-930-1408, you're claiming none of those

18   are you?

19   A      None of those are me.  It's not my number.

20   Q      Did you borrow anyone's phone that day?

21   A      No.

22   Q      Were you using anyone else's phone?

23   A      No.

24   Q      Is it possible you could have been using a phone

25   with the number 216-930-1408?

1   A      No.  I've had the same phone since eighth grade.

2   Q      I thought you told me you've change phones like

3   five times.

4   A      The same phone number since eighth grade.

5   Q      Did you have any communications with Queen Miller

6   after this interaction in the morning at the Landmark?

7   A      Yes.

8   Q      What type of interactions?

9   A      When we met at the Starbucks.

10  Q      How did you coordinate to meet at the Starbucks?

11  A      We discussed it over the phone.

12  Q      How long after September 21st did you meet at the

13  Starbucks?

14  A      It was in October.  I don't remember the exact

15  date.  It was in October.  So at least the next month.

16  Q      Okay.  Did you have any text messages in between

17  the time you met at the Landmark and when you met at the

18  Starbucks?

19  A      From her to me, or me to her?

20  Q      Either one.

21  A      No.

22              (Thereupon, Plaintiff's Exhibit 9 (Smith) was

23              marked for identification.)

24  BY MR. KLEBANOW:

25  Q      Officer Smith, you've been handed what's been

1    marked Plaintiff's Exhibit 9.  This is a series of text

2    messages starting on Friday, September 21st.  I just want

3    to go through them and ask you if any of them are things

4    you've written or you've received on your phone, okay?

5    A      Okay.

6    Q      So Friday, September 21st, at 8:36 in the morning,

7    do you see where it says, "u home"?

8    A      I see that.

9    Q      Did you send or receive that text message?

10   A      No.

11          MR. McLANDRICH:  Can we go off the record?

12          MR. KLEBANOW:  Sure.

13          (Thereupon, a discussion was had off the

14   record.)

15          MR. KLEBANOW:  We can go back on the record.

16   BY MR. KLEBANOW:

17   Q      Officer Smith, there was a short conversation

18   between your counsel and me off the record.

19          So Exhibit 9 --

20   A      Yes.

21   Q      -- we're on, and it is a series of some text

22   messages that I'm going to ask you about, okay?

23   A      Okay.

24   Q      The text messages were produced in this litigation

25   by plaintiff and plaintiff's counsel, okay?  And the

```
 1    messages that were produced indicated a phone number and a
 2    little bit of other information at the top, and due to
 3    some technical issues, counsel has had trouble printing
 4    them with all the information on the top, okay?
 5    A      Okay.
 6    Q      So although the words and the messages and the
 7    times in the messages are the same, there might be
 8    information at the top with the phone number that was
 9    produced in a different format to your counsel, okay?
10    A      Okay.
11    Q      Do you understand that?
12    A      Yes.
13           MR. McLANDRICH:  And I pulled them up on my
14           computer while we're sitting here.
15           MR. KLEBANOW:  Sure.
16           MR. McLANDRICH:  Just for completeness, if you
17           will, so not only is the phone number cut off at
18           the top -- and I don't know whether this is the
19           date and time of the original message, it's
20           probably not -- but it says, you know, AT&T and
21           LTE, and then probably the time they were
22           retrieved.  And then on the bottom of these
23           messages are a bunch of icons from the phone.
24           MR. KLEBANOW:  Can you turn it around?
25           MR. McLANDRICH:  Sure, absolutely.
```

```
 1              MR. KLEBANOW:  For the record, at the top,
 2         there is a phone number indicated, and it's the
 3         same phone number we've referenced, it is
 4         216-930-1408.
 5              MR. McLANDRICH:  Right.
 6              MR. KLEBANOW:  Okay.
 7    BY MR. KLEBANOW:
 8    Q    Officer Smith, do you understand that?
 9    A    Yes.
10    Q    Okay.  So I'd like to ask you some questions about
11    the document you have in front of you, okay?
12    A    Okay.
13    Q    Let's start off with this:
14         Why don't you flip through the few pages of
15    messages, let me know if any of those are any messages
16    that you sent or received.
17    A    Okay.
18    Q    Take your time.
19              (Pause)
20    A    Okay, I'm done.
21    Q    Do you recognize any of those messages?
22    A    No.
23    Q    So you're saying you didn't send or receive any of
24    those?
25    A    Correct.
```

1   Q       So going through some of them -- well, first and

2   foremost, you said you met at a Starbucks, correct?

3   A       The second time?

4   Q       The second time.

5   A       Yes.

6   Q       And you claim you arranged that by telephone.

7   A       Yes.

8   Q       Do you remember when you spoke to arrange that

9   meeting?

10  A       It was earlier that day.

11  Q       The day you met?

12  A       The day we met.  I don't know the date.  But

13  whatever day we met, it was earlier that day.

14  Q       You don't remember what day it was, the date?

15  A       No.

16  Q       Do you know if it was on East 185th, is that where

17  the Starbucks was?

18  A       That we met at?

19  Q       Yes.

20  A       No, it was in Beachwood.

21  Q       Oh, you met at Beachwood.  Okay.

22          Is there anything notable to you that's at East

23  185th by Lake Shore?

24  A       No.

25  Q       Nothing notable?

```
 1    A      No.

 2    Q      Did you ever offer to mail Queen any money?

 3    A      No.

 4    Q      Do you know what the Akron CMB stands for?

 5    A      Say that again.

 6    Q      CMB, do you know what that stands for?

 7    A      No.

 8    Q      Is it possible that you met with Queen at the

 9    Starbucks on Thursday, October 18th?

10    A      It's possible, I guess.  It was in October.  I

11    don't know if that's the exact date.

12    Q      Why did it take you so long to meet up with her, if

13    you wanted to help her out and give her money?

14    A      I had other finances, bills and things I had to

15    take care of.

16    Q      How much did you give her at the end?  What did you

17    give her when you went to Starbucks, how much?

18    A      I don't remember the exact amount.

19    Q      In your interrogatory, you stated that you gave her

20    $80 to $85.

21    A      Yeah.  That's not exact, though.  I told him it was

22    around that.

23    Q      And it was on or around October 18th.

24    A      Sure, around.

25    Q      So October 17th could have been the day?
```

1    A       It could have been.

2    Q       So it took you about a month to come up with $80 to

3    $85 to give her?

4    A       I don't know if I gave her exactly 80 or 85.

5    Q       Maybe it was 75, maybe it was 90, somewhere in

6    there.  It took you a month to come up with 85 or 90 bucks

7    to give her?  You told me that financially, you had bills

8    to pay, you have other obligations --

9    A       Right.

10   Q       -- it took you a month to come up with $85 to give

11   her?

12   A       Yes.

13   Q       Are finances that tight?

14   A       Yes.  Student loans.

15   Q       Were you saving for that month to pay her the $80

16   to $85?

17   A       I was putting some aside to help.

18   Q       Five bucks here, ten bucks there?

19   A       I don't know exactly that amount.

20   Q       Did you stay in touch with her between those two

21   dates?

22   A       No.

23   Q       So you're saying that you have sex with her, you

24   tell her you're going to help her, you go about a month

25   without speaking, then you call her and tell her you have

1    some money to give her?

2    A      I never called her.

3    Q      She called you?

4    A      Yes.  She called me several times.

5    Q      In between the two.

6    A      Yes.

7    Q      Did you pick up?

8    A      A few times, yes.  The other times, she just kept

9    calling.

10   Q      I thought you just said there was no communication

11   between the two of you between September 21st and October

12   18th.

13   A      I didn't say that.

14   Q      Okay, so there was communications between the two

15   of you?

16   A      Yes.

17   Q      She called you numerous times?

18   A      Yes.

19   Q      And you answered?

20   A      After I got -- after she kept calling, I finally

21   answered.

22   Q      What was the substance of those conversations?

23   A      Are you going to help me still.

24   Q      And did you respond yes or no?

25   A      I said, I'm going to help you.  That was it.

1  Q      Did you tell her how much money you were going to

2  give her?

3  A      No, I did not.

4  Q      And did she call you on the 18th?

5  A      I don't know if she called on the 18th.  It was

6  probably around that.  I don't know if it was exactly that

7  date.

8  Q      Did she call you on the day you met at the

9  Starbucks?

10 A      Yes.

11 Q      And that day you told her you had money for her?

12 A      Yes.

13 Q      Whose idea was it to meet at that Starbucks in

14 Beachwood?

15 A      We agreed, when we talked on the phone.

16 Q      And you showed up at the Starbucks?

17 A      Yes.

18 Q      You handed her $85-ish in cash?

19 A      Give her take.

20 Q      80, 85, 90.  Under a hundred dollars?

21 A      It was around there.

22 Q      In cash?

23 A      Cash.

24 Q      Did she say anything when you gave her the money?

25 A      She said -- I think she said, is this it, or is

1   this all you have, something along those lines.

2   Q       Isn't that rude?  Wouldn't you find that to be a

3   rude question?  You're helping somebody --

4   A       Yes.

5   Q       -- you've saved a month to get up to $85 to give

6   her, and she doesn't say, thank you so much, she says, is

7   that it.  Isn't that rude?

8   A       If you take it that way, yes.  I didn't take heart

9   to it, though.

10  Q       How did you take it?  I would find that to be

11  offensive.

12  A       That's you.

13              MR. STRANG:  Objection.

14  A       I didn't take it one way or another.  She just said

15  it.

16  Q       What did you say back?

17  A       I said, that's all I could get.  I said, what, you

18  wanted more?  That's what I said.

19  Q       And what did she say?

20  A       No, I guess this will do, or, I guess this will be

21  enough, something along those lines.

22  Q       She didn't say, yes, I want more money, after

23  asking you for money for all this time?

24  A       No.

25  Q       How many times did you speak between September 20th

1    or 21st and the day you met her at the Starbucks?

2    A      How many times did we actually talk, or did she

3    call?

4    Q      How many times did you actually speak?

5    A      I don't know.  Maybe three or four.

6    Q      And how many times do you think she called?

7    A      More than five.

8    Q      So if we went through her phone records, it should

9    indicate that she called you at least four or five times

10   between those two dates?

11   A      Yes.

12   Q      And if it didn't, you would say that the AT&T call

13   logs are incorrect; is that right?

14          MR. McLANDRICH:  Objection.  You can answer.

15   A      Yes.

16   Q      Yes, they would be incorrect.

17   A      Correct.

18   Q      How did you come up with the amount of money you

19   gave her?  Whether it be 80, 85, 90, how did you come up

20   with that number?

21          So for example, her ticket was, I think, $250, and

22   her car repairs would have likely been more than $80 or

23   $85.  How did you come up with that number?

24   A      I just gave her -- I just gave her what I could.

25   It wasn't a set number.

1    Q      So that day, you wake up, and you just decide after

2    she calls -- she's called you four or five times in

3    between there, right?

4    A      I got tired of her calling me.  She kept calling.

5    So in order for her to stop calling me, and she wanted me

6    to help her, I was helping her by giving her the money.

7    Q      So anytime somebody calls you, and calls you, and

8    calls you, do you just give in and give them money?

9    A      No, people usually don't just call me and ask for

10   money.

11   Q      Have you had people call you and ask for money

12   before?

13   A      I'm sure.

14   Q      Do you always give them the money?

15   A      Not always.

16   Q      So why didn't you just say no?  If you wanted her

17   to stop calling you, and you were tight on money, like you

18   said, tight financially, why not just say, no, I don't

19   have money to give you?

20   A      Because I'm a man of my word, I told her I was

21   going to help her, and I was trying to help the best I

22   could, despite me having other obligations.

23   Q      Did your wife know about this at the time?

24   A      Which this?

25   Q      Did she know that -- start from the beginning.

1    After you had sex with Queen, did your wife find out

2    fairly quickly?

3    A      Not right away, no.

4    Q      Did she know that you were still communicating with

5    Queen?

6    A      No.

7    Q      Did she know that you paid Queen?

8    A      No, not right away.

9    Q      When did she find out about this?

10   A      When you put it on TV.

11   Q      You mean when it aired on TV?

12   A      Correct.

13   Q      And it indicates in your interrogatory response

14   that she was notified through counsel.  Is that incorrect?

15   A      Say that again, please.

16   Q      Interrogatory Number 11, see where it says, "I have

17   spoken with my counsel;

18          "Wife, Jessica Smith, through counsel."

19              MR. McLANDRICH:  Available through counsel,

20          it's supposed to be.

21   A      It's a typo.

22   Q      Oh, available through counsel.  Okay, okay.

23          Are you still married?

24   A      Yes.

25   Q      So you give her this money, 80, 85, 90, whatever it

1   is.  She asks you, is that it, something like that.  You

2   say, yes, and that's it?

