```
1                        - - -

2            IN THE UNITED STATES DISTRICT COURT

3                 NORTHERN DISTRICT OF OHIO

4                     EASTERN DIVISION

5                        - - -

6   Queen Tiera R. Miller,        )

7                    Plaintiff,   )

8       vs.                       )  Case No. 1:19-cv-01080-DCN

9   City of Shaker Heights, Ohio, )
    et al.,
10                                )

                     Defendants.  )
11                                )

12

13                       - - -

14        DEPOSITION OF COMMANDER JOHN COLE

15           WEDNESDAY, OCTOBER 30, 2019

16                       - - -

17  The deposition of COMMANDER JOHN COLE, called by the

18  Plaintiff for examination under the Federal Rules of Civil

19  Procedure, taken before me, Ivy J. Gantverg, Registered

20  Professional Reporter and Notary Public in and for the

21  State of Ohio, by agreement of counsel and without further

22  notice or other legal formalities, at the offices of

23  Gallagher Sharp, Bulkley Building - Sixth Floor, 1501

24  Euclid Avenue, Cleveland, Ohio, commencing at 9:14 a.m.,

25  on the day and date above set forth.
```

```
 1    APPEARANCES:

 2    On Behalf of the Plaintiff:

 3         Jared S. Klebanow, Esq.
           Klebanow Law
 4         850 Euclid Avenue - Suite 701
           Cleveland, Ohio  44114
 5         jklebanow@klebanowlaw.com

 6    On Behalf of Defendant City of Shaker Heights, Ohio:

 7         Steven D. Strang, Esq.
           Nicholas Anhold, Esq.
 8         Gallagher, Sharp
           Bulkley Building - Sixth Floor
 9         1501 Euclid Avenue
           Cleveland, Ohio  44115
10         sstrang@gallaghersharp.com
           nanhold@gallaghersharp.com
11
      On Behalf of Tyler Smith:
12
           John T. McLandrich, Esq.
13         Mazanec, Raskin & Ryder
           100 Franklin's Row
14         34305 Solon Road
           Cleveland, Ohio  44139
15         jmclandrich@mrrlaw.com

16

17

18

19

20

21

22

23

24

25
```

```
1                          WITNESS INDEX

2                                                        PAGE

3    COMMANDER JOHN COLE
     Cross Examination
4    By Mr. Klebanow                                       4

5    Cross Examination
     By Mr. McLandrich                                    64
6
     Recross Examination
7    By Mr. Klebanow                                      73

8    Recross Examination
     By Mr. McLandrich                                    75
9

10

11                         EXHIBIT INDEX

12   EXHIBIT                                            PAGE

13   Plaintiff's (Cole) Exhibit 1                        16
     Plaintiff's (Cole) Exhibit 2                        19
14   Plaintiff's (Cole) Exhibit 3                        21
     Plaintiff's (Cole) Exhibit 4                        22
15   Plaintiff's (Cole) Exhibit 5                        25
     Plaintiff's (Cole) Exhibit 6                        28
16   Plaintiff's (Cole) Exhibit 7                        41
     Plaintiff's (Cole) Exhibit 7 (Re-marked)            45
17   Plaintiff's (Cole) Exhibit 8                        46
     Plaintiff's (Cole) Exhibit 9                        53
18   Plaintiff's (Cole) Exhibit 10                       56
     Plaintiff's (Cole) Exhibit 11                       59
19   Plaintiff's (Cole) Exhibit 12                       59
     Plaintiff's (Cole) Exhibit 13                       59
20

21

22

23

24

25
```

**MORSE, GANTVERG & HODGE**

```
1                     COMMANDER JOHN COLE
2    the deponent herein, called for examination under the
3    Rules, having been first duly sworn, as hereinafter
4    certified, was deposed and said as follows:
5                     CROSS EXAMINATION
6    BY MR. KLEBANOW:
7    Q       Mr. Cole, thank you for coming today.  My name is
8    Attorney Jared Klebanow.  I represent the plaintiff in
9    this lawsuit which has been filed against an officer of
10   Shaker Heights and the City of Shaker Heights.
11           Could you state your full name and spell it for the
12   record, please.
13   A       Sure.  My full name is John Cole, last name is
14   C-O-L-E.
15   Q       Mr. Cole, do you prefer I call you Mr. Cole, I
16   think it's Commander Cole, or John?  Do you have a
17   preference?
18   A       I don't have a preference.
19   Q       Have you ever had your deposition taken before?
20   A       I have.
21   Q       So I'll go briefly through the ground rules.  I'm
22   sure you've heard them before.
23           As you can see, we have a court reporter taking
24   everything down that we're saying.  So I ask that you try
25   to let me finish my questions before you respond.  I'm
```

1    going to do the same for you, and allow you to finish your

2    answer before I ask another question.

3          If I ask a yes or no question, I just ask that you

4    respond with a yes or no, as opposed to a shake of the

5    head, or uh-huh, or uh-uh, just because it's hard for the

6    court reporter to take that down.

7          If at any point you need to take a break today,

8    that's completely fine.  I just ask that if there's a

9    question pending, you respond to that question before we

10   take the break.  You can ask me to take a break, ask your

11   counsel to take a break, for any reason, that's fine.

12         Are you on any medications today that would affect

13   your ability to testify honestly?

14   A     I am not.

15   Q     Are you on any medications today that would affect

16   your memory in any way?

17   A     I am not.

18   Q     Did you do anything to prepare for this deposition

19   today, other than speak with your attorney?

20   A     I spoke with my attorney, yes.

21   Q     Other than that, did you do anything to prepare?

22   A     I just looked over some of my notes.

23   Q     And what notes were those?

24   A     That's my investigations, my former investigations,

25   and my general rules, directives, of the Shaker Heights

1    Police Department.

2    Q      I want to talk briefly about your background.  I

3    won't go too much into detail.

4           What is the highest level of education that you

5    obtained?

6    A      I have a license to practice law.

7    Q      Okay.  And briefly, then, where did you go to high

8    school?

9    A      Wickliffe High School.

10   Q      I'm sorry?

11   A      Wickliffe High School.

12   Q      Wickliffe.

13          College?

14   A      Lake Erie College.

15   Q      And you graduated from there?

16   A      Yes, sir, I did.

17   Q      What degree and what year?

18   A      I have a Bachelor of Arts degree in Psychology, and

19   the year I graduated was 1991.

20   Q      And law school, you said, after that?

21   A      Cleveland-Marshall.

22   Q      What year did you graduate?

23   A      1998.

24   Q      Did you take the Bar?

25   A      I did.

1    Q       Did you pass the Bar?

2    A       I did.

3    Q       What year was that?

4    A       2000.

5    Q       Did you practice law prior to going into Shaker

6    Heights?

7    A       I did not practice -- yes, I did.

8    Q       So briefly take me through from 2000 to how you got

9    to Shaker.

10   A       2000, I was at the Prosecutor's Office.  In 2001, I

11   returned to the Cleveland Division of Police.  From 2001

12   until 2011, I was a Cleveland Division of Police officer.

13   I attained the rank of Sergeant and Lieutenant.

14           In 2011, I went to the Shaker Heights Police

15   Department, where I was appointed Commander of Auxiliary

16   Police Services.

17   Q       What does that mean, Commander of Auxiliary Police

18   Services?

19   A       That means I have all the support services of the

20   Shaker Heights Police Department.

21   Q       You said you returned to Cleveland.  Were you there

22   for a period of time, left to go to law school, and came

23   back?

24   A       I started with the Cleveland Division of Police in

25   1994.

1    Q       Were you a patrol officer?

2    A       I was a patrol officer.

3    Q       Since you went to Shaker, are you the investigator

4    of complaints that come in on officers or administrators

5    of the police department?

6    A       One of the functions I hold is Internal Affairs

7    Office.

8    Q       What does that mean?

9    A       That means that complaints that come in either

10   internally through our department members, or externally

11   through community members, or some other means.  I am the

12   office that holds those complaints.  I assign them or

13   choose to investigate them myself, depending on what the

14   subject matter is.

15   Q       And what would make you decide -- what factors do

16   you use in deciding whether you investigate those or you

17   assign that to somebody else?

18   A       There's actually a General Order that covers that.

19   Q       And what is that General Order?

20   A       I believe it's 5201.  5202 has some in it, too,

21   there's some reference to 5202.

22   Q       I don't expect to you recite those by memory, but

23   generally, what do they say?

24   A       I appreciate that.

25           They talk about the types of complaints.  There's

1    three types of complaints.  There's formal complaints,

2    informal complaints, and inquiries.

3         Inquiries really concern issues with police

4    practices, something where a resident might say, I think

5    you could do this better, and we would start an inquiry

6    that way.

7         Informal could be police conduct or improper police

8    procedure, where somebody will say, I saw an officer do

9    something that was violative of the rules.

10        And then you have formal, which could be criminal

11   investigations or other more serious types of police

12   conduct.

13   Q     And pursuant to those rules, if you know, which

14   ones of those are you to investigate yourself, and which

15   ones of those are you either able or choose to assign?

16   A     Bias based policy complaints are generally assigned

17   to my office.  Criminal misconduct is generally assigned

18   to me.  Anything that is considered to be very serious,

19   generally I take those.

20   Q     And when you say you take those, you mean you

21   handle them yourself?

22   A     I do.

23   Q     And if they're what you would deem to be less

24   serious, or maybe, as you stated, an inquiry, that's

25   something you might assign to somebody else in your

1  office?

2  A      It's something that I could assign to somebody in

3  my office, or actually to the supervisor of the member.

4  Q      In your career dating back to Cleveland and Shaker,

5  have you ever been in charge or been involved in the

6  process of hiring a police officer?

7  A      I have not.

8  Q      So you've never sat on a committee, or looked at

9  resumes, or interviewed police officers for hiring?

10  A      I have -- I'm sorry, I have sat on a committee that

11  would review.  But I don't have the ultimate authority to

12  hire a police officer.