3   A      I said, what, you wanted me?

4   Q      And she says something along the lines of?

5   A      I guess this will do.

6   Q      And do you leave?

7   A      Yes.

8   Q      Anything else?

9   A      Nothing else.  I left.

10  Q      Have you ever spoken to her since then?

11  A      No, I have not.

12  Q      Have you tried to call her?

13  A      No.

14  Q      Has she tried to call you?

15  A      No.

16  Q      And can you give me -- you gave me a phone number.

17  Can you give me your phone number that you had indicated

18  was yours since you were in eighth grade again?

19  A      216-374-5141.

20         MR. McLANDRICH:  Just note for the record that

21         policemen's phone numbers are privileged

22         information.

23  BY MR. KLEBANOW:

24  Q      And I was just going to indicate that we know that,

25  and that information, as well, won't be publicized.

1    A       Thank you.

2    Q       Do you feel like you did anything wrong in this

3    entire interaction that we've talked about with Queen

4    Miller?

5    A       Yes.

6    Q       What do you feel like you've done wrong?

7    A       I feel like I cheated on my wife.

8    Q       Okay.  So you regret that?

9    A       I regret that.

10   Q       Anything else that you feel that you've done wrong?

11   A       No.

12   Q       So you believe it was appropriate to have sex with

13   Queen, even though you were involved in issuing her a

14   citation hours before?

15   A       No, I just stated, I feel guilty for cheating on my

16   wife.

17   Q       Well, right.  So you're saying that from a

18   perspective of your relationship with your wife, you feel

19   bad that you've done wrong in terms of your relationship

20   with her, right?

21   A       Right.

22   Q       And you regret that you've done that, because it

23   likely negatively impacted your relationship with your

24   wife.

25   A       Right.

1   Q       Putting that aside --

2   A       Okay.

3   Q       -- do you feel that it was wrong, as a police

4   officer, to have sex with somebody hours after you were

5   involved in issuing them a citation?

6   A       I feel it was wrong for Queen to have taken

7   advantage of me when I was trying to help her, because I

8   thought she was really in need of help.

9   Q       And I understand that.  But as a police officer --

10  A       As a police officer, or a person, I feel it was

11  wrong.

12  Q       I'm going to talk to you specifically about being a

13  police officer.

14  A       Okay.

15  Q       As a police officer, wouldn't you agree that it's

16  inappropriate to have sex with somebody hours after you

17  issue them a citation if it's not your significant other?

18  A       It depends on the circumstance.

19  Q       What about somebody that you didn't know?

20  A       It still depends on the circumstance.

21  Q       So there are circumstances that you think that

22  would be okay?

23  A       It depends on those two parties, consenting adults.

24  Q       So you think that's okay, if they're consenting

25  adults.

```
 1   A      Each circumstance is different.  It all depends.
 2   Q      In your circumstance, do you think it was
 3   appropriate?
 4   A      No, because I'm married.
 5   Q      Putting your relationship aside, so as a police
 6   officer --
 7   A      As a police officer, I'm still married.  I can't
 8   put it aside.
 9   Q      I understand that you are saying that a married
10   person shouldn't cheat on their spouse, and I understand
11   that.
12          As a police officer, do you think it is wrong for
13   somebody who is a police officer -- which you were, right,
14   in your circumstance --
15   A      Yes.
16   Q      -- to have intercourse with somebody mere hours
17   after you issued them a citation?
18   A      It would be frowned upon.
19   Q      Do you think it's illegal?
20   A      No.
21          MR. STRANG:  Objection.
22   Q      Do you think it violates any of Shaker Heights'
23   policies?
24          MR. STRANG:  Objection.
25          MR. McLANDRICH:  Objection.
```

1    A       It may.  I'm not sure.

2    Q       Have you received any discipline from Shaker

3    Heights in any regard related to Queen?

4               MR. STRANG:  Objection.

5    A       The investigation is still open.  So I can't speak

6    on that.  I mean, it's still an ongoing investigation, IA.

7    Q       Well, you can speak on it.  I understand it's an

8    ongoing investigation.

9               At this point, have you been disciplined?

10   A       I'm on leave right now.

11   Q       Are you on paid administrative leave?

12   A       Yes.

13   Q       Are you reporting in and in-house, or are you not

14   to report to the station, to stay at home?

15   A       I was never told that.

16   Q       What I mean is, do you show up to work every day

17   and you just don't go out on parole, and you're at a desk,

18   or are you not being required to come into work every day?

19   A       I'm not being required to come in, as part of our

20   paid leave policy.

21               MR. KLEBANOW:  Let's take a five minute break.

22               (Short recess had.)

23   BY MR. KLEBANOW:

24   Q       Officer Smith, we're back on the record after a

25   short break, and I just have a few more questions for you,

1    and then we'll be done for the day.

2    A      Okay.

3    Q      So you told me your version of events, of

4    everything that's happened, right?  What I want to ask you

5    is a couple of questions regarding those.

6          We talked about getting information off the ticket

7    and using it for personal gain, and you said that that

8    would be an inappropriate thing for a police officer to

9    do, correct?

10   A      Correct.

11   Q      You would also agree that using information that

12   you received off of a ticket to call to try to get a date,

13   or go out with somebody, would also be inappropriate,

14   correct?

15   A      That's correct.

16   Q      Asking for any sort of sexual favor in exchange for

17   getting rid of a ticket would not only be improper, but

18   unlawful; do you agree with that?

19   A      I agree.

20   Q      And the same with asking for money -- I'm sorry --

21   asking for sex in exchange for giving money to help with a

22   ticket, or anything, would be not only wrong, but

23   unlawful, correct?

24   A      Correct.

25   Q      Do you know of any other Shaker Heights police

1    officers that have ever had sex with somebody that they've

2    cited or arrested?

3    A      No.

4    Q      Have you ever talked about your sex life with any

5    other police officer at Shaker Heights?

6    A      No, I haven't.

7    Q      Has any other officer at Shaker Heights ever talked

8    to you about their sex life?

9    A      No.

10                MR. STRANG:  Objection.

11   Q      To be clear, all of your communications with

12   Ms. Miller have been from that number that you indicated

13   to me earlier; is that correct?

14   A      Yes.

15   Q      You said you have one phone number, and you

16   indicated it was 216-374-5141?

17   A      That's my number.

18   Q      So any communications that we've talked about

19   today, that you have said you have spoken with or called

20   Queen, or received a call, would have been from this

21   216-374-5141?

22   A      Correct.

23   Q      Or to that number, if it was coming to you?

24   A      Correct.  I only have one number.

25   Q      And you've never used another phone with a

```
 1   different number, even if it wasn't your own?  Does that
 2   make sense?
 3          So I understand that this might be the only phone
 4   number that you've ever paid the bill for, had assigned to
 5   you.  Have you ever used any other phone with a different
 6   number for personal use?
 7   A      No.
 8   Q      What about for official use, for business, for
 9   police officer?  A cell phone.
10   A      Oh, no, no.
11   Q      I understand you may have an office line.  That's
12   not what I'm talking about.
13   A      No.
14   Q      And this 216-930-1408, that's not your office
15   number, either, correct?
16   A      No.
17   Q      You're saying that number is completely
18   unaffiliated with you?
19   A      Correct.
20   Q      In any way.
21   A      Correct.
22   Q      When you had Queen pulled over on the 21st, or the
23   driver, right, where Queen was in the vehicle, did you
24   ever talk to her about a pool party?
25   A      Yes.
```

1   Q      What were you talking about?

2   A      Well, she mentioned -- one of us mentioned that

3   either I or she said you look familiar, and the other

4   person -- I don't remember who said it first -- the other

5   person said, yeah, you do, too.

6          And then somebody brought up the pool party.  She

7   said that her relatives -- her grandmother, who was also

8   on the scene, after the stop, she's one of the people that

9   came, she was going to drive the car, said that she used

10  to have parties at her house, and maybe that's perhaps

11  where she knew me from.

12  Q      I thought earlier in the deposition you told me

13  that you didn't have any recollection of Queen until you

14  were in her car and she was kissing your neck.

15  A      That's when I recalled.

16  Q      But didn't she or you, as you just stated, mention

17  at the stop that one of you two might have known each

18  other?

19  A      She said, you look familiar, or I said, you look

20  familiar, but I didn't know from where.

21  Q      So you may have recognized her at the stop?

22  A      Correct.

23  Q      You're unsure.

24  A      I may have recognized her, but I didn't know from

25  where.  I believe she brought up the part about the pool.

1   And the lady, whoever was with her, I think it was her

2   grandmother, it was an older lady, seconded her, saying

3   that, yeah, I used to have parties, were you ever at one

4   of them?  And I said, I don't know, maybe.

5   Q       So you didn't bring up the pool first?

6   A       No.  I don't know who brought it up.  I don't know

7   who brought it up first.  It was discussed.  I don't know

8   who brought it up first.

9   Q       So it's possible that you may have said --

10  A       It's possible.

11  Q       -- about the pool, you might have known her from a

12  pool party.

13  A       It's possible.

14  Q       So she may have looked familiar to you at that

15  time?

16  A       Yeah.  After the stop, though.  This was after the

17  stop.  Because at this point, we're waiting for her jump

18  to come.  This is being discussed during the time we were

19  waiting for somebody to come jump her car, after the stop

20  is all over with.

21  Q       Did you see anything about a pool party of hers on

22  social media?

23  A       No.

24          MR. KLEBANOW:  I have nothing more for you.

25          Thank you for your time.

**MORSE, GANTVERG & HODGE**

```
 1                  THE WITNESS:  You're welcome.
 2                  MR. KLEBANOW:  Your attorney can advise you of
 3          your rights.
 4                  MR. STRANG:  I have just a brief question.
 5                        CROSS EXAMINATION
 6     BY MR. STRANG:
 7     Q     Do you know what year this encounter in Akron,
 8     while you were a student, took place?
 9     A     No.
10     Q     It was when you were in college, right?
11     A     It was when I was in college.  And I was in college
12     four and a half years.  I don't know what year.
13     Q     You can't recall whether it was your freshman year,
14     sophomore year?
15     A     No.
16     Q     What years were you in college?
17     A     So I'll work back to that.  I graduated in December
18     of 2012.  I think I entered in '08.  So go back four and a
19     half years, somewhere in there.
20           I graduated high school in '08.  So I went right
21     after.  I didn't take any breaks.
22     Q     Do you have any idea what brand of condom you used
23     in this 2018 sexual encounter?
24     A     No.
25     Q     Can you describe for me in a little bit more detail
```

1    what exactly you did with the used condom?

2    A      Yes.  I took it off and put it in the side pocket

3    of the passenger side of her Jeep door, and I mistakenly

4    left it there.  I forgot I left it there.

5    Q      When you say, the pocket, do you mean that plastic

6    pocket at the side of the door?

7    A      Yeah.  I know I put it in the pocket.  I don't know

8    if it was the net kind, or if it was the hard -- it was a

9    pocket on the side of the door, the pocket in the door.  I

10   don't know what kind of make it was, the material.

11   Q      Did you put it in anything, as in, did you wrap it

12   up in a tissue, a piece of paper, or anything like that?

13   A      No.

14   Q      And when you left, do you think the condom was

15   still there?

16   A      Yes.

17   Q      And just to be clear, this was the same Jeep that

18   was involved in the traffic stop earlier in the night,

19   correct?

20   A      Yes.

21   Q      What do you remember about where she got the

22   condom?

23   A      Down on her left side, under her feet, where she

24   was sitting.