13  Q      So by sitting on those committees, you may make

14  recommendations or be part of a panel that would make a

15  recommendation to hire or not hire?

16  A      Yes.

17  Q      You said you've been in this role of Internal

18  Affairs investigator or in the Internal Affairs Office

19  since 2001?

20  A      Since 2011.

21  Q      I'm sorry, since 2011.

22         And that's to the present?

23  A      That's correct.

24  Q      I'm sure it's been a number, but give me an

25  estimate as to how many cases you've investigated since

1  that time?

2  A      Much more than 50.

3  Q      What do you think are the characteristics that make

4  for a good police officer?

5           MR. McLANDRICH:  Objection.  You can answer.

6           MR. KLEBANOW:  Go ahead and answer the

7           question.

8           MR. McLANDRICH:  You can answer.  I'm just

9           objecting for the record.

10  A      A productive member, a dependable member, a

11  motivated member, and a competent member.

12  Q      Just to be clear, when you say, member, you mean

13  police officer?

14  A      I do.

15  Q      I'm going to list off a number of characteristics.

16  I just want you to tell me if you believe they're

17  important characteristics for a police officer to have,

18  okay?

19           MR. McLANDRICH:  Objection.

20  Q      What about good judgment?

21  A      Yes.

22  Q      What about being courteous?

23  A      Yes.

24  Q      What about good decision-making?

25  A      Yes.

1    Q     When you're investigating an officer for any sort

2    of alleged misconduct, what are the types of things you

3    look at in the officer's history?

4    A     Whether they have a similar complaint history,

5    whether they have had problems with meeting some standards

6    in the past.

7    Q     So talk me through generally the investigative

8    process.  And I know that you had said there are three

9    types of, we'll call them complaints, but you had said, I

10   think, inquiries, informal complaints, and formal

11   complaints, right?

12   A     Excellent.  Yes.

13   Q     So let's talk about formal complaints first.

14   A     Okay.

15   Q     So talk me through the process, from start to

16   finish, of a formal complaint that would come in from a

17   citizen in Shaker Heights about the conduct of an officer.

18   A     Well, what would happen is that citizen could --

19   they would respond to the department or they would provide

20   the information through mail to our Chief's office.  Our

21   Chief would get that information and go over and provide

22   that information to me.

23         I would record the date/time that I received it,

24   and then I would start the course of investigating,

25   depending on what the citizen said, citizen or officer,

1    the internal officer, said.

2         I would also see what means, during the course of

3    my investigation, see what means were readily available,

4    but I would want to interview that person who filed the

5    complaint to see what the complaint was.  It's nice to

6    have stuff in writing for reinforcement, but it's also

7    excellent to have the comprehensive concern or allegation

8    from the person.

9    Q    What is the scope of your authority in the

10   investigation?  And I can be more clear.

11        Are there things you're permitted to do in the

12   investigation, or documents you're permitted to request or

13   access, or is there a limitation on who you can talk to,

14   what documents you can request, and so on, and so forth?

15   A    The only limitations that I might have is within

16   the Collective Bargaining Agreement and resources that I

17   don't have access to.

18   Q    Would you be permitted to request access to those

19   resources or to go outside of the department to request

20   additional information if you felt you needed it?

21   A    I could.

22   Q    When you look at an officer's history, when you're

23   investigating them currently, what are you looking for in

24   their history that would help be any sort of determinative

25   factor in your current investigation?

1   A     Their complaint history, that's an excellent

2   measure. What their supervisors might say about them.

3   Their report writing. Some of their skill sets, to see

4   what they've had, or what they've been -- what training

5   they've been to.

6   Q     In the event that you substantiate a claim that was

7   made against an officer, meaning that you find, I'll use

8   the term, guilty, even though it's not criminal, what

9   authority do you have, or do you just recommend discipline

10   up?

11   A     I will cite that there is a violation, that I

12   believe there's a violation of a rule, regulation,

13   standard, or other directive, and make recommendations

14   upon there.

15   Q     In an investigation that you would have, where you

16   would have what we'll call a he said/she said situation,

17   or he said/he said, she said/she said situation, is there

18   any benefit of the doubt given to the officer or to the

19   complainant, or is it a completely neutral investigation?

20   A     I maintain my objectivity by going through all the

21   factors and then trying to come to a common sense

22   conclusion.

23   Q     So at the beginning of an investigation where you

24   would have a he said/she said, and you work through it, at

25   the end of the day, it's still one word versus the other,

```
 1   it's a completely neutral objective, and there's no added

 2   weight given to the statement of a police officer or a

 3   citizen?

 4   A      No.

 5   Q      Do you know Officer Tyler Smith?

 6   A      I do know Officer Tyler Smith.

 7   Q      How do you know him?

 8   A      He works at the Shaker Heights Police Department.

 9   Q      How long has he worked there; do you know?

10   A      I believe he was hired in 2015.

11   Q      Were you involved in any way in his hiring?

12   A      Not at all.

13   Q      So when we talked earlier, and you had said you

14   had, in the past, sat on committees, you didn't sit on his

15   committee?

16   A      I did not.

17   Q      Did you meet him prior to ever investigating him,

18   or was the first time that you met him during an

19   investigation?

20   A      I'm sorry, Counsel, you have to be more clear on

21   that.

22   Q      Sure.

23          So did you interact with Officer Smith prior to a

24   time where you investigated him, or the first time you

25   interacted or met with him was during the investigation?
```

1  A      No, I would see him around the station.

2  Q      Have you ever worked with him on a project or an

3  assignment, other than a time where you were investigating

4  him?

5  A      No.

6  Q      How many times have you had to investigate Officer

7  Tyler Smith?

8  A      I believe three.

9  Q      Are you currently investigating Officer Tyler

10  Smith?

11  A      I am.

12  Q      Is that included in the three, or is this a fourth?

13  A      This is included in the three.

14  Q      Do you know if he's been investigated by any other

15  individual at the Shaker Heights Police Department?

16  A      I believe he has.

17  Q      Do you know how many times?

18  A      I believe once.

19  Q      And you're saying once, other than yourself?

20  A      As far as I know.

21           (Thereupon, Plaintiff's Exhibit 1 (Cole) was

22           marked for identification.)

23  BY MR. KLEBANOW:

24  Q      Commander Cole, you've been handed what's been

25  marked Plaintiff's Exhibit 1.  Take a moment, look through

1    the document, and let me know when you've had a chance to

2    do so.

3    A        (Witness complies).

4              (Thereupon, a discussion was had off the

5              record.)

6    A        I've had the opportunity to review this, Counsel.

7    Q        Thank you, Commander Cole.

8              So what you've been handed is a document entitled,

9    Tyler Smith, City of Shaker Heights, Law Enforcement Index

10   Selection Report.  It appears to be a document that was

11   provided by the City of Shaker Heights regarding the

12   hiring process for Tyler Smith; do you see that?

13   A        I do.

14   Q        What I want to do is direct your attention to a

15   number of the paragraphs indicated in this report.  If you

16   could flip to the fourth page for me.

17   A        What's the number at the bottom, sir?

18   Q        There's the SH-000184.

19   A        Thank you.

20   Q        Or the Number 4 is the page of the document.

21   A        Okay.

22   Q        Are you with me?

23   A        I am.

24   Q        When you investigate an officer for any misconduct,

25   do you ever get a chance to routinely look at a report

1    like this?

2    A       No, I don't.

3    Q       If you look at the fourth page, under Decision-

4    Making, and you look at Judgment; do you see that?

5    A       I do.

6    Q       See where it says, in describing Tyler Smith, "May

7    do superficial analysis without getting all the facts,

8    which can result in decisions that are off the mark."  Do

9    you see that?

10   A       I do, sir.

11   Q       Would it be troubling to you in an investigation if

12   you found that an officer had done superficial analysis

13   without getting all the facts, which resulted in decisions

14   that are off the mark?

15              MR. McLANDRICH:  Objection.  You can answer.

16   A       Would it be troubling to me?

17   Q       Yes.

18   A       Yes, it would.

19   Q       Is it concerning to you, as a Commander in the

20   Shaker Heights Police Department, if you find that an

21   officer lacks "confidence in decision-making ability

22   because of poor judgment shown in previous situations"?

23   A       This is all pre-hire, correct?

24   Q       It was January 15th, 2015.  I'm of the

25   understanding this is pre-hire.

```
 1   A       This is pre-hire.

 2   Q       Yes.

 3   A       So if he was exercising decision-making ability

 4   with poor judgment shown in previous situations as a

 5   police officer, yes, it would.

 6                (Thereupon, Plaintiff's Exhibit 2 (Cole) was

 7           marked for identification.)

 8   BY MR. KLEBANOW:

 9   Q       Commander Cole, the same as the first exhibit,

10   you've been handed what's been marked this time

11   Plaintiff's Exhibit 2.  You can take a moment and flip

12   through the two page document and let me know when you've

13   had a chance to do so.

14   A       (Witness complies).

15           MR. STRANG:  Jared, you don't have the rest of

16           this document, do you?

17           MR. KLEBANOW:  No.

18           MR. STRANG:  I'll put an objection on the

19           record to using only the first two pages of it.

20           THE WITNESS:  Counsel, I've had the

21           opportunity to review this document.  Thank you.

22           MR. KLEBANOW:  Thank you, Commander Cole.

23   BY MR. KLEBANOW:

24   Q       What you've been handed has been titled Shaker

25   Heights Police Department, Background Investigator's
```

1   Evaluation, Tyler Smith.  It appears to be application

2   materials for when he applied for the job at Shaker.

3           If you flip to the second page --

4   A       Yes, sir.

5   Q       -- and the reason that there's just two pages in

6   there, I'm just asking you a question about one of the

7   titled paragraphs --

8   A       Okay.

9   Q       -- in lieu of printing out the entire document.

10          If you see, about three quarters of the way down

11  the first paragraph on the second page --

12  A       Yes, sir.

13  Q       -- there's a sentence, "She stated that he has

14  great initiative and his strong point is his traffic

15  enforcement.  Sergeant Robinson described his weakness as

16  decision making.  When asked to explain, she stated like

17  all new employees he needs to work on his decision

18  making."