25   Q      Did it look like she was getting it from the car,

```
1    or did it look like she was getting it from an article of
2    clothing?
3    A      It looked like she was getting it from -- it was
4    dark.  I think it was a bag, though, under her feet,
5    probably her purse.  It was a bag, I believe, though.
6    Q      Did she put the condom on you?
7    A      Yes.
8    Q      She knew how to do that?
9           MR. KLEBANOW:  Objection.  You can answer.
10   A      Yeah, she did.  She did it.
11   Q      How long did it take her to put the condom on you?
12   A      Like a second.
13   Q      Did it look like something she had done before?
14   A      Yes.
15          MR. KLEBANOW:  Objection.  You can answer.
16   A      Yes.
17   Q      Do you remember, in the prior sexual encounter with
18   her, whether you used a condom?
19   A      Yes, because I've always used condoms in college,
20   so I would say yes.  I've never not used a condom.
21   Q      Do you remember who put the condom on back then?
22   A      I don't remember.
23   Q      Did she ask you for money before or after that
24   first sexual encounter?
25   A      Say that again.  So after --
```

MORSE, GANTVERG & HODGE

```
 1   Q      The first sexual encounter in Akron.

 2   A      Did she ask me for any money?

 3   Q      Yes.

 4   A      No, she did not.

 5          MR. STRANG:  Thank you.  That's all I have.

 6          MR. McLANDRICH:  Are you done?

 7          MR. KLEBANOW:  I'm done.

 8          MR. McLANDRICH:  So you have the right to

 9      review the transcript that the court reporter

10      prepares --

11          THE WITNESS:  Okay.

12          MR. McLANDRICH:  -- to essentially ensure the

13      accuracy of the transcription.  You can preserve

14      that right by telling her you'll read, or you can

15      waive that right by telling her you don't want to

16      read.

17          I would suggest you tell her you want to read,

18      because you can always waive later on.

19          THE WITNESS:  Yeah, I'd like to read it.

20                      - - -

21              (DEPOSITION CONCLUDED)

22                      - - -

23

24      _____
        OFFICER TYLER SMITH
25
```

**MORSE,  GANTVERG  &  HODGE**

```
1                           CERTIFICATE

2    State of Ohio,         )
                            )  SS:
3    County of Cuyahoga.    )

4           I, Ivy J. Gantverg, Registered Professional

5    Reporter and Notary Public in and for the State of Ohio,

6    duly commissioned and qualified, do hereby certify that

7    the above-named OFFICER TYLER SMITH, was by me first duly

8    sworn to testify to the truth, the whole truth, and

9    nothing but the truth in the cause aforesaid; that the

10   deposition as above set forth was reduced to writing by me

11   by means of stenotype, and was later transcribed into

12   typewriting under my direction by computer-aided

13   transcription; that I am not a relative or attorney of

14   either party or otherwise interested in the event of this

15   action.

16          IN WITNESS WHEREOF, I have hereunto set my hand and

17   seal of office at Cleveland, Ohio, this 6th day of

18   December, 2019.

19

20

21                        _____
                          Ivy J. Gantverg, Notary Public
22                        in and for the State of Ohio,
                          Registered Professional Reporter.
23                        My Commission Expires November 5, 2023.

24

25
```

**MORSE, GANTVERG & HODGE**



# LEADS
## Law Enforcement Ohio Automated Data System

This is to certify that

**TYLER SMITH**

has successfully completed the Ohio LEADS testing on

September 11, 2015

by completing the following exam:

FQO w/CCH

This certificate is good through

September 11, 2017

PLAINTIFF'S DEPOSITION EXHIBIT

1

SMITH

PENGAD 800-631-6989

THE SEAL OF THE ATTORNEY GENERAL OF OHIO

This is to certify that

**Tyler Smith**

has completed the Ohio Attorney General's online training course on

*Ethics and Professionalism*

Completed on: 4/15/2019 1:38:03 AM

OPOTA

POLICE OFFICER TRAINING ACADEMY

OHIO

SH-000443

PLAINTIFF'S DEPOSITION
EXHIBIT

2

Smith

PENGAD 800-631-6989

# CITY OF SHAKER HEIGHTS
## Department of Public Safety
### Division of Police

April 21, 2015

To D. Scott Lee, Chief of Police, Sir:

I respectfully request to carry my Smith and Wesson M & P 40c handgun, serial No.(DXD8266), as an off duty weapon, when I am not at work. I have shot the weapon on our gun range and have successfully met the requirements needed to pass. I realize this weapon must not replace my current on duty assigned Glock 22 service weapon, serial No. ███

RANGE  *Lin McClure* #11  4/21/2015

4/21/15  On 4/21/15 I inspected Ptl. Tyler Smiths off Duty Weapon, A S&W M&P 40c handgun Ser # ████ Listed Weapon is in good working condition. *[signature]* 73

Signed: *Tyler Smith #32*  No. 232
Tyler S. Smith

Approved
And Forwarded: *LT. Ed Daybert*    Commanding Officer: *[signature] Cmdr* #8
Granted: *[signature]*    Chief of Police: *O 4/23/15* — 4/21/15



PLAINTIFF'S DEPOSITION EXHIBIT
3
SMITH
PENGAD 800-631-6989

SH-000143

# TABLE OF CONTENTS

## F-2017-006

- CONTROL LOG
- SUBSTANTIVE INVESTIGATION
  - COMMUNICATION RECORDS & VIDEO-RECORDINGS
- COMPLAINT
  - OHLEG OF MS. RUSHIN
  - NOTES FROM STATEMENT
    - Cellular Telephone Records
  - VIDEO-RECORDINGS
  - IDENTIFICATION OF PTL. SMITH
  - PREVIOUS CALLS FOR SERVICE
    - 2016-37718
    - 2016-36432
    - 2013-25424
- PTL. SMITH STATEMENT
  - June 10, 2017 Activities



PLAINTIFF'S DEPOSITION EXHIBIT

4

SMITH

PENGAD 800-631-6989

SH-000789

- 2017-17461
- 2017-17457
- 2017-17456
- 2017-17439
- 2017-17438
- 2017-17436
- 2017-17434
- 2017-17432
- 2017-17428
- 2017-17427
- 2017-17425
  - July 20, 2016 Activities
    - 2016-22881
    - 2016-22879
    - 2016-22870
    - 2016-22886

# • LEADS INFORMATION
# • OHLEG INFORMATION
# • GENERAL ORDERS
# • EMAILS

- EMAIL

SH-000791

# CONTROL LOG

## F-2017-006

SH-000792

SHAKER HEIGHTS POLICE DEPARTMENT
INTERNAL AFFAIRS INVESTIGATION CONTROL LOG

## Control Number: <u>F-17-006</u>

Alleged Violator Information:

    Name:           Tyler Smith (PTL. SMITH)

    Rank:            Patrolman

    Badge:          32

    Assignment:    Uniform Services/B Platoon

Report Received on:  (Date) <u>June 13, 2017</u>     (Time)  1600 hours

Nature of Alleged Violation:    Complainant, Ms. Celeste Rushin alleges that, ON TWO (2) OCCASIONS, Patrolman Tyler Smith #32, detained her without cause, made inappropriate comments to her and/or otherwise harassed her.

Complainant Information:

    Name:         **Celeste Rushin**
    Address:      3657 Lattimore Road
                 Shaker Heights, Ohio 44120
    **Phone:**      (██████████

Completion Date of Investigation/Inquiry:     August 18, 2017

Date and Nature of the Final Action by the Chief of Police, Officer in Charge, or Supervisor:

c:      Accreditation

# SUBSTANTIVE INVEST

## F-2017-006

SH-000794

**FROM THE OFFICE OF TRAINING AND INTERNAL AFFAIRS**
**CONFIDENTIAL**
**MEMORANDUM**

**TO:**    Jeffrey N. DeMuth, Chief of Police

**FROM:**    Commander John Cole, Internal Affairs Officer

**DATE:**    **August 18, 2017**

**SUBJECT:**    Formal Internal Affairs Investigation F-2017-006

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

On **TUESDAY, JUNE 13, 2017,** at approximately 1600 hours, Administrative Assistant Soley O'Malley, hereinafter, "MS. O'MALLEY," hand-delivered me a "Confidential Memorandum" (MEMO) from Chief of Police Jeffrey DeMuth, hereinafter, "CHIEF DEMUTH," regarding a complaint by a Ms. Celeste Rushin, hereinafter, "MS. RUSHIN." CHIEF DEMUTH's MEMO identified that his office had received MS. RUSHIN's complaint on **Tuesday, June 13, 2017.**

Immediately thereafter, I reviewed MS. RUSHIN's complaint form, which identified that she had executed it on **Saturday, June 10, 2017,** and read, in pertinent part, as follows:

- Patrolman Tyler Smith #32, hereinafter, "PTL. SMITH," whom MS. RUSHIN identified as "Officer Tyler," puller her over, "about a year ago;"
  - MS. RUSHIN reported that PTL. SMITH started following behind her, without headlights activated, while she was operating her 2000 Lexus RX300, near the intersection of Chagrin Boulevard and Warrensville Center Road;
  - MS. RUSHIN reported that PTL. SMITH pulled her over, i.e., "said pull over," at/near the intersection of South Woodland & Warrensville Center road;
  - MS. RUSHIN reported that PTL. SMITH told her to pull into the BP Station, i.e. 20420 Chagrin Boulevard, where he exited his vehicle and notified MS. RUSHIN that her back tail light was out; and, then requested for her to step out of her vehicle;
  - MS. RUSHIN reported that it was approximately 0300 hours, she was in her pajamas; and, PTL. SMITH inquired about her age, employment and provided her his telephone number
- MS. RUSHIN reported that on **June 10, 2017 at 2110 hours**, PTL. SMITH briefly activated his siren and pulled her over near her home on Lattimore Road ;
- MS. RUSHIN reported that PTL. SMITH asked her if she remembered him; and, after notifying him that she did not,  she notified him that she had a boyfriend; AND

---

August 18, 2017|                    Jeffrey N. DeMuth, Chief of Police    1

- MS. RUSHIN reported that she believed that PTL. SMITH was attempting to flirt with her

I then examined MS. RUSHIN's complaint more closely wherein I observed that she had executed the complaint form on **Saturday, June 10, 2017 at 2221 hours.** As such, I reviewed the Department's Closed Circuit Television system's recordings captured around that time wherein I observed a female of color, petit stature and wearing a blue and white dress, at the Police Information Unit window and later, at the desk. I also observed a male and female of color, who appeared to be with the female previously described. I downloaded, and added these recordings to the investigation.

In accordance with General Order 5501 & 5502 §IV (A) (1) (b), (c) & (e), i.e., "Allegations involving morals and...serious misconduct and serious allegations which would bring disfavor upon the department," I prepared a Control Log and designated this investigation as F-2017-006. In addition, I reviewed the Department's New World Systems computer aided dispatch (CAD) and Law Enforcement Records Management system wherein I confirmed that PTL. SMITH was working on B Platoon on June 10, 2017.

## INVESTIGATION

As I had partially corroborated that MS. RUSHIN had responded to the Police Information Unit on **June 10, 2017**; but, was unclear from her complaint form whether she had been "detained," albeit briefly, which might trigger a recording; or, for that matter, whether the incident occurred on the same date, I conducted a cursory review of the recordings on the Shaker Heights Police Department's (SHPD) Digital Mobile Video Audio Recording System (DMVARS), hereinafter referred to as, "L3." While the L3 system did memorialize that PTL. SMITH had made recordings on June 10th, I did NOT observe any recordings at/around the time MS. RUSHIN would have been stopped. (Emphasis added)

On **THURSDAY, JUNE 15, 2017**, I conducted a review of the electronic records of PTL. SMITH's activities on **June 10, 2017** in order to gain a more comprehensive understanding of where his location was in relation to MS. RUSHIN's residence. I learned that PTL. SMITH had conducted a traffic stop at/near the location of Walgreens, located in the 16000 block of Chagrin Boulevard. (See Incident #2017-17436)

In addition, I learned that PTL. SMITH had then responded to the intersection of East 146 street and Kinsman Road in the City of Cleveland to assist another officer on a traffic stop, and then responded to 2700 Park drive in the City of Shaker Heights, to assist a stranded motorist. (See Incident Numbers 2017-17438 & 2017-17439) I then reviewed the electronic records related to MS. RUSHIN and her residence. In conducting the aforementioned searches, I learned that MS. RUSHIN was a victim of a theft offense in calendar year 2013.

2  Jeffrey N. DeMuth, Chief of Police|                    August 18, 2017

ON **FRIDAY, JUNE 16, 2017**, as I still had NOT corroborated the date of the first traffic stop, I conducted a review of the Communication Center, i.e., "DISPATCH," recordings, hereinafter, "NICE," to determine if MS. RUSHIN's operator/vehicle information was ever requested by PTL. SMITH. I was able to confirm that PTL. SMITH had requested information on a Chevrolet Monte Carlo, "HBG5101." (See Police 1 Radio 85457PM (Monte Carlo))

ON **MONDAY, JUNE 19, 2017**, using the telephone number that she provided on the complaint form, I contacted MS. RUSHIN. After introducing myself and identifying my assignment, I requested a statement. MS. RUSHIN and I agreed to meet at her residence on **Tuesday, June 20, 2017** at 1300 hours.

In addition, as MS. RUSHIN had identified in her complaint form that PTL. SMITH had given her his personal telephone number, I specifically inquired as to whether MS. RUSHIN was still in possession the telephone number. MS. RUSHIN answered in the affirmative. I then requested MS. RUSHIN to have any and all information that would assist me in this investigation at our scheduled interview.

ON **TUESDAY, JUNE 20, 2017**, as I had never met MS. RUSHIN but had observed CCTV video-recordings of a female of color at the SHPD at/around the same time that MS. RUSHIN would have filed her complaint, I conducted an Ohio Law Enforcement Gateway (OHLEG) search for MS. RUSHIN and printed the results. As I also believed that PTL. SMITH was the "Officer Tyler" identified in MS. RUSHIN's complaint, I printed up individual personnel photographs of the nine (9) African American males assigned to the SHPD for identification purposes.