19          If, in the course of an investigation of an

20  officer, you found that they had a history of a weakness

21  in decision-making, would that be troubling to you?

22                  MR. McLANDRICH:  Objection.

23                  MR. STRANG:  Objection.

24  A       If they had a history --

25  Q       Where they had shown a weakness in the skill of

1    decision-making.

2    A     While they were a Shaker Heights police officer?

3    Q     While they were a police officer, in general.

4    A     While they were a police officer, in general, that

5    would be that department's duty, responsibility, to make

6    sure they took care of it.  As a Shaker Heights police

7    officer, if they showed that they had problems with

8    decision-making, then our supervisors would make sure they

9    took care of it, and if I found it, I would make sure that

10   I did something about it.

11   Q     So to be clear, if you, during the course of an

12   investigation of a Shaker Heights police officer, found

13   that they had trouble with decision-making, that would be

14   an issue for you?

15   A     That would be an issue for me, yes.

16            (Thereupon, Plaintiff's Exhibit 3 (Cole) was

17            marked for identification.)

18   BY MR. KLEBANOW:

19   Q     Commander Cole, you've been handed what's been

20   marked Plaintiff's Exhibit 3.  Once again, take a moment

21   to review the document, let me know when you've had a

22   chance to do so.

23   A     (Witness complies).  I have.

24   Q     Thank you, Commander Cole.

25            The document you've been handed is titled City of

1     Shaker Heights, Department of Public Safety, Division of

2     Police.  It appears to be a letter or a memo from Officer

3     Tyler Smith requesting to carry his Smith & Wesson handgun

4     as an off duty weapon when he is not at work.

5         What is the process by which these requests are

6     evaluated, if you know?

7     A     I know that the officer is to fill out what's

8     considered to be a Dear Chief, and that document is

9     forwarded through their chain of command, where their

10    supervisors would be able to look it over and make

11    comment, and then the ultimate approval goes to the Chief

12    of Police, if everything has been satisfied.

13    Q     Do you know what factors are used to determine

14    whether a request like this is approved?

15    A     I do not.

16         (Thereupon, Plaintiff's Exhibit 4 (Cole) was

17         marked for identification.)

18    BY MR. KLEBANOW:

19    Q     Commander Cole, you've been handed what's been

20    marked Plaintiff's Exhibit 4.  It's just a one page

21    certificate.  I'll let you look at it for a moment.

22    A     I've got this one.

23    Q     Not too much on this one.

24         So I wanted to ask you a few questions about the

25    certificate.  I know you may not have been involved in

```
 1   approving the certificate or anything like that, but the
 2   certificate is entitled LEADS; do you see that?
 3   A      Yes.
 4   Q      What is LEADS; do you know?
 5   A      Right underneath, it's the Law Enforcement
 6   Automated Data System.
 7   Q      What is that?
 8   A      That is our sensitive database that contains
 9   information on stolen items, on people -- pretty much
10   people, places, and things in the State of Ohio that's
11   been reported stolen or there's some law enforcement
12   concern with it.  This database is managed by the State of
13   Ohio Highway Patrol.
14   Q      So what I'm trying to figure out, what kind of
15   information would be in LEADS?  So A -- and we can break
16   it down -- first of all, why would it be utilized?  Is it
17   a system that, if an officer pulls someone over, or wants
18   additional information on somebody, they can simply go to
19   a LEADS system, type in their name, and get a criminal
20   history?  Explain to me how it works.
21   A      I smile at you because I haven't used LEADS in
22   years.
23          LEADS, it would be information on plates.  Most
24   police officers would use it to get owner's information,
25   to see operator's information.  Our detectives use it
```

1  primarily to look at stolen articles, so they can see if

2  there's been any report on items that come into the

3  department's possession.

4  Q    Is LEADS information confidential?

5  A    It is.

6  Q    So for example, is an officer permitted to get

7  information from LEADS and give it out to others?

8  A    They would be subject to criminal penalties if they

9  did that.

10 Q    Also, internal discipline?

11 A    Yes, absolutely.  If it's a crime, generally they

12 would be subject to termination for that.

13 Q    What about if they get information from LEADS and

14 use it for personal gain?  They don't give it out to

15 others, but they use it for personal gain.

16 A    There would still be an internal investigation if

17 we found that to have occurred, to happen.  And that is a

18 serious violation because if you're not using it for a law

19 enforcement purpose, law enforcement sensitive database,

20 you'd be subject to very stiff penalties up to and

21 including termination.

22 Q    What about information that an officer obtains

23 while working on the job that might not be in the LEADS

24 database?  So let me give you an example.  If an officer

25 pulls someone over --

1   A      Yes, sir.

2   Q      -- and issues a citation.  My understanding is that

3   when a citation is issued, individuals have to write some

4   information on the ticket; is that right?

5   A      They have to sign the ticket and verify their name,

6   I believe address, and phone number, so that due process

7   can be served, notice and fair hairing.

8   Q      In the event an officer would use the information

9   that they got off of a ticket for personal gain, would

10  that be a violation of Shaker Heights policy?

11          MR. STRANG:  Objection, hypothetical.  You can

12      answer.

13  A      It would be.

14          (Thereupon, Plaintiff's Exhibit 5 (Cole) was

15      marked for identification.)

16  BY MR. KLEBANOW:

17  Q      Commander Cole, you've been handed what's been

18  marked Plaintiff's Exhibit 5.  Take a moment, look through

19  the document, let me know when you've had a chance to do

20  so.

21  A      (Witness complies).  Go ahead, Counselor.

22  Q      Have you had a chance to review the document?

23  A      I have.

24  Q      Do you recognize this document?

25  A      I do.

1  Q    What is this document?

2  A    This document is notification to the officer of the

3  results of their Internal Affairs investigation, as well

4  as the complainant of the results of the Internal Affairs

5  complaint.

6  Q    Were you involved in this investigation?

7  A    I was.

8  Q    We'll go through the investigation and the details

9  a little more specifically, but generally, what do you

10  remember from this investigation?

11  A    That Celeste Rushin came in and said that she

12  considered that an officer had asked her for her phone

13  number, and she felt uncomfortable with the officer.  She

14  felt he was trying to flirt with her.

15  Q    Would it be appropriate for a Shaker Heights police

16  officer to flirt with someone while on the job?

17  A    While on the job?  Yes.

18  Q    It would be inappropriate; is that correct?

19  A    It would be unprofessional.

20  Q    Would it subject them to internal discipline?

21  A    It could very well subject them to internal

22  discipline.

23  Q    If a Shaker Heights police officer gave out their

24  personal phone number to a citizen during a traffic stop,

25  would that be appropriate?

**MORSE, GANTVERG & HODGE**

1    A       It could be appropriate.

2    Q       Under what circumstances could it be appropriate?

3    A       If they needed a way to contact the citizen, or

4    have the citizen contact them.

5    Q       Would it be appropriate for a Shaker Heights police

6    officer to inquire about someone's relationship status

7    during a traffic stop?

8    A       It depends on what that purpose was for doing that,

9    Counselor.

10   Q       What if it were for purposes of trying to get a

11   date with the individual?

12   A       That would be wholly unprofessional.

13   Q       During your investigation of, I think it's Celeste

14   Rushin's complaint, you had an opportunity to meet with

15   both Celeste and Officer Tyler Smith; is that right?

16   A       That's correct.

17   Q       You interviewed both of them; is that correct?

18   A       I did.

19   Q       Did you find Celeste Rushin to be truthful during

20   her interview?

21   A       I found her to be very candid during her interview.

22   Q       Did you find Officer Tyler Smith to be truthful

23   during his?

24   A       I found him to be candid, as well.

25   Q       Do you find Officer Smith to be a truthful person?

1   A      I'm still investigating him.

2   Q      Has your opinion of his honesty changed since the

3   Rushin investigation?

4          MR. McLANDRICH:  Objection.  You can answer.

5   A      I'm still investigating him.

6          (Thereupon, Plaintiff's Exhibit 6 (Cole) was

7          marked for identification.)

8   BY MR. KLEBANOW:

9   Q      Commander Cole, you've been handed what's been

10  marked Plaintiff's Exhibit 6.  You can take your time and

11  review the whole document.

12         I believe, as you had stated, you had conducted

13  this investigation, so I'll be directing you to certain

14  portions of the document.  But if you want to take a

15  moment and flip through the whole document, you can, and

16  just let me know when you're ready to answer some

17  questions about it, okay?

18  A      Okay.

19  Q      Thank you.

20  A      Would you rather I do it as you ask questions, or

21  do you want the review first?

22  Q      It's up to you.  Whatever you're most comfortable

23  with.

24  A      (Witness reviews document).  Counselor, I probably

25  will refer back to it, but I'll go ahead and get you

1    started asking questions.

2    Q       That's fine.

3    A       Sorry about that.

4    Q       No, no, anything you need to refer to in this

5    packet while I ask questions, please feel free to do so.

6    A       Thank you, sir.

7    Q       So in looking through the packet, which essentially

8    includes a Table of Contents and the investigation --

9    A       Yes, sir.

10   Q       -- of the Rushin complaint and investigation, am I

11   correct in stating that, in essence, Ms. Rushin alleged

12   that on two separate occasions she had interactions with

13   Officer Smith?

14   A       Yes, sir.

15   Q       And if you flip to -- I'll direct you to the Bates

16   stamp number on the bottom.

17   A       Thank you.

18   Q       SH-000798.

19   A       Yes, sir.

20   Q       Are you with me on that page?

21   A       Yes, sir.  I'm sorry.

22   Q       Thank you.

23           So you'll see there's bullet points at the top

24   paragraph, and it's essentially a summary of Ms. Rushin's

25   reportings of the first incident; do you see that?

**MORSE, GANTVERG & HODGE**

1    A       I do.

2    Q       And this document, was this prepared by you?

3    A       It was.

4    Q       So if you see about halfway down, "Ms. Rushin

5    reported that PTL --" is that Patrol Officer?