At approximately 1300 hours, I responded to MS. RUSHIN's home where I met with MS. RUSHIN's mother, later identified as Mrs. Tina Thomas, hereinafter, "MRS. THOMAS," who reported that although MS. RUSHIN was NOT home, she would have her call me. Upon returning to the SHPD, I learned that I had received two (2) telephone calls from MS. RUSHIN, apologizing for NOT being available, and requesting that I contact her immediately.   I called MS. RUSHIN and we agreed to meet at her residence at 1515 hours that same day.

At approximately 1513 hours, I arrived at MS. RUSHIN's residence. MS. RUSHIN, who was outside, introduced herself and invited me into her home. Once inside, I confirmed her pedigree information and explained my role as the Internal Affairs Officer; while also identifying the expectations and limitations of my assignment.

Shortly thereafter, I inquired about the race of PTL. SMITH. MS. RUSHIN Identified that she believed PTL. SMITH is African-American. I then handed MS. RUSHIN the nine (9) photographs and asked her if she believed any of the individuals in the photographs were PTL. SMITH. MS. RUSHIN identified PTL. SMITH; and, signed and dated the back of the photograph.

---

August 18, 2017|                        Jeffrey N. DeMuth, Chief of Police  3

I then interviewed MS. RUSHIN, the substance of which is, IN FURTHERANCE OF AND IN ADDITION TO, the information she provided in her complaint form: (Emphasis added)

- MS. RUSHIN reported that she was operating a Lexus RX300 which she had stopped operating in August, 2016;
- MS. RUSHIN reported that she had dropped off Ms. Narissa Williams, telephone number: (216) 536-9178, whom she had picked up from working at the Thistledown Racino in June or July, 2016;
- MS. RUSHIN reported  that PTL. SMITH ordered her to pull over into the BP gas station after notifying her that her license plate light was out;
- MS. RUSHIN reported that PTL. SMITH never asked for her driver's license;
- MS. RUSHIN reported that PTL. SMITH requested that she exit her vehicle; and, although she was in pajamas and felt uncomfortable, she exited her vehicle and observed that her license plate light was out; AND
- MS. RUSHIN reported that PTL. SMITH notified her that his name was, "Tyler," and that he was "26 years old;"
- MS. RUSHIN reported that PTL. SMITH Inquired as to whether she had a boyfriend;
- MS. RUSHIN reported that PTL. SMITH inquired about her age and occupation;
- MS. RUSHIN reported that PTL. SMITH provided his telephone number to her orally, she accepted his telephone number in order to be released from the stop; and, she entered the telephone number into her cellular telephone;
- MS. RUSHIN reported that PTL. SMITH told her to call him and notified her that they could, "hang out;" AND
- MS. RUSHIN reported that she NEVER contacted PTL. SMITH

While taking this information, I asked MS. RUSHIN for a copy and/or other evidence of PTL. SMITH's personal telephone number. MS. RUSHIN began scrolling through her telephone.

After several moments, she notified me that she was unable to locate PTL. SMITH's telephone number. MS. RUSHIN  then notified me that she had purchased a new cellular telephone from AT & T in September of 2016. However, she asserted that she had MAINTAINED the same telephone number, i.e., (216) 702-2672; but also expressed that as she never called PTL. SMITH, she may NOT have saved his contact information. (Emphasis added)

MS. RUSHIN then reported the following:

- On **June 10, 2017,** she was operating a 2016 black, Mazda CX-5 bearing Ohio license plate #GXK9357;
- PTL. SMITH had briefly activated his overhead lights and air horn, but did NOT leave either on; (Emphasis added)
- PTL. SMITH rolled down his vehicle's window, but NEVER left his vehicle; (Emphasis added)

---

4    Jeffrey N. DeMuth, Chief of Police|                              August 18, 2017

- PTL. SMITH never asked her for her driver's license;
- PTL. SMITH identified facts about the previous traffic corroborating that he remembered her occupation, age and vehicle;
- PTL. SMITH inquired as to why she had NOT called him; (Emphasis added)
- PTL. SMITH stated, "Do you still have a boyfriend?" to which she answered in the affirmative;
- PTL. SMITH inquired as to whether she lived at the location where they were stopped; AND
- MS. RUSHIN did NOT recall if there was anyone else out on the street when the stop occurred, but that she believed there was not

I ended our interview by inquiring about the license plates of the vehicles she was operating. MS. RUSHIN reported that she would call me with that information. I also inquired as to whether PTL. SMITH had attempted to contact MS. RUSHIN through a social media outlet and/or another law enforcement officer. MS. RUSHIN responded in the negative. I closed my interview by notifying MS. RUSHIN of the action to take if she were to be contacted by PTL. SMITH during this investigation.

**On WEDNESDAY, JUNE 21, 2017**, as I had been unsuccessful in recovering video-recordings and/or Dispatch records of a traffic stop; and, MS. RUSHIN had acknowledged that she had viewed, i.e. no rear taillight illumination) PTL. SMITH's probable cause for the first stop, I contacted the administrative services of the OHLEG and Law Enforcement Automated Data Systems (LEADS) confidential search platforms wherein I requested identification of ANY law enforcement officer who had conducted a search on MS. RUSHIN from the period of **April 1, 2016 through June 15, 2017**. (See. LEADS/OHLEG REQUESTS)

**ON THURSDAY, JUNE 23, 2017**, I spoke with Jenny Higdon, hereinafter, "MGR. HIGDON, from LEADS wherein I narrowed the scope of my written request, while acknowledging that there COULD BE a possible LEADS violation. ON **FRIDAY, JUNE 24, 2017,** I received notification from LEADS that they had results from my request and that they would be sending me those results in writing.

Later in the date, I downloaded the results from LEADS. The Department's TAC Coordinator Senior Dispatch Karen Cendrowski, hereinafter, "SDISP. CENDROWSKI!" identified the following SHPD members who had requested MS. RUSHIN's LEADS information during the targeted period:

- On April 14, 2016 at 201148 hours, Patrolman Ryan Sidders #66 conducted a LEADS search on vehicle bearing Ohio license plate #GIS1897;
- On July 20, 2016 at 014318 hours, PTL. SMITH conducted a LEADS search on vehicle bearing Ohio license plate #GIS1897;
- On January 17, 2017 at 120452 hours, Patrolman Benjamin Ward (PTL. WARD) conducted a LEADS search on vehicle bearing Ohio license plate #GXK9357;
- On May 4, 2017 222735 hours, Patrolman Shondor Thomas #53 conducted a LEADS search on vehicle bearing Ohio license plate #GXK9357;

SH-000799

- On June 10, 2017 at 210635 hours, PTL. SMITH conducted a LEADS search on vehicle bearing Ohio license plate #GXK9357;

In addition, SDISP. CENDROWSKI identified that MS. RUSHIN's information had been requested on twelve (12) other occasions during the targeted period by members of four (4) different police agencies. (See LEADS Archive and Retrieval Multiple Details Report)

As reflected above, during my review of PTL. SMITH's LEADS information, I learned that he had made a request for information on MS. RUSHIN's vehicle on **Wednesday, July 20, 2016 at approximately 0143 hours, but NOT MS. RUSHIN.** (Emphasis added) However, in reviewing the NICE recordings, I was unable to locate any audio-recording of PTL. SMITH requesting information from the Communications Center about MS. RUSHIN's vehicle, i.e. GIS1897; or, that he had/was detaining MS. RUSHIN. (See **July 20, 2016** audio-recordings)

On **MONDAY, JULY 3, 2017,** I received an electronic correspondence from Michelle Y. Roach-Haver, hereinafter, "SPECIALIST ROACH-HAVER" of OHLEG notifying me that I would need additional information from my Agency Coordinator, Sergeant Troy Allison #86, hereinafter, "SGT. ALLISON," in order to act on my information request on PTL. SMITH. (See Electronic Records) Shortly thereafter, I received the detailed telephone records of MS. RUSHIN. (See MS. RUSHIN Cellular Telephone Records)

On **MONDAY, JULY 10, 2017,** I received the response to my informational request from SPECIALIST ROACH-HAVER wherein I learned that PTL. SMITH had NOT requested social security information and/or driver's license information on MS. RUSHIN on either **July 20, 2016** and/or **June 10, 2017**; or, during the period in between those dates.

On **TUESDAY, JULY 11, 2017 through WEDNESDAY, AUGUST 2, 2017,** I reviewed the records within the New World System from PTL. SMITH's hire date, i.e. **February 2, 2015 through August 2, 2017.** I learned that PTL. SMITH had NOT responded, nor had any calls for service to MS. RUSHIN's address on Latimore. (Emphasis added) In addition, I spoke with MS. RUSHIN and notified her that I would be consulting with the Prosecuting Attorney to determine whether there was probable cause that PTL. SMITH had committed a crime.

On **THURSDAY, AUGUST 3, 2017,** in an effort to determine whether PTL. SMITH should be issued his constitutional rights or provide a compelled statement, I met with Chief Prosecuting Attorney C. Randolph Keller, hereinafter, "CHIEF KELLER," wherein I provided the details learned, which included:

- PTL. SMITH had entered MS. RUSHIN's vehicle information into the LEADS database on **Wednesday, July 20, 2016;**
  - MS. RUSHIN had admitted that there was probable cause (equipment violation) to stop her vehicle;

---

6   Jeffrey N. DeMuth, Chief of Police|                    August 18, 2017

- o PTL. SMITH had NOT entered MS. RUSHIN's driver's license information into OHLEG or LEADS;
  - o There were no records of the encounter in CAD, Records, NICE Recordings and/or L3
- PTL. SMITH had entered MS. RUSHIN's vehicle information into LEADS on **Saturday, June 10, 2017;**
  - o PTL. SMITH had NOT entered MS. RUSHIN's driver's license information into OHLEG or LEADS;
  - o There were no records of the encounter in CAD, Records, NICE Recordings and/or L3;
- There was no evidence that PTL. SMITH had contacted and/or stalked MS. RUSHIN in between the two (2) stops

Critically weighing this information, CHIEF KELLER determined that PTL. SMITH should be compelled to make a statement.

On **THURSDAY, AUGUST 10, 2017,** PTL. SMITH was compelled to make a statement, the substance of which is as follows:

- PTL. SMITH reported that he tested his DMVARS equipment prior to going on the road on both **July 20, 2016** and **June 10, 2017;**
- PTL. SMITH has had the same cellular telephone number, i.e. ▇▇▇▇▇▇▇▇ **for the past two (2) years;**
- As he has moved, PTL. SMITH has changed the telephone number of his landline within the two (2) year period;
- PTL. SMITH admitted that he has had two (2) encounters, WHILE ON DUTY, with MS. RUSHIN; (Emphasis added)
- PTL. SMITH admitted entering MS. RUSHIN's vehicle's information into his Mobile Data Computer on **July 20, 2016** for a rear plate violation;
- PTL. SMITH corroborated MS. RUSHIN's representations of the July 20, 2016 encounter, clarifying that the vehicle's owner's information was "clean," i.e. no wants or warrants, he did NOT activate his overhead lights or siren; and, he provided MS. RUSHIN his cellular telephone number AFTER MS. RUSHIN requested his card; (Emphasis added)
- PTL. SMITH did NOT request MS. RUSHIN's cellular telephone information; (Emphasis added)
- PTL. SMITH reported that he did ask MS. RUSHIN if she was a Shaker Heights resident;
- PTL. SMITH reported that he did NOT inquire about MS. RUSHIN's relationship status; (Emphasis added)
- PTL. SMITH reported that MS. RUSHIN volunteered her relationship status during their second encounter and he clarified to her that she may have misunderstood his intentions in providing her his cellular telephone number;
- PTL. SMITH reported that he did NOT manually turn on his DMVARS equipment as neither encounter was a traffic stop;

- PTL. SMITH reported that he NEVER stated to MS. RUSHIN, "Good luck with your boyfriend;"
- PTL. SMITH reported that he has NEVER requested any member of the Shaker Heights Police Department to obtain information on MS. RUSHIN; (Emphasis added)
- PTL. SMITH reported that he has had similar encounters with other citizens where his purpose was to educate and NOT to enforce the traffic law; (Emphasis added)

On **FRIDAY, AUGUST 11, 2017,** I contacted Ms. Narissa Williams and learned that she was NOT in the vehicle when MS. RUSHIN was stopped on **July 20, 2016**; and, that MS. RUSHIN had contacted her and expressed her concerns with PTL. SMITH's actions after the stop. (Emphasis added)