6    A       That's correct.  Or Patrolman.

7    Q       "Patrolman Smith notified her that his name was,

8    'Tyler,' and that he was '26 years old.'"  Do you see

9    that?

10   A       Yes.

11   Q       Is it standard procedure that an officer would

12   state their age when introducing themselves to somebody

13   they had pulled over?

14   A       I hate to be an "it depends" guy, but it really

15   depends.

16   Q       What would that depend on?

17   A       It could depend on a number of factors.

18   Q       So if you were investigating any matter, and you

19   had found that the officer had, right off the bat,

20   indicated how old they are, what factors would you look

21   for to determine whether or not that was appropriate?

22   A       The nature of the stop, whether the complainant may

23   have been nervous, for the officer to help them calm down.

24   Just a number of factors that could have been.

25   Q       Are there times it would not be appropriate?

1   A    I would think there's times it could not be

2   appropriate, too.

3   Q    The next line down states, "Ms. Rushin reported

4   that PTL. Smith inquired as to whether she had a

5   boyfriend."

6        Would it be appropriate, immediately after stopping

7   someone and introducing themselves, for an officer to

8   inquire about the relationship status of someone they had

9   pulled over?

10   A    I don't know too many reasons why they would

11   inquire about the relationship status, unless it had

12   something to do with the stop, or unless something was

13   said by the person about relationship status.

14   Q    In this case, it appears that Patrol Officer Smith

15   had pulled over Ms. Rushin because her license plate had a

16   light out, correct?

17   A    Yes.

18   Q    Is that an instance where it would be appropriate

19   for Officer Smith to inquire about her relationship

20   status?

21   A    Once again, I don't know the true context on this

22   one, because there was no video on it, so I have to say,

23   it depends.

24   Q    Okay.  In the event that -- in general, if there's

25   a basic traffic stop involving a vehicle, and nothing

1    about the individual, simply the vehicle, when would it

2    be appropriate for an officer to inquire about the

3    relationship status, pretty quickly into the stop, from

4    the person who had been pulled over?

5            MR. STRANG:  Objection to form.

6            MR. McLANDRICH:  Objection.

7    A      Yeah, I don't know, sir.  I'd have to say it

8    depends.  I don't know.

9    Q      Do you see that very often?

10   A      I can't say that I do, but I don't know.

11   Q      Could you understand why someone --

12   A      That's the heart of her complaint.

13   Q      I'm sorry?

14   A      It's the heart of her complaint.

15   Q      That statement?

16   A      The flirting.

17   Q      The flirting.

18          Could you understand why that statement would make

19   her uncomfortable?

20            MR. STRANG:  Objection to form.

21   A      I could.

22   Q      A few lines down, you'll see it states, "Ms. Rushin

23   reported that Patrolman Smith provided his telephone

24   number to her orally, she accepted his telephone number in

25   order to be released from the stop; and, she entered the

1   telephone number into her cellular telephone."

2         Then it states, "Ms. Rushin reported that Patrolman

3   Smith told her to call him and notified her that they

4   could 'hang out.'"  Do you see that?

5   A     I do.

6   Q     So looking at the first statement, do you find it

7   to be troubling if a citizen feels that they have to

8   accept the personal cell phone number of an officer in

9   order to be released from a traffic stop?

10             MR. STRANG:  Objection to form.

11             MR. McLANDRICH:  Objection.

12  A     Would I find it to be troubling?  Yes.

13  Q     Would you find it to be troubling if you found that

14  an officer gave their personal cell phone number to

15  someone they were pulling over, with the intention to hang

16  out with them personally after the traffic stop?

17             MR. STRANG:  Objection to form.

18             MR. McLANDRICH:  Objection.

19  A     With the intention to hang out with them?

20  Q     Yeah.

21        So what I'm asking is, do you find it troubling if

22  an officer provided someone their personal cell phone

23  number, and the intention of providing the cell phone

24  number was to hang out with them personally off duty at

25  a later time?

```
 1                    MR. STRANG:  Objection.

 2                    MR. McLANDRICH:  Objection.

 3      A       Counsel, say that once more.

 4      Q       That's okay.  And if I'm not being clear, let me

 5      try to make the question more clear.

 6      A       Go ahead.

 7      Q       Earlier, we had talked about if it was appropriate

 8      for an officer to give out his personal cell phone number

 9      to somebody that he was pulling over.

10      A       That's correct.

11      Q       And I believe you had indicated it depended on the

12      circumstance.

13      A       That's correct.

14      Q       In a circumstance where they were providing their

15      cell phone number, and the reason for that was to attempt

16      to hang out with the individual at a later time

17      personally, is that an issue?

18                    MR. STRANG:  Objection.

19                    MR. McLANDRICH:  Objection.

20      A       Thank you for your clarification.  It would be

21      unprofessional.

22      Q       In Ms. Rushin's complaint, the two stops were

23      spaced out, right?

24      A       Yes, sir.

25      Q       And I believe they were almost one year apart; does
```

1   that sound right?

2   A       Yes, sir.

3   Q       So if you flip to the next page, SH-000799, there's

4   the similar bullet points as she describes the second stop

5   a year later; is that correct?

6   A       Yes.

7   Q       Do you see, at the top of the page, those bullet

8   points?

9   A       I do.

10   Q       When you were investigating this matter, did you

11   find it strange that Patrolman Smith was able to identify

12   facts not only about the stop from a year prior, but also

13   about the individual's occupation, age, and vehicle?

14   A       I found that he had a very quirky memory.  One of

15   the memories that I had worked with officers before, that

16   they can remember specific details about things that I

17   would never, ever remember.  So his memory, to me, was

18   very, very quirky on what he could remember, such as

19   colors of vehicles, such as people's names, such as dates.

20   It kind of blew my mind, at some point.

21   Q       Were you certain that everything he was

22   remembering, or said he was remembering, was accurate?

23   A       I --

24           MR. McLANDRICH:  Objection.  You can answer.

25   A       I'm sorry.

1       On an occasion, I did corroborate that what he told
2  me was correct.
3  Q     So some things were, but you're not certain about
4  all things?
5  A     I would have to check everything, and I did not do
6  that.
7  Q     Was it at all concerning to you that he was
8  remembering everything about this one particular person
9  from a traffic stop a year ago?
10          MR. McLANDRICH:  Objection.  You can answer.
11          MR. STRANG:  You can answer.
12  A     No.  Only because of his quirky memory with things
13  that he would be able to identify from other stops.
14  Q     What struck you -- strike that.
15       Was there anything concerning to you that he
16  remembered from other traffic stops?  For example, a
17  woman's name, relationship status, age, and so on, and so
18  forth?
19  A     I didn't get into that much detail, but he
20  remembered names, he remembered colors of cars, and he
21  remembered the types of cars, which I found to be very
22  interesting.
23       During my time as a Cleveland police officer, I
24  actually worked with somebody who memorized the hot sheet,
25  and I found that fascinating, because after the first

1   plate, I couldn't remember anything on that hot sheet.

2   Q      If you look one line down, you'll see it says,

3   "Patrolman Smith inquired as to why she had not called

4   him."  Do you see that?

5          And what Ms. Rushin was referencing, if I

6   understand this right, is Officer Smith had inquired as

7   to why she had not called him after receiving his phone

8   number roughly a year ago.  Is that how you understood her

9   complaint?

10  A      I did.

11  Q      Would that have been appropriate, for Officer Smith

12  to stop a vehicle and then ask a woman why she had not

13  called him to hang out from a year ago?

14              MR. STRANG:  Objection.

15              MR. McLANDRICH:  Objection.

16  A      Yes, it would be unprofessional.

17  Q      Did you find that troubling while you were

18  investigating the case?

19  A      I got a chance to interview Officer Smith, I got a

20  chance to look at all of the information, and I was able

21  to make a conclusion based upon the facts and findings

22  that I had in the investigation.

23  Q      Right below that bullet point, there's another one,

24  "Patrolman Smith stated, 'Do you still have a boyfriend?'"

25  A      Uh-huh.

1   Q      Is that an appropriate question for Officer Smith

2   to have asked Ms. Rushin, in your opinion?

3   A      In regards to the substance of her complaint, yes.

4   But I would once again answer, it depends, I don't know

5   the context of this.

6   Q      So I'm clear, when you say, yes, you're saying it

7   would have been inappropriate?

8   A      In the context of the complaint, yes.

9   Q      If you would go to SH-000801 --

10  A      Yes, sir.

11  Q      -- just a few pages later.  Are you there?

12  A      I'm there.

13  Q      You'll see at the middle bottom, we'll start where

14  it says, "On Thursday, August 10, 2017, Patrolman Smith

15  was compelled to make a statement, the substance of which

16  is as follows."  Do you see that?

17  A      I do.

18  Q      Some bullet points down, it states, "Patrolman

19  Smith did not request Ms. Rushin's cellular telephone

20  information."  Do you see that?

21  A      I'm sorry, let me get there.

22  Q      It's okay.

23  A      Did not request Rushin's cellular telephone

24  information.