## FINDINGS

Carefully reviewing the full investigation, which included a comprehensive review of PTL. SMITH's OHLEG and LEADS records, L3 System, NICE Recordings, and interviews form PTL. SMITH and MS. RUSHIN, I respectfully find the following:

- PTL. SMITH did have probable cause as well as did detain MS. RUSHIN's vehicle on **Wednesday, July 20, 2016;**
- PTL. SMITH did provide his personal cellular telephone number to MS. RUSHIN;
- PTL. SMITH did have a conversation with MS. RUSHIN on Saturday, **June 10, 2017** near her residence;
- There are no independent witnesses to either encounter;
- PTL. SMITH has NOT conducted any OHLEG and/or LEADS checks on MS. RUSHIN during the period of **February 2, 2015 through July 10, 2017;** (Emphasis added)
- PTL. SMITH has NOT been deployed to, and/or responded to MS. RUSHIN's residence during his tenure as a Shaker Heights police officer
- MS. RUSHIN did NOT have a boyfriend during the **July 20, 2016** encounter, but she was interested in another male during/after the July 20., 2016 encounter; (Emphasis added)
- MS. RUSHIN did NOT call PTL. SMITH; (Emphasis added)
- PTL. SMITH has NOT called MS. RUSHIN; (Emphasis added)
- PTL. SMITH was engaged during both encounters;
- There are no electronic recordings of any encounters between PTL. SMITH and MS. RUSHIN; AND
- PTL. SMITH has had NO similar allegations levied against him during his employment as a Shaker Heights police officer

---

**8**   Jeffrey N. DeMuth, Chief of Police|        August 18, 2017

## CONCLUSIONS

Carefully and critically evaluating the substantive findings above, coupled with the Department's Vision and Mission statements, i.e., "...partnership with the community..."I respectfully conclude that this incident is a misunderstanding.  While MS. RUSHIN is convinced that PTL. SMITH was flirting with her, there is no doubt that PTL. SMITH had probable cause to stop MS. RUSHIN for her rear plate illumination violation on **Wednesday, July 20, 2016**.

Instead of citing and releasing her, he requested MS. RUSHIN to exit her vehicle and observe the violation in a lighted business area. He even took the extra action of directing her to a business that could correct the violation.

Moreover, PTL. SMITH did NOT request or obtain information on MS. RUSHIN individually, only as owner of the vehicle. (Emphasis added) PTL. SMITH did NOT ask for MS. RUSHIN's cellular telephone number, nor call her. Although NOT recommended for many reasons (ALL SHARED WITH PTL. SMITH BY ME DURING HIS STATEMENT), PTL. SMITH provided his personal cellular telephone number because he had NOT been issued a business card. (Emphasis added)

On **Saturday, June 10, 2017**, PTL. SMITH  who averages more than five hundred (500) police citizen counters BI-MONTHLY since the commencement of his employment, encountered MS. RUSHIN in a totally different vehicle; and, in a totally different area, that turned out to be her residence. As evidenced by her statement about being in a relationship, there is no doubt that PTL. SMITH, who has a quirky, law enforcement memory (during his statement, he attempted to remember the color of MS. RUSHIN's vehicle from more than 1 year ago without me providing that information to him) provided information to MS. RUSHIN that she perceived as being flirtatious. Without any independent witnesses, coupled with Management's directive to meet, educate and engage our community; especially our residents, there is equally enough information revealed during this investigation that leads me to believe that PTL. SMITH questions about personal information MS. RUSHIN had previously provided were intended to assist MS. RUSHIN refresh her recollection, NOT solicit a date. (Emphasis added)

## RECOMMENDATIONS

Based upon the foregoing, I am respectfully recommending that this investigation be CLOSED and designated UNFOUNDED as to improper conduct. Based upon my training and experience, there was nothing that I noted from my interrogation training and/or stated by MS. RUSHIN and/or PTL. SMITH that would lead me to believe that he had ill motives; or, was being flirtatious during either encounter.

---

August 18, 2017|                    Jeffrey N. DeMuth, Chief of Police    9

However, as General Order 8303 §II (A) (4) (a) requires uniformed police officers to operate their DMVARS equipment when they are conducting traffic enforcement (See 2017-22870), I respectfully recommend that PTL. SMITH receive counseling on when to active his body camera. Although not dispositive, body camera recordings could have been helpful.

10 | Jeffrey N. DeMuth, Chief of Police|                    August 18, 2017

SH-000804

Confidential                                August 10, 2017
Shaker Heights Police Department            0615 hours
Internal Affairs Unit
F-17-006
City of Shaker Heights
Statement of Patrolman Tyler Smith #32


The following is a statement taken on Thursday, August 10, 2017, at the Shaker
Heights Police Department, made by Patrolman Tyler Smith #32, pertaining to an
Internal Investigation.  Present for this statement is Patrolman Tyler Smith #32 and
John Cole, Commander of Police.


Q.    Please state your name for the record.
A.    Tyler Scott Smith.

Q.    How long have you been employed by the Shaker Heights Police
      Department?
A.    Since February 2, 2015.

Q.    Do you have a cellular telephone?
A.    Yes.

Q.    What is that cellular telephone's number?
A.    ███████████

Q.    Do you have a landline at your residence?
A.    Yes.

Q.    What is that landline's number?
A.    I don't know it. I never use it. The only reason I have it is for the cable
      company.

Q.    Have you changed your cellular telephone number at any time within the
      past two (2) years?
A.    No I have not.

Q.    Have you changed the landline within your residence at any time within the
      past two (2) years?
A.    I have only had it for approximately a year and a half.

Q.    What was your previous landline telephone number?
A.    It was my grandparent's phone number. ███████████ I am unsure of the rest
      as they moved.

Q.    Were you living at your grandparent's residence on July 20, 2016?
A.    No.

1



TS

SH-000880

Confidential                                          August 10, 2017
Shaker Heights Police Department                      0615 hours
Internal Affairs Unit
F-17-006
City of Shaker Heights
Statement of Patrolman Tyler Smith #32


Q.    During the course of your employment have you been given instructions on
      when to operate the DMVARS, i.e. body camera and/or in car dash camera,
      equipment?
A.    Yes, I recently read that.

Q.    Please describe when you are required to activate the DMVARS equipment?
A.    On a traffic stop. When a normal conversation turns into a negative
      encounter, or you start to perceive it as becoming negative. On the way to a
      call and while on scene, until the conclusion of the call.

Q.    Do you know why have been called here today?
A.    Yes.

Q.    Why have you been called here?
A.    My Sergeant, Clementi, informed me that there was an allegation that I
      scared a female on June 10, 2017.

Q.    Did Sergeant Clementi tell you how you had scared the female?
A.    Yes.

Q.    What did he tell you?
A.    He stated that the female said I followed her home.

Q.    When did Sergeant Clementi tell you that?
A.    On the same date that the female came in to file the complaint.

Q.    Do you recall the name Celeste Rushin?
A.    I recall the name "Celeste" because I have a first cousin named Celeste in
      Texas, and that is an unusual name.

Q.    I am handing you an OHLEG photograph of Ms. Celeste Rushin. Do you
      recall who this woman is?
A.    Yes.

Q.    How do you know this woman?
A.    From the two (2) encounters that I had with her while on duty at work.

Q.    Have you ever encountered Ms. Rushin outside of work?
A.    No.

2

TS

Confidential                                      August 10, 2017
Shaker Heights Police Department                   0615 hours
Internal Affairs Unit
F-17-006
City of Shaker Heights
Statement of Patrolman Tyler Smith #32


Q.    The LEADS records reflect that on July 20, 2016 at approximately 0143
      hours, you requested information on a Lexus bearing Ohio License plate GIS
      1897. Do you recall requesting this information?
A.    Yes, I ran the plate by typing it into my MDC. I did not call out over the
      radio. I actually typed the plate in myself because my computer was up and
      running.

Q.    Do you recall why you requested this information?
A.    Yes.

Q.    Why did you request this information?
A.    The plate which was on the Lexus SUV had a violation with the rear plate
      illumination not lit.

Q.    Did you stop the Lexus?
A.    No.

Q.    What actions, if any, did you take in regards to addressing the observed
      violation on the Lexus?
A.    After obtaining the driving status of the owner, seeing that there was no
      invalid license or no warrants attached to the owner, seeing that the operator
      matched the description of the owner, and feeling that there was no threat, I
      pulled alongside the vehicle. At Warrensville Center northbound at
      Fairmount Boulevard eastbound, the Lexus' right front passenger window
      was rolled down. The Lexus was in the left hand curb lane and I was in the
      right hand curb lane. While waiting for the light to change from red to green
      I spoke to the operator and said, "Is this your car?" The operator replied,
      "Yes, it is." I asked her if she was aware that her rear license plate light was
      not lit and she stated, "No, what's that?" I stated, "It is just what it says, it's
      the light above your license plate." She replied, "I don't think my car has
      that." I replied, "Yes, it does. All cars have a rear license plate light." I said,
      "Do you have a minute, I can show you?" She said, "Yea, Yea, no problem."
      I then said, "Why don't we pull into the BP gas station right up here on the
      corner so we do not block the roadway." I then pulled up ahead, pulling into
      the gas station first. She then followed and pulled into the gas station as well.
      I then exited my vehicle and walked to the rear of my cruiser and said, "This
      is what I'm talking about right here. You can see how my plate is lit by the
      light right here." I was pointing to the light. The operator then got out of her
      car and walked to the rear of her car. I then walked to the rear of her car

                                    3

                                                                    TS

Confidential                                          August 10, 2017
Shaker Heights Police Department                      0615 hours
Internal Affairs Unit
F-17-006
City of Shaker Heights
Statement of Patrolman Tyler Smith #32

and pointed above her plate. Then I said, "Do you see the plastic cover right here? This is where the light is for your vehicle, under this piece." The operator then stated, "I had no idea I had that. I will have my dad look at it or fix it." I don't remember her exact words. I then said, "Also, if you didn't know you can go to an auto parts store, (I named a few), they are about $5.00/bulb and most times they will even put it in for you if you ask." I then said, "What are you doing out so late?" The operator replied, "I am coming/going to/from babysitting." (I'm not sure exactly) I believe I then said, "Do you still live in Shaker?" She said, "Yes." I believe I then said something along the lines of be safe or take care. She then asked me if I had a card with me or on me. I replied, "No." I had run out. I then offered to give her my cell phone number if she had any questions because at the time I could not remember my work phone number extension or password. Then we both left.

Q.   Do you recall if Ms. Rushin was wearing anything unusual?
A.   No.

Q.   If I were to tell you that Ms. Rushin was wearing pajamas, would that be correct?
A.   I don't remember.

Q.   At any time during your encounter with Ms. Rushin on July 20, 2016, did you inquire about her relationship status?
A.   No, not that I recall.

Q.   At any time during your encounter with Ms. Rushin on July 20, 2016, did she inquire about your relationship status?
A.   No.

Q.   At any time during your encounter with Ms. Rushin on July 20, 2016, did you ask her for her cellular telephone number?
A.   No, I did not.

Q.   At any time during your encounter with Ms. Rushin on July 20, 2016, did you ask her for any of her personal contact information?
A.   No. However, I did ask her if she lived in Shaker still.

Q.   Was there anyone else in Ms. Rushin's Lexus that you recall?
A.   No, I don't believe so.

4

TS

SH-000883

Confidential                                                August 10, 2017
Shaker Heights Police Department                            0615 hours
Internal Affairs Unit
F-17-006
City of Shaker Heights
Statement of Patrolman Tyler Smith #32


Q.      At any time during your encounter with Ms. Rushin on July 20, 2016, did
        you inquire as to whether she had a boyfriend?
A.      No.

Q.      At any time during your encounter with Ms. Rushin on July 20, 2016, did she
        tell you she  had a boyfriend?
A.      No, there was no talk about a boyfriend on July 20, 2016.

Q.      Did you tell Ms. Rushin you were in a relationship?
A.      No.

Q.      Since July 20, 2016, have you encountered Ms. Rushin while on duty?
A.      Yes, approximately 1 year later. However, initially I did not know it was her.