25  Q      Do you see that?

```
1    A      Yes.

2    Q      Did Patrolman Smith tell you that?

3    A      Yes.

4    Q      And two lines down, "Patrolman Smith reported that

5    he did not inquire about Ms. Rushin's relationship

6    status."  Do you see that?

7    A      That's correct.

8    Q      Is that what Patrolman Smith told you?

9    A      Yes.

10   Q      So there were, I'll call them competing stories,

11   right, where Patrolman Smith said he didn't do it,

12   Ms. Rushin said he did.

13   A      Very well said.  Yes.

14   Q      Did you find in this case, on this particular

15   bullet point, Patrolman Smith to be more credible than

16   Ms. Rushin, or was it not determinative in your final

17   decision of the investigation?

18           MR. McLANDRICH:  Objection.  You can answer.

19   A      I wrote this down as a fact from what he told me,

20   just as I did hers.

21   Q      With your investigation now concluded, do you

22   believe that he did ask for the relationship status, or

23   did not?

24           MR. McLANDRICH:  Objection.

25           MR. STRANG:  You can answer.
```

```
 1   A      I don't know, but I will have the opportunity to
 2   look at this investigation.
 3   Q      You mean look at it further?
 4   A      (Witness nods).  Yeah.
 5   Q      Is that a yes?
 6   A      Yes.
 7   Q      Thank you, Commander Cole.
 8          If you'd go to SH-0000802.
 9   A      Yes, sir.
10   Q      Under the Findings section -- do you see that?
11   A      Yes, sir.
12   Q      At the very bottom, you'll see where it says,
13   "Patrolman Smith has had no similar allegations levied
14   against him during his employment as a Shaker Heights
15   police officer."  Do you see that?
16   A      Yes, sir, I do.
17   Q      Since that time, he has had a similar allegation
18   levied against him; would you agree with that?
19   A      Yes.
20   Q      Is that the case we're here for today?
21   A      I believe that's why you're interviewing me.
22   Q      Has he had any others levied against him since
23   Ms. Rushin's, and not including what we're here for today?
24   A      Not that I know of.  And since I keep those
25   records, no.
```

1    Q      Had Patrolman Smith had prior similar allegations

2    levied against him prior to Ms. Rushin's case, would that

3    have affected your findings?

4    A      It definitely would have affected my findings.  It

5    definitely would have been factored into my evaluation.

6                (Thereupon, Plaintiff's Exhibit 7 (Cole) was

7            marked for identification.)

8    BY MR. KLEBANOW:

9    Q      Commander Cole, you've been handed what's been

10   marked Plaintiff's Exhibit 7.  Similar to the other

11   exhibits, take a moment to review the document, and let me

12   know when you've had a chance to do so.

13   A      (Witness complies).  Counselor, you can go ahead.

14   I'm sorry.

15   Q      Are you sure?

16   A      You can go ahead.

17   Q      So what I've handed you appears to be an interview

18   of Tyler Smith relating to Ms. Rushin's complaint; is that

19   correct?

20   A      That's correct.

21   Q      Were you the interviewer?

22   A      I was.

23   Q      So the questions were yours, and the As, answers,

24   were Officer Smith's?

25   A      That's correct.

1   Q      I have a few questions about some of the questions

2   and responses, and I'll direct you to those pages, okay?

3   A      Sure.

4   Q      If you can go to 000883.

5   A      Yes, sir.

6   Q      You'll see at the bottom of the top big paragraph,

7   Officer Smith stated, "I replied, 'No.' I had run out.  I

8   then offered to give her my cell phone number if she had

9   any questions because at the time I could not remember my

10  work phone number extension or password."  Do you see

11  that?

12  A      I do.

13              MR. McLANDRICH:  I'm sorry, where are you?

14              MR. KLEBANOW:  What's that?

15              MR. McLANDRICH:  Where are you reading?

16              MR. KLEBANOW:  000883, and if you look at the

17          second to last sentence of the top paragraph.

18              MR. McLANDRICH:  Oh, the top paragraph.

19  A      Thank you, Counselor.

20  Q      Are you with me, Commander Cole?

21  A      I am.

22  Q      First and foremost, did you find it strange that

23  for a guy who could remember details from a year ago, such

24  as someone's occupation, age, or car, that they couldn't

25  remember their own work number?

1    A       Not really.

2    Q       That's not strange to you?

3    A       Not really.

4    Q       Why is that?

5    A       Only because we transfer numbers a lot in our

6    department.

7    Q       So for someone who can remember something as minor

8    of a detail as someone's occupation from a year ago, but

9    then they can't remember their own work telephone number,

10   even if it had recently changed, you don't find that

11   strange?

12               MR. McLANDRICH:  Objection.  You may answer.

13   A       I didn't find that strange.

14   Q       Do you find it strange now?

15   A       I still don't find that strange, only because the

16   inner workings of the Shaker Heights Police Department

17   require us moving around, and they do periodically get new

18   phone numbers.

19   Q       If you'd flip to 000885.

20   A       Yes, sir.

21   Q       And again looking at Officer Smith's response at

22   the top of the page, it says, "Then I said to the driver,

23   'Hey, I think I remember you.'  Then the driver said, 'I

24   don't think we ever met.'  I said, 'Yes, I believe so, I

25   believe about a year and a half, maybe 2 years ago at the

```
 1   BP on Fairmount Circle.'  The driver said, 'I don't think
 2   so.'  I then asked the driver, 'Did you used to drive a
 3   gold Lexus.'  She replied, 'Yes.'  I then said, Did you
 4   use to babysit and/or be a babysitter?'"  Do you see that?
 5   A     I do.
 6   Q     Again, and I know I've asked you similar questions
 7   already, did you find that strange, that an officer who
 8   pulls over potentially hundreds of people a year could
 9   remember the occupation of a random stop from a year and a
10   half or two years prior?
11   A     If I hadn't experienced his quirky memory, I would
12   have said yeah.  But experiencing it firsthand, yeah, I
13   didn't find that unusual.
14   Q     But again, the guy with this quirky, great memory
15   couldn't remember his current phone number.
16           MR. McLANDRICH:  Objection, asked and
17           answered.  You can answer again.
18   A     Couldn't remember his current work phone number,
19   yeah.
20   Q     If you could flip to 000887.
21   A     Yes, sir.  I don't have an -887.
22   Q     Did it not copy for you?
23   A     I'm sorry, I don't have an -887 (indicating).
24           MR. KLEBANOW:  We can go off for one second.
25             (Thereupon, a discussion was had off the
```

```
 1          record.)
 2                  MR. KLEBANOW:  We can go back on.
 3                  (Thereupon, Plaintiff's Exhibit 7 (Cole) was
 4          re-marked for identification.)
 5                  THE WITNESS:  I'm on Page -887.
 6                  MR. KLEBANOW:  Steve, are you okay looking on
 7          with the witness?
 8                  MR. STRANG:  Sure.
 9   BY MR. KLEBANOW:
10   Q      Thank you, Commander Cole.  So we're on SH-000887.
11   And if you'll see the question that was asked at the top
12   of the page, "On either of your encounters with
13   Ms. Rushin, did provide her with your age," and he
14   responded, "No."
15   A      Uh-huh.
16   Q      The following question, "How would Ms. Rushin have
17   known your age?"
18          Officer responded, "She may have asked, and I may
19   have told her, but I don't recall."
20   A      Uh-huh.
21   Q      Did you find it strange that he flipped his answer
22   from one question to the next question --
23                  MR. STRANG:  Objection.
24   Q      -- regarding the same substance?
25                  MR. STRANG:  Objection to form.
```

```
 1                   MR. McLANDRICH:  Objection.

 2    A      I did not.  I've got his answer, "She may have

 3    asked, and I may have told her."  He did not recall that

 4    circumstance.

 5    Q      So you didn't find it troubling that you had just

 6    asked him whether he provided her with his age, and he

 7    definitively said no, and then the next question, when it

 8    was asked, how would Ms. Rushin have known your age, he

 9    said, maybe I did tell her.

10                   MR. STRANG:  Objection, form.

11                   MR. McLANDRICH:  Objection, mischaracterizes

12           what it says.

13    Q      Was that troubling to you?

14    A      It was not troubling to me.

15    Q      Is it troubling to you now, as you reread it?

16    A      It's something I could pay more attention to detail

17    on.

18                   (Thereupon, Plaintiff's Exhibit 8 (Cole) was

19           marked for identification.)

20    BY MR. KLEBANOW:

21    Q      Commander Cole, you've been handed what's been

22    marked Plaintiff's Exhibit 8.  Take a moment to review the

23    document and let me know when you've had a chance to do

24    so.

25    A      This is a very long document.
```

```
 1   Q      If you want to, Commander Cole, I'm just going to

 2   direct you, as I have, to certain portions.  If you've

 3   seen this document before, I can ask you questions about

 4   specific portions, but if you prefer to review the entire

 5   document before I ask you questions, that's okay, as well.

 6   A      Counsel, I have seen this document before.  So if

 7   you would like to ask me questions, that's fine.  If I

 8   don't know something, I will refer back to the document.

 9   I do not have this document memorized.

10   Q      I'm sorry?

11   A      I do not have this document memorized.

12   Q      I don't think anyone would expect you to memorize

13   the whole document.  So let's do that.  I'll ask you some

14   questions about specific portions, and if at any time you

15   want to reference or take some time to review the

16   document, just let me know, and that's not a problem.

17   A      Thank you.

18   Q      So what you've been handed is the City of Shaker

19   Heights, Department of Police, Rules and Regulations.

20   A      Yes, sir.

21   Q      Is this the current set of Rules and Regulations in

22   effect?

23   A      Yes, sir, it is.

24   Q      If you flip to 000042 --

25   A      Yes, sir.
```

1    Q      -- or a 5 is under it.  Are you with me?

2    A      Yes.

3    Q      You'll see Number 4 says, Immoral Conduct.

4    A      Yes, sir.

5    Q      And it reads, "Officers and members shall maintain

6    a level of moral conduct in their personal and business

7    affairs which is in keeping with the highest standards of

8    the law enforcement profession.  Officers shall not

9    participate in any incident involving moral turpitude

10   which impairs their ability to perform as law enforcement

11   officers and members or causes the Department to be

12   brought into disrepute."  Do you see that?

13   A      I do.

14   Q      In the event that an officer obtained information

15   from a traffic stop and used it for personal gain, would

16   that violate this immoral conduct provision?

17                MR. STRANG:  Objection to form.

18                MR. McLANDRICH:  Objection.

19   A      It would definitely be mentioned in my Order, but I

20   believe there's a more applicable rule in abuse of power.

21   Q      Okay.  So you're saying that this Immoral Conduct

22   could apply, but there are also additional provisions that

23   may apply or even be better applied?

24   A      It's a very broad provision, and I would definitely

25   include it in my conclusions and recommendations to the

1  Chief of Police.

2  Q      Would you find that conduct to violate that

3  provision, even though there's a more specific provision

4  that could apply?