Q.      Please describe the circumstances of that encounter.
A.      On June 10, 2017, while driving on Traynham at Lomond I stopped for the
        stop sign. There was another vehicle to my right, which would be east of me.
        A black Mazda SUV which stopped at the stop sign at approximately the
        same time as I had arrived, the operator motioned to me with their hands to
        go ahead. I stayed stopped and then motioned for that driver to go ahead.
        The operator did not go, and we each stayed stopped for about 15 seconds.
        My training and experience led to believe that the operator may have been
        attempting to avoid me from obtaining a position to obtain plate information
        about the vehicle. A lot of people have done that when they have a warrant,
        suspended license or, expired plates, etc. The vehicle did eventually go and
        proceeded west on Lomond from that location. I did not pull off right away
        because another vehicle from my left was approaching. I then proceeded to
        catch up to the suspicious vehicle, i.e. black Mazda SUV. After catching up to
        the vehicle, I ran the license plate on my MDC to make sure that the owner
        was valid. The plate information did not return right away. I followed the
        vehicle and the vehicle turned left on either Gridley or Latimore. The vehicle
        then stopped on the wrong side of the street and I activated my air horn,
        believing that the driver was parking illegally. The vehicle did not move and
        put on their left turn signal. At this time the plate information returned and I
        read the status of the owner and saw that the owner lived on whatever street
        we were on. I then proceeded to pull alongside the vehicle. While I was
        proceeding around the vehicle, the driver started moving to turn left into a
        driveway. I then hit my regular horn to avoid a collision. The vehicle
        stopped. Once alongside the vehicle, I said, "Oh, you're cool. I didn't realize

                                         5

                                                                              TS

Confidential                                              August 10, 2017
Shaker Heights Police Department                          0615 hours
Internal Affairs Unit
F-17-006
City of Shaker Heights
Statement of Patrolman Tyler Smith #32

that you lived here." Then I said to the driver, "Hey, I think I remember you. Then the driver said, "I don't think we ever met." I said, "Yes, I believe so, I believe about a year and a half, maybe 2 years ago at the BP on Fairmount Circle." The driver said, "I don't think so." I then asked the driver, "Did you used to drive a gold Lexus." She replied, "Yes." I then said, "Did you use to babysit and/or be a babysitter?" She said, "Yes, how did you know?" I said, "Because, we met at the gas station and had a conversation on the license plate light on the other vehicle you were driving." I said, "I even gave you my phone number, and said to call me if you had any questions." I believe she replied, "Well, I might have remembered that happening, but I was talking to someone at the time who ended up becoming my boyfriend and that is why I never called." I then replied, "No, I wasn't meaning it like that. I did not mean it like that." I believe I then said something along the lines of take care, and/or have a good day." She replied, "You too." I then drove away and then I saw her turn into the driveway in my rear view mirror.

Q.   Why did you not activate your DMVARS equipment when you were obtaining information on the license plate if you believed the driver was acting suspiciously?

A.   I have never done that because if I was going to pull the vehicle over, the lights would have activated which automatically goes back one minute prior. I had not decided if I going to make a traffic stop at that time.

Q.   When you activate your air horn, does your DMVARS equipment activate?

A.   No.

Q.   Had you tested your DMVARS equipment prior to going on the road on July 20, 2016?

A.   Yes, at the start of the shift.

Q.   Had you tested your DMVARS equipment prior to going on the road on June 20, 2017?

A.   Yes, at the start of the shift.

Q    Why did you not activate your DMVARS equipment when the driver parked on the wrong side of the street?

A.   I forgot to. It wasn't a traffic stop. I very rarely manually turn on the DMVARS equipment as it comes on automatically during a traffic stop. In addition, the information came back as valid, and I then knew it was a resident who lived on the street we were on.

6

TS

SH-000885

Confidential                                          August 10, 2017
Shaker Heights Police Department                       0615 hours
Internal Affairs Unit
F-17-006
City of Shaker Heights
Statement of Patrolman Tyler Smith #32

Q.    Why did you pull alongside of the vehicle placing yourself in a position to be
      struck if you believed the driver was going to be pulling into the driveway?
A.    The vehicle did not start moving until I was almost alongside the vehicle.

Q.    You stated, that you told the driver that it, "Wasn't like that," when she told
      you about her boyfriend." What did you mean?
A.    I felt that she implied the reason for me giving my phone number to her on
      the first encounter a year ago was because I wanted to date her and those
      were NOT my intentions.

Q.    At any time during your encounter with Ms. Rushin on June 10, 2017, did
      you inquire about Ms. Rushin's relationship status?
A.    No. She mentioned her relationship status.

Q.    At any time during your encounter with Ms. Rushin on June 10, 2017, did
      you inquire as to whether Ms. Rushin had a boyfriend?
A.    No.

Q.    At any time during your encounter with Ms. Rushin on June 10, 2017, did
      you state, "Good luck with your boyfriend," to Ms. Rushin?
A.    No.

Q.    At any time during your encounter on June 10, 2017 did you provide Ms.
      Rushin your contact information?
A.    No.

Q.    When you got out of your vehicle on July 20, 2016, why did you not activate
      your body camera?
A.    Because it was not a traffic stop and the conversation did not turn negative.

Q.    When Ms. Rushin got out of her vehicle on July 20, 2016, why did you not
      activate your body camera?
A.    Because it was not a traffic stop and the conversation did not turn negative.

Q.    On either of your encounters with Ms. Rushin, did you provide her with your
      first name?
A.    Yes.

7

TS

Confidential                                            August 10, 2017
Shaker Heights Police Department                        0615 hours
Internal Affairs Unit
F-17-006
City of Shaker Heights
Statement of Patrolman Tyler Smith #32


Q.    On either of your encounters with Ms. Rushin, did you provide her with your
      age?
A.    No.

Q.    How would Ms. Rushin have known your age?
A.    She may have asked, and I may have told her, but I don't recall.

Q.    At any time have you requested any member of the Shaker Heights police
      department to obtain any information on Ms. Rushin?
A.    No.

Q.    What did you do in preparation for this interview?
A.    I brought with me a map to familiarize myself with what street(s) on was on
      and I printed out two (2) images that showed different views and different
      perspectives on the same thing.

Q.    Have you ever called Ms. Rushin?
A.    No I have not.

Q.    Has Ms. Rushin ever called you?
A.    No, she has not.

Q.    Have you ever looked up Ms. Rushin through Social media means?
A.    No, I have not.

Q.    Looking back now, during the encounter on July 20, 2016, did Ms. Rushin
      say anything that would lead you to believe that she was interested
      romantically in you?
A.    Yes, possibly because she stated that I stated, "Good luck with your
      boyfriend."

Q.    Is there anything else that you would like to add?
A.    The other day, approximately 2 weeks ago, at Sunoco at Lee and Lomond, I
      saw a guy with no front plate on his car. I mentioned to the guy, "Do you
      know you have to have a front plate on your car?" He stated, "I did not know
      it was an actual law or if it was optional. I stated, "Here, let me show you
      something right quick." I then showed him the ORC/Municipal Ordinance,
      "Display of Plates" section where it states that you must have affixed to the
      exterior of both the front and rear of a motor vehicle a front and rear license
      plate; with the exception of a motorcycle. He then threw both his arms in the

                                      8

                                                                    TS

Confidential
Shaker Heights Police Department
Internal Affairs Unit
F-17-006
City of Shaker Heights
Statement of Patrolman Tyler Smith #32

August 10, 2017
0615 hours

air and I stated, "What's that for?" He replied, "This is the first time I had
an encounter with a police officer where I did not get a ticket and it was not
negative." He then stated, "You could have given me a ticket, but instead you
talked to me like I was a human being." The guy then went on and started
asking me questions about becoming a police officer. I told him that you have
to go to the police academy and he asked me what that consists of while
there. I asked him how serious he was about being a police officer. He stated,
"I want to be a police officer or go into mortuary science." I then gave him
my personal cell phone number and told him to call me and I would help him
set up a ride along.

Q.    Did you activate you DMVARS equipment prior to the encounter with this
male?

A.    No, I did not.

Q.    Have you read this statement and is it true? __YES__

Witness:

8/10/2017
@
0944

Signature: _____
Date: __8/10/2017__
Time: __8:41 AM__

9

TS

SH-000888

☑ SHAKER HEIGHTS MUNICIPAL COURT, CUYAHOGA COUNTY, OHIO
☐ CUYAHOGA COUNTY JUVENILE COURT
☑ STATE **OTRD** TICKET # **SH:F 324443**
☑ CITY OF SHAKER HEIGHTS
CASE # **05992**

NAME **QUEEN TIERA R. Miller**
STREET **1228 WEST BLVD. APT. 4**
CITY, STATE **CLEVELAND, OH 44102**

| OPERATOR LICENSE / STATE ID # | ☐ None | BIRTH DATE | ISSUE DATE **10-8-17** | STATE **OH** |
|---|---|---|---|---|
| CLASS **D** | EXPIRES **12-18-20** | ENDORSEMENT(S) | RESTRICTION(S) ☐ CDL ☐ MC ☐ Other | SS# (last 4 digits) |
| SEX **F** | HEIGHT **5 02** | WEIGHT **150** | EYES **BRO** | HAIR **BRO** | RACE **B** | FINANCIAL RESPONSIBILITY PROOF? ☑ Yes ☐ No |

☐ I1 in OL/State ID; REQUIRED documentation attached.

TO DEFENDANT: COMPLAINT ON **4-21** 20 **18** AT **0239** AM/PM **PM** ☑ Other **OWNER**
Operator/Passenger/Walked a ☐ Passenger ☐ Motorcycle ☐ Bicycle ☐ Other
☐ Commercial DOT# __ ☐ ≥26,001 lbs. ☐ <16 Pass. Bus ☐ ≥16 Pass. Bus ☐ Haz. Mat.
VEHICLE: YEAR **2011** MAKE **Jeep** MODEL **COMPASS**
COLOR **Gray** LICENSE # **W00SPA** STATE # **OH**
UPON A PUBLIC HIGHWAY, NAMELY **Warrensville Cntr (N/B)**
AT/NEAR **Shaker blvd** (M.P. )
IN THE **City** OF **Shaker Heights** IN **Cuyahoga**
COUNTY (NO.) **18** STATE OF OHIO AND COMMITTED THE FOLLOWING OFFENSE(S):

| | ☐ ORC ☐ ORD ☐ T.P. |
|---|---|
| SPEED: __ MPH in __ MPH zone | |
| ☐ Over limits ☐ Unsafe for condition ☐ ACDA | |
| ☐ Radar ☐ Air ☐ VASCAR ☐ Pace ☐ Laser | ☐ Stationary ☐ Moving |
| OVI: ☐ Under the influence of alcohol/drug of abuse. | ☐ ORC ☐ ORD ☐ T.P. |
| ☐ Prohibited blood alcohol concentration. BAC __ | |
| ☐ Blood ☐ Urine ☐ Refused | |
| ☐ Breath # of prior OVIs __ Years of prior OVIs __ | |
| Prior OVIs: | |
| DRIVER LICENSE: ☐None ☐Not on person ☐Revoked ☐Suspended | ☐ ORC ☐ ORD ☐ T.P. |
| EXPIRED: ☐ <6 months ☐ >6 months ☐ Failure to Reinstate | |
| Suspension Type: | |
| SAFETY BELT: Failure to wear | ☐ ORC ☐ ORD ☐ T.P. |
| ☐ Driver ☐ Passenger ☐ Child Restraint ☐ Booster Seat | |
| ☑ OTHER OFFENSE: **Wrongful Entrustment** | ☐ ORC ☑ ORD ☐ T.P. **1135.08** |
| ☐ OTHER OFFENSE: | |

| ☐ DRIVER LICENSE HELD | ☐ VEHICLE SEIZED | ☐ JUVENILE OFFENDER |
|---|---|---|
| PAVEMENT: ☑ Dry ☐ Wet ☐ Snow ☐ Icy # of Lanes __ ☐ Construction Zone | | |
| VISIBILITY: ☐ Clear ☐ Cloudy ☐ Dusk ☑ Night ☐ Dawn | | |
| WEATHER: ☐ Rain ☐ Snow ☐ Fog ☑ No Adverse | | |
| TRAFFIC: ☐ Heavy ☐ Moderate ☑ Light ☐ None | | |
| AREA: ☐ Business ☐ Rural ☑ Residential ☐ Industry ☐ School | | |
| CRASH: ☐ Yes ☑ No ☐ Almost Caused ☐ Non-Injury ☐ Injury ☐ Fatal | | |

Crash Report Number: __
REMARKS: **31    6728**

ACCOMPANYING CRIMINAL CHARGE ☐ Yes ☑ No    TOTAL # OFFENSES **1**

TO DEFENDANT: SUMMONS    PERSONAL APPEARANCE REQUIRED
You are summoned and ordered to appear on **10-18** 20 **18** AT **1:30 PM**
☑ SHAKER HTS MUNICIPAL COURT
3355 LEE ROAD, SHAKER HTS, OHIO 44120 **17    TS/32**
☐ CUYAHOGA COUNTY JUVENILE COURT
9300 QUINCY AVENUE, CLEVELAND, OH 44106

If you fail to appear at this time and place you may be arrested or your license may be cancelled.
This summons served personally on the defendant on __ 20 __
The issuing/citing law enforcement officer states under the penalties of perjury and falsification that
he/she has read the above complaint and that it is true.