5  A      I would definitely mention it, and write language

6  that would lead any reasonable reviewer to believe that

7  it's violative of that directive.

8  Q      What about if an officer used the information that

9  they received on a ticket to contact that person and ask

10 them out for breakfast for a personal meeting --

11         MR. STRANG:  Objection to form.

12 Q      -- would that violate this immoral conduct

13 provision?

14 A      It's definitely unprofessional, Counselor.  But

15 there's very little immoral to going out to breakfast with

16 somebody.

17 Q      What about the fact that they got the information

18 from a ticket, and used it for personal gain to ask

19 someone on a date?

20 A      That's more --

21         MR. STRANG:  Objection.

22         THE WITNESS:  I'm sorry.

23         MR. STRANG:  Objection, form.

24 A      That's more of your Abuse of power -- Abuse of

25 position.

1    Q      So let's jump over there.

2    A      Yes, sir.

3    Q      I believe that that's on Page 000 -- well, 000045,

4    and it's also listed Number 4, Abuse of position?

5    A      Yes, sir.

6    Q      Is that what you were referring to, Commander Cole?

7    A      It was.

8    Q      And that provision states, under a., "Use of

9    official position or identification - officers and members

10   shall not use their official position, official

11   identification cards or badges for the following:

12          "For personal or financial gain

13          "For obtaining privileges not otherwise available

14   to them except in the performance of duty."  Do you see

15   that?

16   A      I do.

17   Q      And you indicated that if an officer had used

18   information that they obtained on the ticket to then ask

19   somebody out on a date, that would be an abuse of the

20   position?

21   A      That would be abuse of the position.

22   Q      What about if an individual asked someone they had

23   been involved in issuing a citation to for a sexual favor

24   in exchange for trying to get rid of the ticket?

25          MR. McLANDRICH:  Objection.

```
1              MR. STRANG:  Objection.

2    Q      Would that be an Abuse of position?

3    A      That would touch both of the previous clauses you

4    gave me, as well as the Abuse of position.

5    Q      What if an officer lied --

6              MR. McLANDRICH:  I'm sorry, could you read

7              back the last question and answer for me.

8              (Record read.)

9    BY MR. KLEBANOW:

10   Q      Commander Cole, what if you found that an officer

11   had lied during the course of an investigation?

12   A      That's grounds for termination, sir.  If you read

13   the Insubordination clause, that should cover it.

14   Q      Would there ever be a reason, in your experience as

15   a police officer or an investigator, for an individual to

16   be involved in a traffic stop, and then hours later,

17   invite the person they were involved in stopping out for

18   breakfast?

19             MR. STRANG:  Objection to form.

20   A      It's never happened to me in my police career.

21   Q      Would it ever be appropriate, in your experience,

22   for an officer who was involved in issuing someone a

23   citation to request any sort of sexual relationship with

24   that person within days of stopping them?

25   A      That would be violative of rules, sir.
```

1    Q      What rule is that?

2    A      You articulated them before, with 4, Abuse of

3    position, Immoral Conduct, and probably a whole host of

4    other ones.

5            MR. McLANDRICH:  Could you read that one, too,

6        for me, please.

7            (Record read.)

8    BY MR. KLEBANOW:

9    Q      Going back to Ms. Rushin's complaint, Celeste

10   Rushin, if you had found that Officer Smith had pulled

11   over Ms. Rushin in an attempt to ask her out on a date,

12   would that have been an abuse of the position?

13   A      I would have cited those rules we discussed before,

14   and I would have recommended that the rules had been

15   violated, yes.

16   Q      And I know somewhere in here -- and I can look for

17   it, but you'll probably just know the answer -- there are

18   a number of levels of severity of offenses; is that

19   correct?  Does that sound familiar?  If not, I can find

20   it.

21   A      No, no.  Manual of rules, nonfeasance, misfeasance,

22   malfeasance, are you talking about that sentence?

23   Q      That might be right.  So it's different severity of

24   offenses; is that correct?

25   A      Yes, that's correct.

1  Q     Somebody abusing their position for sexual favors,

2  would that fall on the highest level of severity?

3  A     Yes, sir, it would.

4           (Thereupon, Plaintiff's Exhibit 9 (Cole) was

5           marked for identification.)

6  BY MR. KLEBANOW:

7  Q     Commander Cole, you've been handed what's been

8  marked Plaintiff's Exhibit 9.  Similar to the last

9  exhibit, I will ask you a number of questions about

10  certain provisions.  But if you'd like to, you can review

11  the entire document prior to me asking questions.

12  A     No, thank you.

13  Q     Have you seen this document before?

14  A     Yes.

15  Q     And this is the current Code of Ethics that is in

16  effect at Shaker Heights?

17  A     Yes.

18  Q     If you flip to the second page, 000772 --

19  A     Yes, sir.

20  Q     -- you'll see where it says, Performance of the

21  Duties by all Personnel, and right below it, it says,

22  "Personnel will not allow personal feelings, animosities,

23  or friendships to influence official conduct and, in

24  carrying out the professional responsibilities, all

25  personnel will strive to obtain maximum cooperation from

1   the public."  Do you see that?

2   A      I do.

3   Q      And then at the bottom, you'll see where it says

4   Integrity?

5   A      Yes, sir.

6   Q      "Police department personnel will not engage in

7   acts of corruption or bribery, nor will personnel condone

8   such acts by another employee."  Do you see that?

9   A      I do.

10  Q      In the event that an officer would request sexual

11  favors in return for getting rid of a ticket they were

12  involved in issuing, would that violate that integrity

13  provision?

14          MR. McLANDRICH:  Objection.

15  A      It would.

16  Q      If you'd flip to the next page, it's under the same

17  provision, the very last sentence -- well, second to last

18  sentence, it states, "Police department personnel must not

19  receive personal or professional advantage from their

20  official status."

21  A      Yes, sir.

22  Q      Requesting any sort of favor, sexual or not, in

23  order to get rid of a ticket that they had been involved

24  in issuing, would violate that section of the provision,

25  as well, would it not?

1    A      Yes.

2    Q      Do you see where it says Private Life, halfway down

3    the page?

4    A      Yes.

5    Q      And under that, it says, "Police department

6    personnel will act and behave in a manner that does not

7    bring discredit to their agencies or themselves."

8    A      Yes.

9    Q      Would an officer who used information they received

10   off a ticket to request a date violate that provision?

11              MR. STRANG:  Objection.

12   A      Yes.

13   Q      And an officer who then requested sexual favors in

14   order to, what they would say, get rid of a ticket, would

15   also violate that provision?

16              MR. McLANDRICH:  Objection.

17   A      I might be able to save you some time.  Requesting

18   sexual favors in a position of authority would always

19   violate the rules of the Shaker Heights Police Department.

20   Q      What about having an affair?  So under this

21   provision, "Police department personnel will act and

22   behave in manner that does not bring discredit to their

23   agencies or themselves," would having an affair bring

24   discredit to their agency or themselves?

25              MR. McLANDRICH:  Objection.

1   A      Yes.

2             (Thereupon, Plaintiff's Exhibit 10 (Cole) was

3         marked for identification.)

4   BY MR. KLEBANOW:

5   Q      Commander Cole, you've been handed what's been

6   marked Plaintiff's Exhibit Number 10.

7   A      Yes.

8   Q      It's a two page document.  Have you seen this

9   document before?

10  A      I have.

11  Q      Would you like to review it, or can I ask you a

12  couple of questions?

13  A      I'm not as familiar with this document as I am

14  others.

15  Q      Why don't you take a minute to review it, and let

16  me know when you've had a chance to do so.

17  A      (Witness complies).  Counselor, I'm ready.

18  Q      Thank you, Commander Cole.

19         So you've been handed what's been marked a Records

20  Security and Privacy policy, I guess I'll say, of the City

21  of Shaker Heights Department of Police; do you see that?

22  A      I do.

23  Q      Based upon this document or other knowledge you

24  have, what procedures are in place to protect information

25  of the public that gets into the hands of a police

1    officer?

2          So I'll be more specific.  So in the event that an

3    officer obtains information, let's say, through

4    information on a ticket, or through an investigation, what

5    procedures are in place in the City of Shaker Heights to

6    stop that information from being used for personal gain?

7          MR. STRANG:  Objection.

8    A     The direct supervision, the chain of command, we

9    have an Internal Affairs process, we have a complaint

10   process.  We have any number of mechanisms in place to

11   make sure that that information does not go to any

12   unauthorized persons, including this (indicating), which

13   actually says severe disciplinary action up to and

14   including termination.

15   Q     Are there any preventative measures that the City

16   takes?  So what you have described, as I understand it,

17   would be action that could or may even would be taken

18   after information comes to light.  Are there any

19   preventative measures that the City has taken, that you're

20   aware of, to stop this from happening in the first place?

21   A     I would think that the body camera would do a very

22   good job of capturing the officer sharing anything.  Once

23   again, the officer's supervisors.

24         But as far as preventative, the officers know not

25   to share any of that information, subject to criminal

1    penalties, and no officer wants to go to prison.

2    Q       How do they know that?  You said they know not to

3    do that.  How do they know that?

4    A       Every stage of our training process reinforces our

5    commitment to ensuring the privacy of the people that we

6    come into contact with.  So that's reinforced not only

7    during their probationary period, but the entire time that

8    they are wearing a uniform of the Shaker Heights Police

9    Department.  We're committed to that, we're nationally

10   accredited, and we take that very seriously, not to give

11   out unauthorized information to any member of the public.

12   Q       Since you've been an investigator for the City of

13   Shaker Heights, have any complaints come in regarding an

14   individual's personal information either getting out of

15   the department, or being used by an officer for personal

16   gain?

17   A       No, not that I recall.

18   Q       And earlier in the deposition today, you indicated

19   that Officer Smith has been investigated a number of other

20   times for alleged misconduct; is that correct?

21   A       That's correct.

22   Q       I'm going to hand you a series of exhibits, and

23   just briefly go through and document those complaints.