**T.M. Arr # 32**
Issuing Law Enforcement Officer
☐ SAME AS ABOVE
**B. Meredith**
Issuing Officer: Verify address. If different from license address, write present address in space provided.

| | Court Code | Unit | Post | District |
|---|---|---|---|---|

OHP0060  10-0060-00 (REVISION 0509)    COURT RECORD    OSHP HP7 [B6305]



PLAINTIFF'S DEPOSITION
EXHIBIT
**6**
**SMITH**

SH-000067

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| QUEEN TIERA R. MILLER, | ) CASE NO.: 1:19-CV-01080 |
| | ) |
| Plaintiff, | ) JUDGE: DONALD C. NUGENT |
| | ) |
| vs. | ) **DEFENDANT TYLER SMITH'S** |
| | ) **ANSWERS AND RESPONSES TO** |
| CITY OF SHAKER HEIGHTS, OHIO, et | ) **PLAINTIFF'S FIRST SET OF** |
| al., | ) **INTERROGATORIES AND REQUESTS** |
| | ) **FOR PRODUCTION OF DOCUMENTS** |
| Defendants. | ) |

Now comes Defendant, Tyler Smith, by and through counsel, Mazanec, Raskin & Ryder Co., L.P.A., and for his Answers and Responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents Propounded to Defendant Tyler Smith, states as follows:

## **GENERAL OBJECTION**

Defendant objects to Plaintiff's "Instructions" and "Definitions" to the extent that they attempt to expand or otherwise modify the obligations and requirements of the Federal Rules of Civil Procedure (including, but not limited to, requests for documents obtained and/or developed as attorney work-product or trial-preparation materials). The following Answers and Responses are made without waiver of this objection.

## **INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please identify every lawsuit in which you have been named a defendant since January 1, 2009.

**Answer:** None.



**INTERROGATORY NO. 2:**

Please state the following information concerning complaints in writing made about you since January 1, 2009: (a) the name of the complainant (b) the nature of the complaint (c) the date of the complaint and (d) where the complaint was filed.

**Answer:**     **Defendant does not recall the detail of any written complaint.  See the Citizen Complaints produced by Defendant City of Shaker relative to Defendant Smith.**

**INTERROGATORY NO. 3:**

Please state the following information concerning any complaints in writing for sexual harassment against you: (a) the name of the complainant (b) the date of the complaint and (c) where the complaint was filed:

**Answer:**     **No complaints of sexual harassment.**

**INTERROGATORY NO. 4:**

Please state the amount of money, if any, you have given to Queen Tiera M. Miller and the date on which you gave the money.

**Answer:**     **OBJECTION.  This Interrogatory is overly broad and seeks information not relevant to this action.  Notwithstanding, I gave Ms. Miller approximately $80.00 to $85.00 total on or about October 18, 2018.  Additionally, I paid for our meals at Landmark Restaurant on September 21, 2018, and gave her the change from paying the bill.**

**INTERROGATORY NO. 5:**

Please state the reasons why you gave Queen Tiera M. Miller money for each occasion that you have given her money.

**Answer:**     **I gave money to Ms. Miller because she said she did not have a lot of money, was a struggling mother, and had a terminally ill child and would have trouble.**

**INTERROGATORY NO. 6:**

Please state whether you knew Queen Tiera M. Miller prior to pulling her vehicle over on September 21, 2018.

**Answer:**   **I did not remember Ms. Miller at the time of the traffic stop.  I later remembered that I had met her in college and also at a gas station in East Cleveland.**

**INTERROGATORY NO. 7:**

If you knew Queen Tiera M. Miller prior to September 21, 2018, please state how you knew her.

**Answer:**   **I did not remember Ms. Miller at the time of the traffic stop, but later remembered that I had met her in college and also at a gas station in East Cleveland.  While attending college at the University of Akron, I had sex with Ms. Miller in her dorm or a vehicle.**

**INTERROGATORY NO. 8:**

Please state the following information concerning any discipline you have received from the City of East Cleveland and the City of Shaker Heights: (a) the date of the discipline (b) the discipline proposed and (c) the reason for the reason for the discipline.

**Answer:**   **None.**

**INTERROGATORY NO. 9:**

Please state with specificity what sexual acts you participated in with Queen Tiera M. Miller on September 21, 2018.

**Answer:**   **On September 21, 2018, while I was in the passenger seat of Ms. Miller's car, she started kissing me on my cheek and neck area, climbed on top of me, and we had intercourse.**

3

**INTERROGATORY NO. 10:**

Please list the times and dates in which you contacted or attempted to contact Queen Tiera M. Miller since September 20, 2018.

**Answer:**     **I contacted Ms. Miller on September 21, 2018 to advise her that she would need to appear in court for her citation.**

**INTERROGATORY NO. 11:**

Please identify the following information with whom you have spoken about the allegations contained in this lawsuit, indicating (a) the name of the person (b) the contact information of the person, (c) the date(s) of the contact and (d) the nature of the communication.

**Answer:**     **I have spoken with my counsel;**

**Wife, Jessica Smith, though counsel, 5-15-19, telling her of the affair;**

**Commander Cole, through counsel, 4-13-19, IA Interview; and**

**Pastor Dr. Jawanza Colvin, 5-16-19, Olivet Institutional Baptist Church, guidance and payer.**

**INTERROGATORY NO. 12:**

Please state if you have received training from Defendant City of Shaker Heights, regarding the use of person information of private citizens cited by you for traffic violations for non-police business.

**Answer:**     **Yes.**

**INTERROGATORY NO. 13:**

Please list all phone numbers you have used and which are in your name since January 1, 2009.

**Answer:**     <u>**OBJECTION**</u>.  **This Interrogatory seeks protected information of a peace officer.**

4

**INTERROGATORY NO. 14:**

Identify each woman who you have had any sexual relationship with since you have become a police officer.

Answer:      **OBJECTION.  This request seeks information which is not relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action.  Notwithstanding, since becoming a police officer, I have had an ongoing sexual relationship with my wife and had intercourse with Ms. Miller on September 21, 2018.**

## REQUESTS FOR PRODUCTION OF DOCUMENTS

## REQUEST FOR PRODUCTION NO. 1:

All documents, files and all other communications relating to Queen Tiera R. Miller.

**Response:     None.**

## REQUEST FOR PRODUCTION NO. 2:

Any text messages or emails between you and Queen Tiera R. Miller.

**Response:     None.**

## REQUEST FOR PRODUCTION NO. 3:

All documents relating to any discipline you have ever received while working as a police officer.

**Response:     None.**

## REQUEST FOR PRODUCTION NO. 4:

A copy of your complete personnel file.

**Response:     Not in Defendant's possession.**

**REQUEST FOR PRODUCTION NO. 5:**

Documents relating to any litigation in which you have ever been named as a party.

**Response:** **None.**

**REQUEST FOR PRODUCTION NO. 6:**

Documents relating to the investigation of Queen Tiera R. Miller's allegations against you.

**Response:** **None in my possession.**

**REQUEST FOR PRODUCTION NO. 7:**

All communications of any nature related to the allegations made by Queen Tiera R. Miller against you and the City of Shaker Heights, Ohio.

**Response:** **None.**

**REQUEST FOR PRODUCTION NO. 8:**

Any video or audio files related to Queen Tiera R. Miller.

**Response:** **None.**

**REQUEST FOR PRODUCTION NO. 9:**

All documents used in assisting Defendant Tyler Smith in responding to Interrogatories propounded to Defendant Tyler Smith by Plaintiff.

**Response:** **OBJECTION.  This request seeks attorney work product.**

**REQUEST FOR PRODUCTION NO. 10:**

All documents evidencing any money or gifts you have ever given to Queen Tiera R. Miller.

**Response:** **None.**

6

**REQUEST FOR PRODUCTION NO. 11:**

   All documents which relate to any of the claims made in Plaintiff's Complaint or which relate to any of the defenses, admissions or denials made in your Answer to Plaintiff's Complaint.

**Response:**   **See the documents previously produced in this litigation.**

       As to all objections:

       */s/Christina M. Nicholas*
       JOHN T. MCLANDRICH (0021494)
       TERENCE L. WILLIAMS (0081363)
       CHRISTINA M. NICHOLAS (0091248)

       Respectfully submitted,

       MAZANEC, RASKIN & RYDER CO., L.P.A.

       */s/Christina M. Nicholas*
       JOHN T. MCLANDRICH (0021494)
       TERENCE L. WILLIAMS (0081363)
       CHRISTINA M. NICHOLAS (0091248)
       100 Franklin's Row
       34305 Solon Road
       Cleveland, OH  44139
       (440) 248-7906
       (440) 248-8861 – Fax
       Email: jmclandrich@mrrlaw.com
          twilliams@mrrlaw.com
          cnicholas@mrrlaw.com

       *Counsel for Defendant Tyler Smith*

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2019, a copy of the foregoing Defendant's Answers and Responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents were served by email and by depositing same in first-class United States mail, postage prepaid, to the following:

Avery S. Friedman, Esq.
Avery Friedman & Associates
701 The City Club Building
850 Euclid Avenue
Cleveland, OH 44114
Email: avery@lawfriedman.com

-and-

Jared S. Klebanow, Esq.
Klebanow Law, LLC
701 The City Club Building
850 Euclid Avenue
Cleveland, OH 44114
Email: jklebanow@klebanowlaw.com

*Counsel for Plaintiff Queen Tiera Miller*

Steven D. Strang, Esq.
Gallagher Sharp LLP
Sixth Floor Bulkley Building
1501 Euclid Avenue
Cleveland, OH 44115
Email: sstrang@gallaghersharp.com

*Counsel for Defendant City of Shaker Heights, Ohio*

/s/Christina M. Nicholas
JOHN T. MCLANDRICH (0021494)
TERENCE L. WILLIAMS (0081363)
CHRISTINA M. NICHOLAS (0091248)

*Counsel for Defendant Tyler Smith*

TRID-190137/Smith Rsp to Ps 1st ROG RFPD

8

## **VERIFICATION**

I, Tyler Smith, hereby certify that the answers to Plaintiff's interrogatories are true and accurate according to my first-hand knowledge.


Executed on October 29, 2019.

_____
TYLER SMITH


Sworn to and subscribed in my presence this __29th__ day of October, 2019.

_____
NOTARY PUBLIC

9

PENGAD 800-631-6989 · PLAINTIFF'S DEPOSITION
EXHIBIT
8
SMITH


AT&T

QUEEN RASHE MILLER
7928 LORAIN AVE
CLEVELAND, OH 44102-4256

Page: A-9 of 31
Bill Cycle Date: 09/04/18 - 10/03/18
Account: 287274193964
Foundation Account: FAN 07155927
Invoice: 287274193964X10112018