24   A       Yes, sir.

25

```
 1                    (Thereupon, Plaintiff's Exhibits 11 through 13

 2           (Cole) were marked for identification.)

 3    BY MR. KLEBANOW:

 4    Q      Commander Cole, you've been handed what's been

 5    marked Plaintiff's Exhibits 11, 12, and 13.

 6    A      Yes.

 7    Q      If you'd like to review them, you can.  I'm just

 8    going to ask some pretty basic questions about them.  So

 9    it's up to you if you want review them first, or if you

10    want me to go ahead and ask.

11    A      If you want to go ahead and ask.

12    Q      Okay.

13    A      These are investigated by other investigators, I

14    believe.

15    Q      Sure.

16           So that was my first question, there's three

17    complaints -- I shouldn't say complaints -- three

18    documents that are documenting complaints which were made

19    by individuals against Officer Smith, that's 11, 12, and

20    13; do you see those?

21    A      Yes.

22    Q      Were you involved in investigating any of these?

23    A      I know 11 and 12, I was not.  But from reading

24    this -- I don't recall doing Dieesha Witherspoon.  I don't

25    know why this says, "Commander John Cole found that upon
```

1    his review."  I'd have to check that, Counselor.  I

2    don't -- Dieesha Witherspoon.

3    Q       Okay, Commander, so are you saying that although it

4    says, Commander John Cole found that upon his review

5    findings, you think that may be inaccurate, or you just

6    don't remember?

7    A        I know I did look at those.  I think someone else

8    did the investigation, but I just think I corroborated it

9    through my review, too.

10   Q       Okay.

11   A        So I did have some ancillary supervisory authority

12   over this one.

13   Q       Okay.  The other two, so not including, I think it

14   was Dieesha --

15   A        -- Witherspoon, Number 13.

16   Q       For 11 and 12, were those that came through your

17   office that you assigned to others, or did those not even

18   touch your office?

19   A        If these would have come through my office, they

20   would have been assigned based upon the allegation to a

21   supervisor.

22   Q       And on all three, I believe it was found that there

23   was no wrongdoing; is that correct?

24   A        That's correct.

25   Q       Based upon your current investigation of Queen

1  Miller's case, is there any intention to reopen any of

2  these three or the Rushin investigation?

3  A      I'm still investigating.  It depends on what is

4  disclosed.

5  Q      So it's possible that depending on what you find,

6  you may reopen one of those four investigations?

7  A      I do have that authority and ability.

8  Q      What's the current status of the investigation

9  regarding Queen Miller?

10  A      It's under investigation.

11  Q      So no findings have been made at this point?

12  A      It's under investigation, sir.

13  Q      Based upon everything you've seen from the Rushin

14  investigation and the current investigation you're doing,

15  is there any concern about the other moving citations or

16  arrests that Officer Smith has been involved in?

17              MR. STRANG:  Objection.

18  A      I don't know how to answer that question, sir.  If

19  you could rephrase it.

20  Q      Yeah, no problem.

21              So for example, it looks like from records I've

22  received from the year -- from November 1, '15 to

23  October 31st, 2016, it looks like Officer Smith issued 618

24  moving citations, had two OVIs, and was likely involved in

25  other arrests.

1          Based on the allegations that have been made in the

2     Miller case, and your prior investigations, is there a

3     concern for his conduct on all those other traffic

4     citations?

5     A     I have the ability to go through and review

6     records.  And during the course of this investigation, if

7     there's something, I have the ability to go through and

8     review what he has done.

9     Q     Do you intend to do that?

10    A     I'm still investigating the case, so it depends.

11          MR. KLEBANOW:  We'll take a quick five minute

12          break.

13          (Short recess had.)

14          MR. KLEBANOW:  Back on.

15    BY MR. KLEBANOW:

16    Q     Commander Cole, after a short break, I just have a

17    few additional questions for you.

18          If an individual is issued a citation and there's a

19    required court appearance, in your experience, would it be

20    normal for an officer to have to meet that individual

21    outside of work in order to explain that to them, or are

22    there other mechanisms by which they could learn that

23    information?

24          MR. STRANG:  Objection.

25    A     If you could do that once more.

1  Q      Sure.

2  A      I think I know what you mean, but I just -- I'm

3  sorry.

4  Q      I want to make sure my question is clear.

5         So there are certain citations issued that require

6  a court appearance; is that correct?

7  A      Yes.

8  Q      And if a court appearance is required, how would

9  the individual be notified of that?

10  A      They would be notified by the officer who issued

11  the ticket.

12  Q      At the stop?

13  A      At the stop.

14  Q      And would it also be noted on the ticket?

15  A      It would be noted on the back of the ticket, and I

16  believe it's on the front of the ticket.

17  Q      Would they get anything in the mail about that, as

18  well?

19  A      I don't believe so, but I don't know that side.

20  Q      In your experience as both a police officer and an

21  investigator, is it normal for an officer to request a

22  meeting when they're off work in order to explain that

23  process to an individual?

24              MR. STRANG:  Objection.

25  A      It's not my experience, but it could happen.

**MORSE, GANTVERG & HODGE**

```
 1              MR. KLEBANOW:  Nothing further.
 2              MR. STRANG:  He'll read.
 3              MR. McLANDRICH:  I have some questions.
 4                      CROSS EXAMINATION
 5   BY MR. McLANDRICH:
 6   Q      Commander, my name is John McLandrich.  I represent
 7   Officer Smith.  I do have a few questions I'd like to ask
 8   you today.
 9   A      Yes, sir.
10   Q      So you've spent a fair amount of time going through
11   these policies and procedures with plaintiff's counsel.
12   And my question for you is, is there a difference between
13   a policy and procedure and a legal requirement?
14   A      A policy and a procedure, yes, there is.
15   Q      So an officer can violate a policy and procedure
16   without committing a constitutional violation?
17   A      Yes, sir.
18   Q      He can violate a policy and procedure without
19   committing a criminal act?
20   A      Yes, sir.
21   Q      I assume there's police officers at Shaker Heights,
22   City of Cleveland, wherever, that have had affairs during
23   the course of their work life?
24   A      Yes.  Yes, sir.
25   Q      I would imagine that any number of those officers
```

1    have retained their employment at those employers?

2                  MR. KLEBANOW:  Objection.  You can answer.

3    A       I don't know, but I would assume so, sir.

4    Q       Have you terminated any Shaker Heights police

5    officers for merely having an affair?

6                  MR. KLEBANOW:  Objection.  You can answer.

7    A       Not during my tenure, sir.

8    Q       Do you know whether negligent entrustment is a

9    citation that requires a personal appearance in court?

10   A       I'm not familiar with that one, sir.

11   Q       All right.  If an officer called someone who had

12   received a ticket, after they got the ticket, to clarify

13   whether they needed to make that court appearance or not,

14   would that be a law enforcement activity?

15                 MR. KLEBANOW:  Objection.  You can answer.

16   A       Yes.

17   Q       Would that be a proper use of the information about

18   that person that's on the ticket?

19   A       Yes.

20   Q       Including their phone number?

21                 MR. KLEBANOW:  Objection.  You can answer.

22   A       Yes.

23   Q       Did you request an interview of Queen Miller as

24   part of your investigation?

25   A       Yes.

1    Q      Did she agree to have such an interview with you?

2    A      She refused to have an interview with me.

3    Q      Is that something that you take into account when

4    you're performing IA investigations, when the complaining

5    witness refuses to be interviewed?

6              MR. KLEBANOW:  Objection.  You can answer.

7    A      Yes.

8    Q      And as I understand it, Ms. Miller's complaint to

9    the police department regarding Officer Smith in this

10   matter was only verbal, correct?

11   A      That's correct.

12   Q      People who register complaints with the police

13   department, are they invited to reduce their complaint to

14   writing?

15   A      They are, sir, yes.

16   Q      And did Ms. Miller decline the invitation to put

17   her complaint in writing?

18   A      She never wrote out a complaint.

19   Q      And I presume you don't know the reason that she

20   didn't write out a complaint?

21             MR. KLEBANOW:  Objection.  You can answer.

22   A      I do not, sir.

23   Q      Are certain of the policies and procedures and

24   Codes of Ethics of the Shaker Heights Police Department

25   aspirational?

```
 1              MR. KLEBANOW:  Objection.  You can answer.
 2  A       Yes, they are.
 3  Q       And so as an organization, we're looking to hold
 4  ourselves out and hold ourselves to a higher standard of
 5  conduct than what might be the legal requirements for the
 6  average citizen, or even for a police officer?
 7  A       Yes, sir.
 8  Q       So when you gave answers like it would be -- and I
 9  think you said this a number of times -- it would be
10  unprofessional for Officer Smith to engage in a certain
11  piece of conduct that you were being asked about,
12  unprofessional doesn't equate to a constitutional
13  violation, correct?
14  A       It does not, sir.
15  Q       It doesn't equate to a violation of law of any
16  kind, correct?
17  A       It does not, sir.
18  Q       So I understand that you're not a person who is
19  doing traffic enforcement for Shaker Heights, right?
20  A       Thank God, sir.
21  Q       And it's probably been a long time, if ever, since
22  you did traffic enforcement.
23  A       That's correct, sir.
24  Q       All right.  Do you have an understanding of the
25  mechanisms related to the traffic side of the business,
```

1    the police department?

2    A      What do you mean by mechanisms, sir?

3    Q      So it's been suggested in the questioning that

4    Officer Smith solicited Ms. Miller for sex in exchange for

5    getting rid of the ticket.  You heard those questions?

6    A      Yes, sir, I did.

7    Q      All right.  So it's my understanding that tickets

8    have numbers on them that are sequential.

9    A      That's correct, sir.

10   Q      Do you know whether the officers are required to

11   account for all the tickets in the numbered sequence that

12   are issued to them?

13   A      They certainly are, sir.

14   Q      So a ticket in that numbered sequence, can an

15   officer simply make that numbered ticket disappear without

16   inquiry from the police department?