Visit us online at: **www.att.com/business**

## 216 645-7142
### QUEEN RASHE MILLER

**Call Detail** - Continued

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Add'l Charges |
|------|------|------|------|------|------|------|------|
| **Wednesday, 09/19** | | | | | | | |
| 06:08p | CLEVEL OH | 216-262-2896 | SDDV | | 1 | 0.00 | 0.00 |
| 06:29p | CLEVEL OH | 216-205-8705 | SDDV | | 6 | 0.00 | 0.00 |
| 08:01p | INCOMI CL | 440-610-3310 | SDDV | | 1 | 0.00 | 0.00 |
| 08:48p | CLEVEL OH | 216-536-0568 | SDDV | | 9 | 0.00 | 0.00 |
| 08:50p | INCOMI CL | 440-610-3310 | SDDV | | 1 | 0.00 | 0.00 |
| 08:58p | CLEVEL OH | 216-205-8705 | SDDV | | 1 | 0.00 | 0.00 |
| 08:59p | CLEVEL OH | 216-205-8705 | SDDV | | 1 | 0.00 | 0.00 |
| 09:01p | CLEVEL OH | 216-205-8705 | SDDV | | 1 | 0.00 | 0.00 |
| 09:06p | CLEVEL OH | 216-240-0429 | SDDV | | 4 | 0.00 | 0.00 |
| 09:58p | AKRON OH | 330-344-0946 | SDDV | | 15 | 0.00 | 0.00 |
| 10:54p | CLEVEL OH | 216-536-0568 | SDDV | | 1 | 0.00 | 0.00 |
| 10:56p | CLEVEL OH | 216-421-6666 | SDDV | | 2 | 0.00 | 0.00 |
| 10:58p | CLEVEL OH | 216-262-2896 | SDDV | | 4 | 0.00 | 0.00 |
| **Thursday, 09/20** | | | | | | | |
| 08:01a | CLEVEL OH | 216-205-8705 | SDDV | | 1 | 0.00 | 0.00 |
| 10:17a | INCOMI CL | 877-825-4490 | SDDV | | 1 | 0.00 | 0.00 |
| 10:18a | Toll F CL | 877-825-4490 | SDDV | | 1 | 0.00 | 0.00 |
| 10:35a | INCOMI CL | 216-553-3440 | SDDV | | 1 | 0.00 | 0.00 |
| 10:36a | CLEVEL OH | 216-553-3440 | SDDV | | 1 | 0.00 | 0.00 |
| 10:44a | CLEVEL OH | 216-536-0568 | SDDV | | 18 | 0.00 | 0.00 |
| 11:38a | CLEVEL OH | 216-205-8705 | SDDV | | 1 | 0.00 | 0.00 |
| 11:44a | INCOMI CL | 216-215-1194 | SDDV | | 1 | 0.00 | 0.00 |
| 12:45p | CLEVEL OH | 216-242-9505 | SDDV | | 1 | 0.00 | 0.00 |
| 01:14p | CLEVEL OH | 216-205-8705 | SDDV | | 1 | 0.00 | 0.00 |
| 01:46p | INCOMI CL | 888-544-4877 | SDDV | | 1 | 0.00 | 0.00 |
| 01:53p | INCOMI CL | 216-205-8705 | SDDV | | 3 | 0.00 | 0.00 |
| 01:57p | CLEVEL OH | 216-262-2896 | SDDV | | 1 | 0.00 | 0.00 |
| 01:59p | Toll F CL | 800-686-9901 | SDDV | | 32 | 0.00 | 0.00 |
| 02:16p | CLEVEL OH | 216-672-4191 | SDDV | | 1 | 0.00 | 0.00 |
| 02:31p | CLEVEL OH | 216-205-8705 | SDDV | | 2 | 0.00 | 0.00 |
| 02:40p | Toll F CL | 800-503-1283 | SDDV | | 1 | 0.00 | 0.00 |
| 02:42p | Toll F CL | 800-503-1283 | SDDV | | 1 | 0.00 | 0.00 |
| 02:42p | CLEVEL OH | 216-443-5100 | SDDV | | 9 | 0.00 | 0.00 |
| 02:49p | INDEPE OH | 216-253-0727 | SDDV | | 1 | 0.00 | 0.00 |
| 02:51p | INDEPE OH | 216-253-0727 | SDDV | | 1 | 0.00 | 0.00 |
| 02:53p | Toll F CL | 866-387-7363 | SDDV | | 4 | 0.00 | 0.00 |
| 03:09p | INCOMI CL | 216-529-0181 | SDDV | | 1 | 0.00 | 0.00 |
| 03:43p | INDEPE OH | 216-253-0727 | SDDV | | 1 | 0.00 | 0.00 |
| 03:47p | INDEPE OH | 216-253-0727 | SDDV | | 1 | 0.00 | 0.00 |
| 03:48p | INDEPE OH | 216-253-0727 | SDDV | | 1 | 0.00 | 0.00 |
| 03:48p | INDEPE OH | 216-253-0727 | SDDV | | 1 | 0.00 | 0.00 |
| 03:50p | INDEPE OH | 216-253-0727 | SDDV | | 1 | 0.00 | 0.00 |
| 03:51p | INDEPE OH | 216-253-0727 | SDDV | | 1 | 0.00 | 0.00 |
| 03:55p | INCOMI CL | 440-610-3310 | SDDV | | 5 | 0.00 | 0.00 |
| 04:39p | INCOMI CL | 281-466-4763 | SDDV | | 2 | 0.00 | 0.00 |
| 04:46p | INCOMI CL | 216-543-8120 | SDDV | | 4 | 0.00 | 0.00 |
| 05:04p | INCOMI CL | 440-610-3310 | SDDV | | 1 | 0.00 | 0.00 |
| 05:29p | INCOMI CL | 216-645-2559 | SDDV | | 1 | 0.00 | 0.00 |
| 05:44p | INCOMI CL | 216-253-0727 | SDDV | | 12 | 0.00 | 0.00 |

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Add'l Charges |
|------|------|------|------|------|------|------|------|
| **Thursday, 09/20** | | | | | | | |
| 06:12p | CLEVEL OH | 216-297-9232 | SDDV | | 1 | 0.00 | 0.00 |
| 06:54p | CLEVEL OH | 216-262-2896 | SDDV | | 1 | 0.00 | 0.00 |
| 06:56p | CLEVEL OH | 216-262-2896 | SDDV | | 1 | 0.00 | 0.00 |
| 07:54p | CLEVEL OH | 216-543-8120 | SDDV | | 1 | 0.00 | 0.00 |
| 07:56p | INCOMI CL | 216-543-8120 | SDDV | | 2 | 0.00 | 0.00 |
| 08:01p | CLEVEL OH | 216-205-8705 | SDDV | | 1 | 0.00 | 0.00 |
| 08:01p | CLEVEL OH | 216-205-8705 | SDDV | | 3 | 0.00 | 0.00 |
| 08:12p | CLEVEL OH | 216-451-2990 | SDDV | | 2 | 0.00 | 0.00 |
| 08:47p | MONTRS OH | 216-632-1775 | SDDV | | 2 | 0.00 | 0.00 |
| 08:48p | MONTRS OH | 216-632-1775 | SDDV | | 2 | 0.00 | 0.00 |
| 11:23p | CLEVEL OH | 216-543-8120 | SDDV | | 1 | 0.00 | 0.00 |
| **Friday, 09/21** | | | | | | | |
| 01:11a | INCOMI CL | 216-376-4300 | SDDV | | 3 | 0.00 | 0.00 |
| 01:53a | CLEVEL OH | 216-536-0568 | SDDV | | 1 | 0.00 | 0.00 |
| 02:12a | CLEVEL OH | 216-240-0429 | SDDV | | 1 | 0.00 | 0.00 |
| 02:16a | CLEVEL OH | 216-543-8120 | SDDV | | 8 | 0.00 | 0.00 |
| 02:34a | CLEVEL OH | 216-543-8120 | SDDV | | 5 | 0.00 | 0.00 |
| 02:42a | CLEVEL OH | 216-543-8120 | SDDV | | 3 | 0.00 | 0.00 |
| 02:48a | INCOMI CL | 216-543-8120 | SDDV | | 1 | 0.00 | 0.00 |
| 02:51a | INCOMI CL | 216-543-8120 | SDDV | | 1 | 0.00 | 0.00 |
| 03:05a | CLEVEL OH | 216-543-8120 | SDDV | | 7 | 0.00 | 0.00 |
| 03:11a | CLEVEL OH | 216-543-8120 | SDDV | | 1 | 0.00 | 0.00 |
| 03:11a | CLEVEL OH | 216-543-8120 | SDDV | | 1 | 0.00 | 0.00 |
| 03:11a | INCOMI CL | 216-543-8120 | SDDV | | 7 | 0.00 | 0.00 |
| 03:25a | CLEVEL OH | 216-543-8120 | SDDV | | 1 | 0.00 | 0.00 |
| 05:00a | INCOMI CL | 216-930-1408 | SDDV | | 27 | 0.00 | 0.00 |
| 05:27a | CLEVEL OH | 216-543-8120 | SDDV | | 1 | 0.00 | 0.00 |
| 05:28a | CLEVEL OH | 216-543-8120 | SDDV | | 1 | 0.00 | 0.00 |
| 05:36a | INCOMI CL | 216-930-1408 | SDDV | | 2 | 0.00 | 0.00 |
| 05:39a | INCOMI CL | 216-930-1408 | SDDV | | 1 | 0.00 | 0.00 |
| 05:45a | CLEVEL OH | 216-543-8120 | SDDV | | 4 | 0.00 | 0.00 |
| 05:47a | INCOMI CL | 216-930-1408 | SDDV | | 2 | 0.00 | 0.00 |
| 05:49a | INCOMI CL | 216-543-8120 | SDDV | | 8 | 0.00 | 0.00 |
| 07:25a | CLEVEL OH | 216-543-8120 | SDDV | | 13 | 0.00 | 0.00 |
| 07:37a | INCOMI CL | 216-543-8120 | SDDV | | 21 | 0.00 | 0.00 |
| 11:07a | INCOMI CL | 216-253-0727 | SDDV | | 8 | 0.00 | 0.00 |
| 11:21a | INCOMI CL | 440-610-3310 | SDDV | | 1 | 0.00 | 0.00 |
| 12:33p | INCOMI CL | 216-536-0568 | SDDV | | 3 | 0.00 | 0.00 |
| 01:05p | INCOMI CL | 216-205-8705 | SDDV | | 9 | 0.00 | 0.00 |
| 01:15p | CLEVEL OH | 216-205-8705 | SDDV | | 44 | 0.00 | 0.00 |
| 01:58p | INCOMI CL | 216-401-3869 | SDDV | | 20 | 0.00 | 0.00 |
| 02:18p | CLEVEL OH | 216-205-8705 | SDDV | | 17 | 0.00 | 0.00 |
| 02:35p | CLEVEL OH | 216-815-0470 | SDDV | | 5 | 0.00 | 0.00 |
| 02:39p | INCOMI CL | 216-232-3864 | SDDV | | 26 | 0.00 | 0.00 |
| 03:05p | INDEPE OH | 216-232-3864 | SDDV | | 2 | 0.00 | 0.00 |
| 03:08p | INCOMI CL | 216-232-3864 | SDDV | | 46 | 0.00 | 0.00 |
| 03:56p | CLEVEL OH | 216-672-4049 | SDDV | | 1 | 0.00 | 0.00 |
| 04:32p | INCOMI CL | 844-206-9035 | SDDV | | 1 | 0.00 | 0.00 |
| 04:45p | INDEPE OH | 216-253-0727 | SDDV | | 5 | 0.00 | 0.00 |
| 05:05p | CLEVEL OH | 216-205-8705 | SDDV | | 28 | 0.00 | 0.00 |
| 06:04p | INCOMI CL | 440-610-3310 | SDDV | | 9 | 0.00 | 0.00 |
| 08:18p | INCOMI CL | 216-645-5682 | SDDV | | 1 | 0.00 | 0.00 |
| 09:00p | INCOMI CL | 216-376-4300 | SDDV | | 2 | 0.00 | 0.00 |
| 09:39p | INCOMI CL | 216-543-8120 | SDDV | | 29 | 0.00 | 0.00 |

**Text Message**
Fri, Sep 21, 8:36 AM

u home?

Mon, Sep 24, 1:57 PM

They let us go early

Mon, Sep 24, 6:04 PM

can u talk?

I wanted to share something with you

Wed, Sep 26, 1:01 AM

You forgot about me

I called you

Wed, Sep 26, 8:27 AM

Gm

Mon, Oct 1, 5:27 PM

You played me



PLAINTIFF'S DEPOSITION
EXHIBIT

9

SMITH

PENGAD 800-631-6989

Tue, Oct 2, 8:34 AM

how

you don't answer when I call

You never called. So you going to play games and make me pay for this ticket

see what I mean I just called you no answer

Can we meet today

Thursday evening

Will that work?

Yes

Or I can meet you in traffic today

I'm not able to meet today

Sun, Oct 7, 11:22 PM

Sun, Oct 7, 11:22 PM

can you meet tomorrow

Mon, Oct 8, 10:20 AM



Thu, Oct 11, 10:27 PM

I called you the other day but got no answer..can you meet me tomorrow...maybe around 8 or 9pm



is that a yes?



ok

Mon, Oct 15, 4:24 PM

what happened

I was saying  can meet you
tomorrow



ok

Tue, Oct 16, 3:35 PM

can u meet me around 630 or 7pm?

Tue, Oct 16, 5:00 PM

?



on east 185 by lakeshore

Meet you

Yea if u can

I'm in aurora now

Ok I'm over here until about 6:30
but I have to work tomorrow if you
want to meet me there near where
we met or something

Wed, Oct 17, 12:08 PM

Cmb

Wed, Oct 17, 1:48 PM

cmb?

Wed, Oct 17, 4:16 PM

what does cmb mean?

Wya

work

I can come get it

Wed, Oct 17, 4:16 PM

what does cmb mean?

Wya

work

I can come get it

after 8 yes

…

hit me up around then

I can meet you in traffic now before then!

I'm busy @ the moment

Thu, Oct 18, 2:47 AM

can you meet now?

Thu, Oct 18, 3:36 PM

Your playing games

how so when I'm the one that continuously reaches out to you I try to meet you last week and this week and we both had scheduling conflicts ..I offer to mail it to you and you won't give me an address I don't understand how that's playing games please explain that to me

I'm here

Call me

Ok soo your playing games

Your just wasting my time.

I'm about to be there

Where the fuck are u

are you sure you're okay you look really sad