17   A      Absolutely not, sir.

18   Q      So this idea that once written, a police officer

19   can just make a ticket go away, without it being known

20   inside the department leading to inquiry, is a fallacy?

21   A      Yes, sir.

22   Q      And in fact, the ticket that was issued to

23   Ms. Miller was turned in and processed, to the best of

24   your knowledge?

25   A      Yes, sir.

1    Q      In your investigation, you found no indication that

2    Officer Smith -- and I understand your investigation is

3    ongoing, but as far as we know so far, he did not try to

4    take that ticket out of its normal chain of process?

5                    MR. KLEBANOW:  Objection.  You can answer.

6    A      I'm still investigating, sir.

7    Q      All right.  If a citizen is upset with an officer

8    on a call, they might ask the officer for information

9    about himself, correct?

10   A      That's correct.

11   Q      Who are you, what's your badge number, things like

12   that?

13   A      Yes, sir.

14   Q      They might ask, what's your phone number?

15   A      Yes, sir.

16   Q      I take it you are not the person who received

17   Ms. Miller's complaint on a face to face basis.  In other

18   words, did Ms. Miller's complaint regarding Officer Smith

19   come in to you directly at the police department, or was

20   it passed on to you from someone else who actually

21   received the complaint?

22   A      It was passed on to me, sir.

23   Q      Do you know who received the complaint as an

24   initial matter at the police department?

25   A      I believe the chief prosecuting attorney.

1    Q      And was it by way of a phone call?

2    A      I know that he received information from

3    Ms. Miller's counsel.  I don't know what means he received

4    it through.

5    Q      All right.  I take it even though you had a BA in

6    psychology -- correct, do I remember that right?

7    A      You're perfect, sir.

8    Q      -- that you're not a psychologist?

9    A      I am not a psychologist.

10   Q      And you wouldn't profess to know the science or

11   reliability behind the PRADCO pre-employment testing?

12   A      Not at all, sir.

13   Q      As a police officer, you've had the opportunity,

14   I'm sure, to question a number of people on a number of

15   occasions in all kinds of investigations, right?

16   A      Yes, sir.

17   Q      All right.  And in the process of police work, when

18   we're interviewing people, we're trying to come to

19   credibility determinations oftentimes, right?

20   A      Yes, sir.

21   Q      And there's certain indicia that we may use to try

22   and form opinions about whether someone is truthful or

23   not, correct?

24   A      Yes, sir.

25   Q      But you have no way of knowing, absent some

```
 1   physical corroborating evidence, whether someone is

 2   actually being truthful with you or not?

 3              MR. KLEBANOW:  Objection.  You can answer.

 4   Q      Correct?

 5   A      That's correct.

 6   Q      So when you were asked, was this person more

 7   credible or that person more credible, that could be your

 8   personal opinion, but this is not a statement of fact,

 9   correct?

10   A      That's correct.

11   Q      And that would be true with Celeste Rushin,

12   correct?

13   A      That's correct.

14   Q      It would be true with Officer Smith?

15   A      That's correct.

16   Q      And it would be true with Plaintiff Miller, if you

17   ever got an opportunity to speak to her?

18   A      That's correct.

19   Q      In the course of being in charge of IA

20   investigations and processing complaints against

21   policemen, is it a circumstance where people make

22   complaints against police officers that aren't well

23   founded?

24   A      Yes, sir.

25   Q      And on occasion, are people making those complaints
```

```
 1   based on their own motivations and -- I'll just leave it
 2   at that, on their own motivations.
 3             MR. KLEBANOW:  Objection.
 4   A      What do you mean by motivations, sir?
 5   Q      Well, a motive that, once you conducted the
 6   investigation, you conclude is separate and apart from
 7   merit in the allegation.
 8   A      Yes, sir.
 9   Q      In conducting an internal affairs investigation in
10   a circumstance like this, is the fact that the complaining
11   witness has a financial interest in the outcome of the
12   investigation something that you would take into account
13   in making your determination?
14             MR. KLEBANOW:  Objection.
15   A      I would definitely look into it.
16   Q      In fact, financial gain could be something that
17   would influence a person's truthfulness in an
18   investigation, correct?
19             MR. KLEBANOW:  Objection.  You can answer.
20   A      It could, sir.
21   Q      That's been known to happen in the course of human
22   history, correct?
23             MR. KLEBANOW:  Objection.
24   A      Yes, sir.
25   Q      The passage of time between when an alleged
```

1    impropriety by a policeman occurs and when it's brought to

2    the attention of the police department, does that factor

3    into your calculus as to someone's credibility with

4    respect to the strength of their allegation against the

5    officer?

6    A      It's definitely something I have to evaluate.

7    Q      And in this instance, there was, I think, about a

8    five month lapse between the time of the event and the

9    time of the report.

10   A      I believe that's fair, sir.

11   Q      So with respect to this inference that Officer

12   Smith is weak in decision-making, you're not in a position

13   to make a personal judgment about that, are you?

14   A      I am not, sir.

15   Q      And with respect to his judgment as a police

16   officer, are you in a position to make an opinion about

17   that?

18   A      No, sir, I'm not.

19          MR. McLANDRICH:  Thank you.  That's all I

20          have.

21          MR. KLEBANOW:  I have a few follow-up

22          questions real quick.

23                    RECROSS EXAMINATION

24   BY MR. KLEBANOW:

25   Q      Mr. McLandrich just asked you a number of questions

1    about the process of once a ticket comes in, how it goes

2    through the chain of command.  Is it possible that the

3    public wouldn't be aware of how chain of command works

4    with a ticket?

5            MR. STRANG:  Objection.

6    A      Yes.

7    Q      Mr. McLandrich also asked you if simply because you

8    have a violation of a policy, it may not be a violation of

9    law or the Constitution, right?  Do you remember him

10   asking you that question?

11   A      Yes.

12   Q      And you had indicated that it might not be, right?

13   A      Yes.

14   Q      It's also possible that it is, correct?  That you

15   could have both a violation of policy and a violation of

16   law and the Constitution?

17   A      Yes.

18   Q      Simply because somebody doesn't report an instance

19   of misconduct by a police officer doesn't mean it didn't

20   happen, right?

21   A      Yes.

22   Q      So it's possible that somebody doesn't report, your

23   office would find out about it, and you would still

24   investigate it if you thought there was a chance something

25   happened that wasn't proper?

1    A     We are compelled to even investigate anonymous

2    complaints.

3    Q     Or no complaint at all, if you found out about

4    something, correct?

5    A     Yes.

6    Q     In your police career and investigator experience,

7    have you ever seen a witness be scared?

8    A     Yes.

9    Q     Have you ever seen them be scared of a police

10   officer?

11   A     Yes.

12   Q     Have you ever seen a witness be scared to report?

13   A     Yes.

14   Q     Have you ever seen a witness be intimidated after

15   reporting?

16   A     Yes.

17              MR. KLEBANOW:  That's all I have.

18              MR. McLANDRICH:  I have a couple of questions.

19                    RECROSS EXAMINATION

20   BY MR. McLANDRICH:

21   Q     With respect to this Dear Chief document that was

22   Exhibit 3, is it routine for officers to carry firearms

23   off duty?

24   A     Yes.  They do need permission, though, sir.

25   Q     Right.  So what this is, is an approval by the

1    Chief for this particular firearm to be carried by this

2    particular officer?

3    A      Yes, sir.

4    Q      And part of it is not only approval to care a gun,

5    but to make sure that it's an appropriate weapon, it's in

6    good working order, he's familiar with it, that sort of

7    thing?

8    A      Yes, sir.

9    Q      So with respect to this issue of people being

10   nervous and afraid of police officers, and so forth, and

11   so on, different officers have different styles, right?

12   A      Well said, sir.

13   Q      And some are more of a Joe Friday, very direct,

14   blunt, nothing but the facts, ma'am, sort of guy, right?

15   A      I have to admit my age, but you are absolutely

16   correct, sir.

17   Q      And I thought I would shorthand that for us old

18   timers.

19          Then there's other officers that are very

20   conversational with people, try to be very gregarious,

21   friendly, outgoing, right?

22   A      Yes.

23   Q      And sometimes they'll do that in an effort to quell

24   those sorts of fears and concerns that people might have

25   about police officers, right?

1   A       Yes.

2   Q       And that would include when they're out interacting

3   with the public on something like a traffic stop?

4   A       Yes.

5   Q       So they may exchange a little banter, that isn't

6   directly related to the traffic stop, in an effort to make

7   the stop something less intimidating.

8   A       Yes.

9               MR. McLANDRICH:  Thank you.

10              MR. KLEBANOW:  I'm done.

11              MR. STRANG:  We'll read the transcript.

12                          -  -  -

13                  (DEPOSITION CONCLUDED)

14                          -  -  -

15              _____

16              COMMANDER JOHN COLE

17

18

19

20

21

22

23

24

25

**MORSE,  GANTVERG & HODGE**

```
1                        CERTIFICATE
2  State of Ohio,        )
                         )  SS:
3  County of Cuyahoga.   )

4          I, Ivy J. Gantverg, Registered Professional

5  Reporter and Notary Public in and for the State of Ohio,

6  duly commissioned and qualified, do hereby certify that

7  the above-named COMMANDER JOHN COLE, was by me first duly

8  sworn to testify to the truth, the whole truth, and

9  nothing but the truth in the cause aforesaid; that the

10 deposition as above set forth was reduced to writing by me

11 by means of stenotype, and was later transcribed into

12 typewriting under my direction by computer-aided

13 transcription; that I am not a relative or attorney of

14 either party or otherwise interested in the event of this

15 action.

16         IN WITNESS WHEREOF, I have hereunto set my hand and

17 seal of office at Cleveland, Ohio, this 2nd day of

18 December, 2019.

19

20

21         _____
           Ivy J. Gantverg, Notary Public
22         in and for the State of Ohio,
           Registered Professional Reporter.
23         My Commission Expires November 5, 2023.

24

25
```

**MORSE, GANTVERG & HODGE**